# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       Plaintiff,

       v.                                  Case No. 5:18-CR-40058-HLT

THOMAS FRITZEL,

       Defendant.

## MEMORANDUM AND ORDER

A jury convicted Defendant Thomas Fritzel on three Clean Air Act violations following a five-day trial: failure to notify of intent to demolish or renovate prior to removing regulated asbestos-containing material ("RACM"), failure to adequately wet RACM, and failure to contain RACM in a leak-tight wrapping or container.[1] Doc. 133. Fritzel now seeks a new trial under Federal Rule of Criminal Procedure 33. Doc. 137. For the reasons discussed below, the Court denies Fritzel's motion.

## I.      BACKGROUND

The government originally indicted Fritzel along with three others—Casey Stewart, Wesley Lynch, and Tucker Fritzel (Fritzel's son, referred to here as Tucker). Doc. 1. The indictment alleged four counts against all the defendants—the three counts that Fritzel was ultimately convicted of and a conspiracy charge. *Id.* at 9-11. Two days before trial started, the government dismissed Fritzel's co-defendants, along with the conspiracy charge. Docs. 108, 113. Fritzel alone proceeded to trial on the remaining three counts.

---

[1]   All counts are violations of different subsections of 42 U.S.C. § 7413.

At trial, the government presented testimony from an individual who observed demolition at the Alvamar Country Club, officials from the Kansas Department of Health & Environment ("KDHE") who visited the site and took samples, individuals from an asbestos-testing company who tested those samples, asbestos-remediation contractors, and landfill employees. Fritzel put on testimony by individuals who took drone photographs of the renovation project, as well as Fritzel's employee, architect, and attorney. The trial lasted five days. During the course of the trial, the Court issued two written orders on evidentiary matters, including one on expert disclosures (Doc. 121) and the other on testimony by Richard Herries (Doc. 130).

At the close of the government's case, and again at the close of all evidence, Fritzel moved for a judgment of acquittal. Doc. 124. The Court took the motions under advisement and ultimately denied them. Doc. 136. Fritzel has now moved for a new trial. Doc. 137.

## II.     STANDARD

Federal Rule of Criminal Procedure 33(a) states that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." A motion for new trial is within the Court's discretion. *See United States v. Jordan*, 806 F.3d 1244, 1252 (10th Cir. 2015). Fritzel has the burden of establishing the need for a new trial. *See United States v. Walters*, 89 F. Supp. 2d 1206, 1213 (D. Kan. 2000).

The standard for granting a new trial is not as strict as it is in a motion for acquittal. *United States v. Stiner*, 765 F. Supp. 663, 664 (D. Kan. 1991). The Tenth Circuit has counseled that, "if after weighing the evidence and the credibility of the witnesses, the court determines that 'the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred,'" a new trial may be appropriate. *United States v. Gabaldon*, 91 F.3d 91, 93-94 (10th Cir. 1996) (quoting *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994)). More specifically,

any error that would be sufficient to cause a reversal on appeal is sufficient to grant a new trial under Rule 33. *Walters*, 89 F. Supp. 2d at 1213.

But the Court should not grant a new trial simply because it feels a different result would be more reasonable. *United States v. Yoakam*, 168 F.R.D. 41, 44 (D. Kan. 1996). A motion for a new trial "is not regarded with favor and should be granted only with great caution." *United States v. Custodio*, 141 F.3d 965, 966 (10th Cir. 1998) (quoting *United States v. Stevens*, 978 F.2d 565, 570 (10th Cir. 1992)).

## III.    ANALYSIS

Fritzel's motion is based on five arguments: the government failed to prove each element of every count beyond a reasonable doubt; the government elicited improper testimony from Richard Herries; the Court allowed improper expert testimony; the government filed the indictment to put pressure on Fritzel in an unrelated case; and the government engaged in prosecutorial misconduct. Doc. 137 at 1. For the reasons stated below, the Court concludes none of these arguments, singularly or in combination, warrant a new trial.

### A.    The government presented sufficient evidence of friability and knowledge on each count.

Fritzel's first argument for a new trial is that the government presented insufficient evidence of friability and insufficient evidence that Fritzel had knowledge of the alleged NESHAP[2] violations for which he was convicted. Although the standard is more lenient in a motion for new trial, these arguments are identical to those raised in Fritzel's motions for judgment of acquittal, which he incorporates by reference, Doc. 124, and which the Court previously denied, Doc. 136.

---

[2]    National Emission Standards for Hazardous Air Pollution.

### 1.    The government presented evidence of friability.

Fritzel argues there was insufficient evidence that the material sampled was friable. Doc. 137 at 3. The charges against Fritzel related to "regulated asbestos-containing material," or RACM. *See* Doc. 132 at 31-36. The jury instructions defined RACM as, in part, friable asbestos. *Id.* at 25. "'Friable asbestos material' means any material containing more than 1 percent asbestos . . . that, when dry, can be crumbled, pulverized, or reduced to powder by hand pressure." *Id.*

As the Court previously found, the government presented sufficient evidence that the material at issue was friable asbestos. During its case-in-chief, the government presented testimony by Philip Schlaman with KDHE. He testified that he took a sample of material from the site on October 13, 2016, which he described as white, pliable, and not very stiff. Tr. at 283:4-19. Schlaman also discussed photographs from that visit depicting the demolition work, debris piles, and dumpsters (photographs admitted as Exhibit 17), testified about a video that depicted him using his hand to tear off a sample of the material (video admitted as Exhibit 1049B), and further testified that the sample subsequently tested positive for chrysotile (test results admitted as Exhibit 21). Although he noted that chrysotile does not necessarily mean friable, he testified that in this case, the material that contained the chrysotile "is friable." Tr. at 305:23-306:3.

The government also presented testimony from Scott Mesler, who initially reported the suspected violation to Schlaman. Mesler, a roofer by trade, testified that the asbestos in the Alvamar Country Club roof was a friable type called Nicolite felt, and described it as being "soft," "like a plaster form," and "mushy." Tr. at 260:14-261:6.

The government also called Adrian Turner, an accredited asbestos inspector. Tr. at 489:16-18. Turner testified that he collected samples from the site (including the dumpsters) in October 2016 and those samples tested positive for friable asbestos. Tr. at 484:4-485:10; 478:21-479:2 (test

results admitted as Exhibit 1060). Turner specifically testified that the asbestos was friable because it was capable of being crushed by slight hand pressure. Tr. at 484:25-485:5. Tina Gustafson and Tami Van also testified for the government, and each woman presented evidence relevant to this issue.

Fritzel argues that because the government offered no witnesses who testified "that he or she had crumbled, pulverized or reduced any sample by hand pressure," there is insufficient evidence of friability. Doc. 137 at 3. Fritzel argues that the witnesses who testified about friability only assumed that was the case but did not state how they reached that conclusion or that they "performed a friability test." *Id.* The Court disagrees with that characterization. The Court also notes that Fritzel cites no authority stating that friability can only be determined through the testimony of a witness who personally "crumbled, pulverized or reduced any sample by hand pressure." Questions about how a witness arrived at the conclusion of friability are questions of foundation, not sufficiency. The Court notes that Fritzel never raised any foundational objection to any of the testimony cited above or cross-examined any witness about his or her testimony on this issue. Based on this, the Court concludes the government presented sufficient evidence for the jury to conclude that the asbestos from the Alvamar roof was friable, and thus qualified as RACM.[3]

### 2. The government presented sufficient evidence of Fritzel's knowledge.

Fritzel also argues that the government failed to establish that he had knowledge of the NESHAP violations because no witnesses testified that Fritzel was present at the demolition site or that he directed individuals who were present. Doc. 137 at 4. Fritzel also raised this argument in his motions for acquittal, Doc. 124 at 3-5, which the Court rejected, Doc. 136 at 1-4.

---

[3] The government alternatively suggests, as it did in closing, that there was also evidence that the material was non-friable asbestos that had a high probability of becoming crumbled, pulverized, or reduced to power through acts of demolition—another category of RACM. *See* Doc. 132 at 25. Because there was sufficient evidence that the material was friable asbestos, the Court need not reach that argument.

As explained in the prior order denying the motions for judgment of acquittal, the Court finds that the government presented sufficient evidence of Fritzel's knowledge. Specifically, there was ample evidence that Fritzel was aware there was asbestos in the clubhouse roof. John (Jay) Patterson testified he had a sample of the roof tested in 2008 and that the sample tested positive for asbestos (test results admitted as Exhibit 3). He further testified that he gave a copy of the 2008 test results to Wes Lynch in 2016 and that he understood Lynch to be the general manager of the Jayhawk Club. Tr. at 226:11-22. Richard Herries testified that he sent an email to Fritzel in 2016 (email admitted as Exhibit 10) stating that the roof contained asbestos. Tr. at 402:1-22. Schlaman testified that during his first site visit, he said work needed to stop, and he then followed up with a telephone message and emails to Fritzel stating there was an "asbestos problem" (emails admitted as Exhibits 19 and 1066). Tr. at 287:25-289:17. Schlaman also testified that he and Gustafson met with Fritzel after getting the 2016 positive test results (meeting notes admitted as Exhibit 22). Tr. at 310:21-311:14.

The asbestos found at the job site was later determined to be friable asbestos containing at least 75% chrysotile (Van and Turner test results admitted as Exhibits 21 and 1060). Fritzel argues that the government was required to show that he had knowledge that it was specifically RACM (meaning material containing more than 1% friable asbestos) in the roof, rather than just generic knowledge that there was asbestos. Doc. 140 at 4-6. But he offers no support for that contention. Further, the government cites *United States v. Weintraub* to specifically dispute that argument. In *Weintraub*, the Second Circuit held that "the government need only prove that the defendant knew that the substance involved in the alleged violations was asbestos; it need not establish the defendant's knowledge that the conduct . . . involved the kind and quantity of asbestos sufficient to trigger the asbestos work-practice standard." *United States v. Weintraub*, 273 F.3d 139, 151 (2d

Cir. 2001); *see also United States v. Buckley*, 934 F.2d 84, 88-89 (6th Cir. 1991) ("Because of the very nature of asbestos and other hazardous substances, individuals dealing with them have constitutionally adequate notice that they may incur criminal liability for emissions-related actions."). Fritzel states that he "takes issue with the legal conclusions reached by the courts in *Weintraub* and *Buckley*," Doc. 140 at 5, but cites no authority that squarely contravenes those holdings. As the court stated in *Weintraub*, all that is required is "knowledge of facts and attendant circumstances that comprise a violation of the statute, not specific knowledge that one's conduct is illegal." *Weintraub*, 273 F.3d at 147. That standard was met here, as there was sufficient evidence to show that Fritzel, as owner and operator, knowingly failed to seek prior approval before removing the asbestos, failed to adequately wet the friable asbestos, and failed to properly dispose of it.

The Court further finds there was sufficient evidence of the charged violations. Schlaman testified that KDHE did not receive a form about the demolition project. Tr. at 275:16-276:15. Gustafson likewise authored the KDHE report (report admitted as Exhibit 23), which notes that the clubhouse roof was removed and disposed of at "Hamm's landfill . . . without permitting or proper disposal of potential asbestos containing material."[4] Videos and photos of the site also permit a fair inference that the material in question was not kept wet. Schlaman and Gustafson also testified about their return visit to the site, where they noted the removal of debris, including the

---

[4]  Fritzel contends that the government was required to prove lack of notice to the EPA, not KDHE. But as the government points out, EPA authority has been delegated to the State of Kansas for purposes of enforcing NESHAP regulations. *See* Delegation of Authority to the States of Iowa; Kansas; Missouri; Nebraska; Lincoln-Lancaster County, NE; and City of Omaha, NE, for New Source Performance Standards (NSPS), National Emission Standards for Hazardous Air Pollutants (NESHAP) Including Maximum Achievable Control Technology (MACT) Standards, 83 F.R. 25382-01 (June 1, 2018) (stating delegation authority to the State of Kansas for asbestos regulations as of July 1, 2010). Fritzel responds that, because 40 C.F.R. § 61.02 defines "Administrator" as "the Administrator of the Environmental Protection Agency or his authorized representative," then the government was required to prove that neither entity was notified. Doc. 140 at 7. But Fritzel cites no authority for this interpretation. Nor is it logical that the EPA would require reporting to it where it has delegated authority to KDHE.

pile the sample had been taken from, and the movement of dumpsters. Tr. at 302:20-304:19; 380:22-381:19. Their testimony was supported by photographs and video taken during this visit (photographs admitted as Exhibit 17; videos admitted as Exhibits 18 and 1049C). And the government also presented the testimony of Angie Higgins and introduced as exhibits tickets and invoices from Hamm Sanitary Landfill where dumpsters from the site were dumped following KDHE's initial visit to the job site (admitted as Amended Exhibits 15 and 16).

In sum, the Court again finds there was sufficient evidence as to both friability and knowledge on all counts. The Court is mindful that in a motion for new trial, it may weigh the evidence and the credibility of the witnesses to determine whether a miscarriage of justice occurred. *See Gabaldon*, 91 F.3d at 93-94; *see also* Doc. 136 at 1-2. But even considering credibility, the Court does not conclude that the weight of evidence was against conviction. Accordingly, the Court denies Fritzel's motion for a new trial based on insufficient evidence.

**B.      Richard Herries's testimony was not improper.**

Fritzel's next argument for a new trial was also the subject of considerable discussion between the parties and the Court, as well as an order memorializing the dispute and the Court's ruling. *See* Doc. 130. It focuses on testimony by Richard Herries.

In his motion for a new trial, Fritzel argues that he initially "briefed and lost" a limine motion to exclude some emails sent by Herries, and accordingly did not object to admission of the emails during the trial because the government was only offering them to show that Fritzel had notice that the roof had asbestos—not that the roof actually had asbestos. Doc. 137 at 5. Fritzel claims that the government then "sought to elicit additional testimony from Mr. Herries during direct examination that greatly exceeded the scope of a conversation he had with Wes Lynch related to the emails." *Id.* Fritzel now seeks a new trial on the grounds that Herries's testimony

went beyond notice and into the truth of the matter asserted. *See id.* at 5-6. Fritzel also claims that he was "greatly prejudiced" by Herries's testimony that Fritzel had an adverse reaction to the emails. *Id.* at 6. Fritzel claims that the Court later concluded that the prejudicial value of the testimony outweighed its probative value and prohibited the government from referencing the testimony in closing. *Id.* at 7.

Some clarification is warranted. This issue involves two separate pieces of evidence: first, emails sent by Herries to, among others, Fritzel stating that the clubhouse roof had asbestos; and second, a conversation Herries had with Lynch about the emails where Lynch allegedly relayed a message from Fritzel that Herries ought not put such information in emails. The Court analyzes these separate pieces of evidence independently.

Before trial, Fritzel filed a motion in limine to exclude the emails on grounds that they were hearsay and risked unfair prejudice. The government contended it was not offering the emails to show that there was asbestos in the roof (the truth of the matter asserted in the emails), but only to show that Fritzel had notice of the possibility that there was asbestos in the roof (a non-hearsay purpose). The Court took the motion in limine regarding the emails under advisement. But when the government sought to admit the emails at trial, Fritzel's counsel stated that he had "reconsidered" and now had no objection to the emails. Tr. at 399:5-10 (first email); 402:1-5 (second email).

The conversation was not the subject of any motion in limine. Although the indictment references the conversation, Doc. 1 at 7, neither party brought it to the Court's attention as a possible point of contention. Fritzel did not raise any objection to admission of the conversation until the government asked Herries if he knew whether Fritzel actually received the emails. At that point, the following exchange took place:

Q.     Okay. Did you get any confirmation back from anyone that confirmed that Mr. Wes Lynch and Mr. Fritzel received this e-mail?

A.     Yes. I talked to Mr. Lynch. I got called up into his office and he brought it up on his computer and--

          THE COURT: Could the parties approach, please.

               (THEREUPON, a bench conference was had out of the hearing of the jury and the defendant).

          MR. NOVAK: Here's the objection: To what Mr. Lynch said to him and what he said to Mr. Lynch back in March of 2016.

          MR. HATHAWAY: It's not being offered to prove the truth of the matter asserted that what information was contained in there is correct. It's just been offered as notice that they did receive the information.

          MR. NOVAK: The information that they received is about asbestos. What the jury is going to hear is that Mr.-- he told Mr. Lynch that there was asbestos in the roof. And that's what he wants-- that's what the government wants the jury to hear. And that's what they're going to hear.

          THE COURT: I'm going to overrule the objection. I think it's-- I don't think it's being offered for the truth of the matter asserted. They're not offering it to show that there's asbestos in the roof; they're offering it for notice.

          MR. HATHAWAY: Thank you, Your Honor.

               (THEREUPON, the following proceedings were had in the presence and hearing of the jury and the defendant).

Q.     (By Mr. Hathaway) Mr. Herries, carry on with your discourse. What was said to you?

A.     So I got called back up into-- or I got called into Wes' office and he brought up on the computer the e-mail. And he told me to not ever do that again. Don't ever put anything like this in writing. No text messages or anything. If there's something that's needs to be-- that's an important matter, that we talk about it in person or a phone call.

> Q. Did he say where that concern came from?
>
> A. He told me that Mr. Fritzel explained to him that he did not want me to ever do that again and that it was his job to tell me.

Tr. at 402:23-404:25. Although Fritzel's counsel initially objected to "what Mr. Lynch said to him and what he said to Mr. Lynch back in March of 2016," when asked to elaborate, he objected only that the government was offering the conversation to show that the roof had asbestos. *See* Tr. 403:9-22 ("What the jury is going to hear is that Mr.-- he told Mr. Lynch that there was asbestos in the roof."). Because that was not the truth of the matter asserted in the <u>conversation</u>, and because the government was offering the conversation only to show that Fritzel indeed received the email,[5] the Court overruled Fritzel's hearsay objection to admission of the conversation. Fritzel did not make any further objections and did not argue at the time that the conversation was unduly prejudicial.

The next morning, after Herries had testified and been excused (when the government no longer had the opportunity to rephrase any questions), Fritzel asked the Court to strike all of Herries's testimony on grounds that it contained hearsay, that Herries's response to the government's question went beyond the scope of the question, and that Herries's testimony about his conversation with Lynch was unduly prejudicial under Rule 403. The Court heard arguments and took the weekend recess to review the record before ruling.

The following Monday, after reviewing the record and trial briefs filed by the parties over the weekend, *see* Docs. 125, 127, the Court questioned Fritzel's counsel as to whether Fritzel still contested actually receiving the emails. Fritzel had previously suggested as much. Doc. 93 at 3-4

---

[5] As discussed further below, Fritzel previously disputed whether he received the emails. Doc. 93 at 3-4 (stating that "Mr. Fritzel does not recall ever seeing these emails" and that an email being sent does not "provide proof that the recipient ever received or read the email").

(stating that "Mr. Fritzel does not recall ever seeing these emails" and that an email being sent does not "provide proof that the recipient ever received or read the email").[6] The Court needed clarification on that point because Rule 403 does not prohibit admission of evidence just because it is prejudicial, but only evidence whose "probative value is substantially outweighed by a danger of . . . unfair prejudice." If Fritzel contested receiving the emails, that made the probative value of the conversation much higher to the extent the government was offering it for the non-hearsay purpose of showing that Fritzel actually saw the emails. *See* Tr. at 594:21-595:11.

Fritzel's counsel stated that he would not make the argument that Fritzel did not see the emails. Tr. at 598:11-599:15; 605:5-13. In light of that assurance—made for the first time on the Monday following Herries's testimony on the previous Thursday—the Court concluded that the probative value of the conversation was now less than it had previously been at the time of Herries's testimony. *See* Tr. at 605:25-606:5; Doc. 130 at 5. Although there was still a non-hearsay purpose to the conversation (to show that Fritzel had seen the emails), the Court concluded that the Rule 403 balancing now tipped toward prejudice because the probative value of the conversation was diminished. *See* Tr. at 603:9-604:4; *see also* Doc. 130 at 4-6. Accordingly, the Court struck the portion of the testimony quoted above, starting with the objection. Tr. at 606:5-11; Doc. 130 at 5. The Court offered to give a limiting instruction but Fritzel's counsel specifically declined, provided the government did not reference the testimony in closing. Tr. at 606:22-607:3; Doc. 130 at 6.

Fritzel now argues for a new trial on grounds that Herries's testimony about the conversation was hearsay and unfairly prejudicial. The Court disagrees that the testimony was

---

[6]  In other words, although Fritzel did not contest that Herries sent the emails, Fritzel seemed to be reserving the argument that he never actually saw or read the emails, which would diffuse their usefulness to the government as a source of notice. This is what makes the conversation a probative piece of evidence because it demonstrates that Fritzel did indeed see the emails—he would not have made comments about them otherwise.

hearsay. An out-of-court statement is only hearsay if offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c)(2). But the government did not offer the conversation for the truth of the matter asserted (that Fritzel did not want Herries to put such information in an email). It was offered to show that Fritzel actually read the email.[7] *See United States v. Lewis*, 594 F.3d 1270, 1282 (10th Cir. 2010) ("It is essential to understand that 'the matter asserted' is the fact being asserted by the declarant in uttering the statement. That is not necessarily the matter that the party offering the statement into evidence is trying to prove with the statement."). That makes it not hearsay.

The Court also disagrees that this testimony was so prejudicial to Fritzel to warrant a new trial. First, at the time Herries testified about the conversation, Fritzel made no Rule 403 objection. The only contemporaneous objection was hearsay, which the Court overruled. Fritzel made no claim of prejudice at all until the following day. The Court declines to grant a new trial based on admission of evidence for which there was no error and to which Fritzel failed to timely object. *See United States v. Hill*, 60 F.3d 672, 675 (10th Cir. 1995) (stating that in the absence of a contemporaneous objection, the admission of evidence is reviewed for plain error and reversal will only be appropriate if "the underlying fairness of the entire trial in doubt"); *see also United States v. Madsen*, 614 F. App'x 944, 949-50 (10th Cir. 2015) ("Where a litigant has the ability to alert the trial court to possible errors in time for the court to change course and rectify them and the litigant fails to do so . . . ordinarily we will conclude that the alleged error has not been preserved.").

---

[7] Fritzel's statement to Lynch is not hearsay because it is a statement by a party and was being offered by an opposing party. *See* Fed. R. Evid. 801(d)(2)(A).

Second, although the Court ultimately ruled that the prejudicial value of the testimony outweighed the probative value, that was only <u>after</u> Fritzel stipulated to a fact that negated the conversation's probative value. Until that stipulation, the Court had specifically found that the probative value of the conversation weighed heavier than any prejudice. Thus, the decision to strike the testimony was based more on the diminished probative value than it was on any potential prejudice. Doc. 130 at 4-6. And even considering the testimony purely for its prejudicial value, the Court does not view the testimony to be so inherently prejudicial to warrant a new trial. It was an isolated and fairly tame remark made once in a non-animated manner and that was largely unrelated to the ultimate issue in the case. *See Hill*, 60 F.3d at 675 (stating that an isolated remark must be considered in the context of the entire trial and reversing only where the evidence "placed the underlying fairness of the entire trial in doubt").

Third, the Court offered to instruct the jury to not consider Herries's testimony about the conversation, but Fritzel declined. Tr. at 606:22-607:3. Instead, Fritzel requested that the Court instruct the government to not mention the conversation in closing, which the Court did. Doc. 130 at 6.[8] Based on this, the Court denies the request for a new trial.

### C. The admission of the testimony of Van, Turner, and Schlaman does not warrant a new trial.

Fritzel next argues that three witnesses offered impermissible expert testimony: Tami Van, Adrian Turner, and Phillip Schlaman. Doc. 137 at 7-9. This issue was the subject of a motion in limine (Doc. 91), two limine conferences (Docs. 107 and 119), and an order issued at the start of trial (Doc. 121).

---

[8]   Fritzel argues in his motion that there was no way for him to counter this testimony without testifying himself. Doc. 137 at 7. However, he could have called Lynch.

### 1.     Tami Van

In his motion for a new trial, Fritzel claims that Van was not "qualified as an expert," that her testimony was not appropriate lay testimony because her analysis required specialized training, and the government failed to give advance notice that it was calling her as an expert. Doc. 137 at 7-9.

As the Court previously held, it disagrees that Van's testimony was entirely expert in nature, given her role in testing the roof sample at issue. Van was responsible for testing the specific roof sample relied on by the government, and it is the Court's view that she was able to testify about her receipt of the sample, what she did with it, and what results she observed, all without crossing into expert territory. Such testimony based on her first-hand observations does not necessarily cross into the sphere of expert opinion addressed in Federal Rule of Evidence 702. At the very least, Van was an appropriate witness to lay a foundation for her written findings.

Even if the Court accepted that Van's testimony was expert in nature, the Court disagrees that its inclusion requires a new trial. The Court notes that Fritzel has never raised any argument about Van's actual qualifications to testify about the asbestos testing she conducted (i.e. her training, qualifications, or expertise). Rather, Fritzel has only challenged her testimony on grounds that the government did not timely disclose Van as an expert under Federal Rule of Criminal Procedure 16 and the Court's scheduling order. *See* Docs. 91, 110.[9]

But the Court previously considered—and rejected—Fritzel's argument that the Court should exclude Van because of that late disclosure. Doc. 121 at 3-7. Specially, the Court found no bad faith in the government's actions and found that any prejudice to Fritzel was minimal considering that the government disclosed both Van's identity and her lab report to Fritzel months

---

[9]    The history of the government's expert disclosures in this case is set forth in Doc. 121 at 2-3.

before trial. Nevertheless, Fritzel was also offered—and specifically declined—a continuance.[10] As an alternative, the Court offered to prohibit Van from testifying until at least the third day of trial to allow Fritzel's counsel additional time to prepare for her testimony. Fritzel's counsel accepted and noted that would "alleviate the prejudice." Tr. at 6:13-7:19. Based on this, the Court finds no basis to grant a new trial based on Van's testimony.

### 2. Adrian Turner

Fritzel briefly argues that Turner also "was not qualified as an expert (and provided no testimony regarding any testing he did on friability)," and thus a new trial is necessary to exclude his testimony. Doc. 137 at 9. Again, as with Van, Fritzel has never challenged Turner's actual qualifications. Nor is it clear what grounds he would have to make such a challenge, as Turner is an accredited asbestos inspector. Tr. at 489:16-18. To the extent Fritzel is arguing that the Court should have excluded Turner because of the government's late expert disclosures, the Court rejects that argument for the same reason it rejects that claim as to Van. Further, the Court notes that Fritzel <u>never</u> objected to any of Turner's testimony. Based on this, the Court finds no grounds to grant a new trial on this issue.

### 3. Philip Schlaman

Fritzel admits that Schlaman was qualified as an expert, but he argues that Schlaman did not provide any support for his claim that the material at issue was friable. As the Court noted above, Fritzel has come forward with no authority suggesting that friability must be supported with "scientific testing." To the extent Fritzel sought to challenge the foundation of Schlaman's

---

[10] In his reply, Fritzel argues that any errors involving expert disclosure cannot be cured with a continuance because "a continuance is an ineffective deterrent to prosecutorial misconduct." Doc. 140 at 9. The Court separately addresses Fritzel's claim of prosecutorial misconduct below. But the Court notes that use of a continuance to cure any prejudice associated with a delay in expert disclosures under Federal Rule of Criminal Procedure 16 is specifically contemplated by the Tenth Circuit. *See United States v. Yepa*, 608 F. App'x 672, 677-78 (10th Cir. 2015) (citing *United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988)).

testimony about friability, he was free to do so. But he has not set forth any grounds for a new trial based on Schlaman's testimony.

> **D.** **Fritzel cites no support for his claim that the government filed the indictment to put pressure on him in an unrelated case.**

Fritzel also moves for a new trial because he believes the government filed the indictment in this case against Fritzel and his co-defendants (who included his son and nephew) to pressure Fritzel to plead guilty in an unrelated case. Doc. 137 at 10. But even if this were true, it is unclear how a new trial in this case would rectify that claim. The Court also notes that Fritzel offers nothing in support of this claim other than conclusory allegations. While it is true that the government dismissed Fritzel's co-defendants on the eve of trial, Fritzel has pointed to nothing that suggests the indictment in this case was improper. The Court also notes that a grand jury returned the indictment after finding probable cause to believe that the crimes charged had been committed. *See* Doc. 1. Based on this, the Court denies Fritzel's motion for a new trial on this issue.

> **E.** **Fritzel has not established any prosecutorial misconduct.**

Whether to grant a new trial based on alleged prosecutorial misconduct is within the discretion of the Court. *See Gabaldon*, 91 F.3d at 93-94. If prosecutorial misconduct deprives a defendant of a fair trial and due process, a new trial is appropriate. *Id.* at 93. A motion for a new trial based on prosecutorial misconduct "call[s] for an examination of the prejudicial impact of an error or errors when viewed in the context of an entire case." *Id.* at 94. To be prejudicial to the defendant, any prosecutorial misconduct "must have been substantial enough to influence the jury's verdict." *Yoakam*, 168 F.R.D. at 45. Where the defense did not object to the prosecutor's comments, a defendant must demonstrate that the misconduct rises to the level of plain error to justify a new trial. *Id.* at 45 n.2.

Fritzel identifies five instances of alleged prosecutorial misconduct: (1) the government's representations regarding expert disclosures; (2) the government's reference to a dismissed co-defendant as a "bartender;" (3) the government's closing argument that misstated the jury instructions; (4) the government's comments regarding the hazards of asbestos; and (5) the prosecutor's comments about his personal life and health. Doc. 137 at 11-14.

### 1. The government's representations regarding expert disclosures did not influence the jury's verdict.

Fritzel's first claim of prosecutorial misconduct is based on a February 2019 expert-disclosure letter that the prosecutor claimed he sent to defense counsel. *See* Doc. 137 at 11. The government attached the letter to a supplemental response to a motion in limine regarding expert testimony and represented it as disclosures that were sent to defense counsel. *See* Doc. 101 at 8; *see also* Doc. 101-2. Fritzel's counsel had no record of receiving it and pointed out that certain characteristics of the letter (the lack of letterhead, highlighting, and missing Bates numbers) suggested the attached version was just a draft.

Although the Court notes that the government has never responded to inquiries by either defense counsel or the Court about whether it actually sent the February 2019 letter, *see* Doc. 121 at 3 n.3,[11] the Court does not agree that this warrants a new trial. First, none of this conduct occurred in front of the jury—the trial had not even begun. Thus, even if there was misconduct, it would not have influenced the jury's verdict. *See Yoakam*, 168 F.R.D. at 45. Second, to the extent Fritzel claims the government's conduct was an "attempt to confuse the Defendant on the Government's theory of the case and how to best defend himself," Doc. 137 at 11, the Court notes that that the Court offered to prevent the government from calling any of the late-disclosed expert

---

[11] The government does not squarely address whether the letter was ever sent in its response to the motion for new trial either. The Court remains concerned about the government's apparent lack of concern regarding whether it made an inaccurate representation to the Court and notes that it expects more.

witnesses until the third day of trial to ensure Fritzel's counsel had ample time to prepare for their testimony, which Fritzel's counsel conceded would "alleviate the prejudice." Tr. at 6:17-7:19.[12] Accordingly, the Court finds no grounds for a new trial based on the confusion surrounding the government's expert disclosures.

### 2. The government's reference to a dismissed co-defendant as a "bartender" was not misconduct.

Fritzel's next claim of prosecutorial misconduct is that the prosecutor twice referred to dismissed co-defendant Tucker Fritzel as a "bartender," which, according to Fritzel, was an "effort to discredit the asbestos sample he took." Doc. 137 at 11.[13] In the context of a motion for new trial based on prosecutorial misconduct, the first step is determining whether the conduct was improper. *United States v. Gordon*, 173 F.3d 761, 769 (10th Cir. 1999). Here, Fritzel has not established how the comment about Tucker being a bartender was improper.

The Court did instruct the jury "to disregard the statement about Tucker Fritzel's employment." Tr. at 318:20-24. But the original objection focused on the way in which the prosecutor asked the question, not the reference to Tucker being a bartender. Tr. at 316:2-6.[14] The prosecutor then withdrew the remark. Tr. at 316:7. When defense counsel then asked that the Court

---

[12] The Court notes that none of the disputed expert witnesses were surprise witnesses. Fritzel included Van and Schlaman on his own witness list, Doc. 87 at 2, and he included an interview with Turner on his exhibit list, *id.* at 8 (Def. Ex. 1131). So Fritzel was well-aware of all three individuals. The government also listed all three on each version of its witness list. *See* Docs. 85, 89, and 116. Accordingly, the issue was not whether the witnesses were disclosed, but whether the government properly and timely designated them as experts under Federal Rule of Criminal Procedure 16.

[13] The motion for a new trial states that the government referred to Tucker as a bartender "[a]t least twice" during the trial but does not cite to the transcript. Doc. 137 at 11-12. After reviewing the transcript, the Court has only located one instance during Schlaman's testimony, discussed above. Tr. at 315:18-21. The government's response suggests that the prosecutor asked Harrison Quinn and Jennifer Nuessen similar questions, but again provides no cites. Quinn testified that he knew Tucker from working at a nightclub together, where Quinn was a bartender, and Tucker was a manager. Tr. at 623:16-624:3. Nuessen testified that Tucker worked with her at the Jayhawk Club, but she did not say in what capacity. Other than the reference during Schlaman's testimony, the Court has not located any other reference to Tucker working as a bartender.

[14] The prosecutor asked whether the witness knew what Tucker's qualifications were for collecting asbestos samples. The witness answered, "Zero." The prosecutor then volunteered, "I believe he's a bartender." Tr. at 315:18-21.

order the jury to disregard the reference to Tucker's employment, the Court specifically noted that it was fair for the government to investigate what experience Tucker had in taking asbestos samples,[15] but not in the way in which the prosecutor asked the question. The Court then instructed the jury to disregard the statement.

The prosecutor's reference to Tucker as a bartender does not warrant a new trial for prosecutorial misconduct. It was an isolated remark. Fritzel's counsel initially claimed that the prosecutor lacked any good-faith basis to make that assertion. The prosecutor responded that he was told by Tucker's attorney that he was a bartender. Tr. at 317:20-318:2. And while Tucker's qualifications to sample for asbestos were relevant to the question of whether Fritzel could rely on that sample, the issue was not at the forefront of the case. Finally, the Court instructed the jury to disregard it. Based on this, the Court does not believe the statement affected the outcome. *See United States v. Lonedog*, 929 F.2d 568, 572 (10th Cir. 1991) ("In determining whether the misconduct affected the outcome, we consider: 'the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole.'" (quoting *United States v. Martinez-Nava*, 838 F.2d 411, 416 (10th Cir. 1988))).

### 3. The prosecutor did not misstate the law during closing.

Fritzel next argues that the government incorrectly stated that the jury instructions "tell you that actions in demolition can lead to friability." Doc. 137 at 12. The prosecutor more precisely stated: "The instructions are going to tell you that it's just the kind of activity that takes place in demolition that leads to the friability of asbestos. The cutting, the pulling down of the material, leads to its friability. And it doesn't have to be friable to be registered and regulated asbestos." Tr. at 770:21-771:3. Fritzel made no objection to this statement. Where the defense did not object to

---

[15]  An issue at trial was whether Fritzel properly relied on a roof sample collected by Tucker.

the prosecutor's comments, a defendant must demonstrate that the misconduct rises to the level of plain error to justify a new trial. *Yoakam*, 168 F.R.D. at 45 n.2.

The Court disagrees that this statement is an improper statement of the law as stated in the jury instructions. Instruction 24 states that RACM includes friable asbestos material, as well as nonfriable material that "in the course of demolition or renovation" has a probability of becoming "crumbled, pulverized, or reduced to powder." Doc. 132 at 25. Even though the prosecutor's statement is not a direct quote of the instructions, the Court disagrees that it is a misstatement of the law. And it certainly does not rise to the level of plain error, particularly because the jury had the actual instructions with the correct statement of law. Further, as discussed above, there was sufficient evidence that the material at issue was in fact friable. Accordingly, it is highly unlikely that this remark improperly influenced the jury's verdict.

### 4. Statements by the government about the hazards of asbestos were not misconduct.

Fritzel next argues that the government improperly elicited testimony that asbestos samples are not retained after testing because "they do not want to stockpile hazardous material." Doc. 137 at 13. Specifically, the prosecutor asked Schlaman, Van, and Gustafson why they do not retain asbestos samples. All stated that doing so would lead to an accumulation of hazardous materials. Tr. at 300:8-18; 503:14-25; 365:18-23.

Fritzel claims this testimony unfairly prejudiced him in light of the parties' stipulation that asbestos is a health hazard, *see* Doc. 112, and the prosecutor only asked the questions "to distract from the reliability issue—that the Government did not preserve the sample taken and thus denied the Defendant the opportunity to inspect the sample and perform an independent test." Doc. 137 at 13.

The Court disagrees that this is misconduct. First, Fritzel did not object to any of this testimony. *See Yoakam*, 168 F.R.D. at 45 n.2 (requiring a showing of plain error where the defense did not object to a prosecutor's statements). Second, Fritzel had made an issue of the failure to preserve the sample. *See* Tr. at 747:20-25 (Fritzel's closing argument stating "We know that the EPA and KDHE could have acted to preserve the samples. They did not. Why not? I don't know. Didn't get any testimony to that effect."). Although he claims that this testimony was meant to "distract from the reliability issue," the Court views it as more obviously responding directly to it. In other words, Fritzel suggested the samples were improperly destroyed, prompting the government to inquire about why the samples were not retained. There is nothing improper about that line of questioning. Nor is the testimony unfairly prejudicial or cumulative with regard to the parties' stipulation that "[c]ertain types of regulated friable asbestos containing materials may cause health problems if the fibers are inhaled." Doc. 112. The Court thus finds no grounds for a new trial on this issue.

5.     **The prosecutor's comments about his personal life and health did not improperly influence the jury.**

The final claim of prosecutorial misconduct references statements made by the prosecutor about his personal life and health condition. Doc. 137 at 13-14. Specifically, during voir dire, the prosecutor referenced the walking stick he uses and the fact that he purchased it during a trip to Disney World with his granddaughter. Tr. at 110:11-111:3. In the government's rebuttal closing statement, the prosecutor again referenced the trip with his granddaughter, and suggested that Fritzel's defense reminded him of that trip and his visit to Fantasy Land. Tr. at 770:10-17.[16] Fritzel's counsel made no objections to either of these statements.

---

[16] Fritzel argues in his motion that there were "repeated references to trips to Disneyland with his granddaughter where he purchased his walking stick." Doc. 137 at 13. Other than during voir dire and in closing, the Court has only found one other reference, and it was made outside the presence of the jury. Tr. at 608:17-25.

Fritzel claims the prosecutor made the statements "in a deliberate attempt to curry favor or sympathy for his ability to physically try the case," and that they were "flagrant and designed to influence the jury away from the facts of the case and towards a conviction." Doc. 137 at 13-14. Fritzel offers no further argument in support of this claim.[17]

Based on this limited and largely conclusory argument, the Court finds Fritzel has not established prosecutorial misconduct sufficient to warrant a new trial. The remarks were isolated and not egregious. Fritzel made no objections to either of these statements. Further, Fritzel's own counsel made statements about his personal life during voir dire as well, including describing his background, family, and hobbies. Tr. at 112:19-113:9.

In sum, the Court finds that none of the instances cited by Fritzel warrant a new trial based on prosecutorial misconduct. Nor does the cumulative effect of any of the issues warrant a new trial. The Court was able to carefully observe the entire trial. Both sides were able to present their respective cases and submit their arguments to the jury based on the evidence. There is no reason to believe that any of the actions alleged in the motion for new trial improperly influenced the jury's verdict.

## IV. CONCLUSION

THE COURT THEREFORE ORDERS that Fritzel's motion for a new trial (Doc. 137) is DENIED.

IT IS SO ORDERED.

Dated: September 25, 2019                    /s/  Holly L. Teeter
                                             HOLLY L. TEETER
                                             UNITED STATES DISTRICT JUDGE

---

[17] Fritzel cites to another case where the prosecutor's unrelated statements in that case were found to be improper. Doc. 137 at 13. But that case has no bearing on the issues in this case.