**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(Topeka Docket)**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CASE NO.   5:18-CR-40058-HLT** |
| ) | |
| **v.** ) | |
| ) | |
| **THOMAS FRITZEL,** *et al.*, ) | |
| ) | |
| **Defendant.** ) | |

## DEFENDANT'S OBJECTIONS TO PRESENCE REPORT

COMES NOW, the Defendant Thomas Fritzel and hereby submits his objections to the Presentence Investigation Report ("PSIR").  Defense counsel has reviewed the PSIR with the Defendant.  The PSIR includes statements inconsistent with the trial testimony.  The Defendant objects to the inclusion of Guideline 2Q1.2(b)(1)(B).

### Objections to Fact Assertions in PSIR

Paragraph 9 – It should indicate that Count 1 of the Indictment was dismissed.

Paragraph 11 - The owners of Gene Fritzel Construction are Thomas, Tim and Andy Fritzel.

Paragraph 13 - The 2008 ACT report of the sample taken by Patterson notes that the roof felt tested was "brown compact fibrous" (Trial Exhibit 1060) which is inconsistent with the trial testimony of Schlaman, that the sample which he took was white.  (Tr. at 283).

Paragraphs 14 – 17 –  In the purchase agreement between Alvamar and Eagle 1968, there were environmental representations made at Paragraph q.   Alvamar represented that there was no asbestos anywhere on the property or its improvements – meaning the buildings.  (Tr. at 674).

(Agreement attached)  There was no mention of the Patterson sample or its results in the Alvamar file disclosed to Eagle during the due diligence period.  (Tr. at 682-683).  The Patterson test results were not given to Eagle until Alvamar's lawyer produced it in May of 2016, long after the closing on the golf club and only after inquiry from Eagle's attorney.  It was the receipt of the report in May which prompted the Defendant to have Tucker Fritzel take the sample in June 2016. (Tr. at 683).

The agreement represented that no member of Alvamar had a right to claim membership by being an adjoining landowner.  (Tr. at 675). Jay Patterson was one of those adjoining land owners. This was a sore point with Patterson, as was the traffic the new development would bring.

If Eagle determined that any representation in the purchase agreement was not true, it could terminate the contract by cancelling the deal.  A deal which would pay the Alvamar stockholders $4.3 million. (Tr. 677).  At the end of December 2015, the deal closed with a payment in excess of $1.5 million. The balance to be paid in three installments over the next three years.  (Tr. at 679).  If the representations were found to be false after the deal closed, the indemnification provision of the contract would kick in.  The indemnification provision would require Alvamar to pay Eagle 1968 for any damages they incurred.  (Tr. at 682). In others words all of the remediation damages for asbestos problems would be paid by Alvamar NOT Eagle 1968.

Paragraph 20 - There is no formal training for taking a sample.  Tucker Fritzel, Jay Patterson and Phil Schlaman were not certified to take samples.  Tucker had experience in the construction business as did Patterson.

Paragraph 21 - Moffet did not testify at trial.  Moffet did tell defense counsel that it took only one day for the roof to be removed.  This is corroborated by the photographic evidence in Exhibit 1026 which was admitted at trial.  (Tr. at 617).  The operator of a drone aircraft, Harrison Quinn, testified that a photo taken on September 23, 2016 showed the roof in place and untouched.  A photo taken on September 28, 2016 showed the roof had been torn down.  (Tr. at 617-618).

The roof was approximately 2250 square feet as estimated by Moffet.  Broken down into pieces, the roof would fit into *one* of the dumpsters on the ground.

Paragraph 22 - The PSIR states, when Lynch showed Patterson the test results obtained by Tucker Fritzel, he, Lynch, covered a corner with his thumb "so the site….was not visible." The inference the Government wanted to draw from this testimony was that Lynch was hiding something on the sample taken by Tucker Fritzel. (Exhibit 12 at trial; attached hereto as Exhibit A.)  Tami Van, the test lab director, testified regarding the sample she received from Eagle and did not note any changes to the report during her testimony.  (Tr. at 508-518).  The sample report obtained by Patterson does however contain a material change.  The copy he gave to Alvamar and to EPA Agent Bahney (Exhibit 3 at trial) was altered while in his possession.  The address of the building from which the sample was taken had been altered.  The address of the location had been written over.  The actual unaltered report prepared by Ms. Van was included in response to a Grand Jury Subpoena for the lab's records. (Exhibit 1060 at trial). That report shows the address of the location of the building from which Patterson took the sample as *1800* Crossgate, which is the smaller public club house located away from the private club house which is the subject of this case.  Patterson submitted to the Government an altered document and the

Government offered no explanation for that alteration during testimony.  KDHE did get the address correct on its ACT test report as 1809 Crossgate. (Exhibit 21 at trial)(Tr. at 305).

Paragraph 23 - By October 13, 2016, a portion of the roof at 1809 Crossgate had been down for more than two weeks and the only remains were some pieces which remained in a debris pile.  It was from that debris pile from which KDHE employee Schlaman pulled his sample which was not taken to ACT until October 18, five days after it was obtained.  (Exhibit 1060 at trial).  The day after the results were obtained the Defendant went to KDHE to ask what they wanted to have done.

Paragraph 25 and 26 - The dates are incorrect.  KDHE did not have the test results until October 18, so they could not have contacted B&R until the 18th or later.  Dick Hall testified that he looked at the site on January 20 and that there were no large debris piles on site. (Tr. at 411).  He testified that, after looking at the KDHE photos, the debris pile contained "a lot of different building debris other than the roof."  (Tr. at 417).  Hall also testified that, despite his 30 years in the business, he would not have expected to see asbestos in the roof of the private clubhouse. (Tr. at 417).  He also stated the City of Lawrence does not require an asbestos survey to obtain a demolition permit which Eagle 1968 had for the roof demolition and the remodel of the private club house.  (Tr. at 418).

Paragraph 31 -  Schlaman estimated the roof portion to be 8764.5 sq. ft. to investigators but there was no such testimony at trial.  In fact, this estimate was objected to by the defense and not admitted into evidence.  Mike Moffet, who removed the roof, told investigators he estimated the roof at 2250 sq. ft..  There is no basis in the trial record for the estimate of 8764.5.  Whether a cell contains asbestos material or not, it is only covered by dirt. (Tr. 280-281).

The lack of evidence regarding the loads delivered to Hamm Landfill is correct.  The Defendant had a number of different construction projects ongoing in October, 2016 at different locations.  The loads were not identified by Hamm by originating construction project, so there is no evidence to refute the suggestion that only one dumpster load of asbestos roofing material went to the landfill.

Paragraph 42 -  The specific offense characteristic of USSG & 2Q1.2(b)(1)(B) is unwarranted.  Application Note 6 states that "Subsection (b) assumes a discharge or emission into the environment resulting in actual environmental contamination."  It goes on to state: "Depending upon the harm resulting……."  Meaning that there must be some harm resulting.  In this instance, there was no harm.  The expert report of Dr. Kim Anderson, which was provided to the Government and the US Probation Office. (Attached hereto as Exhibit B.)  There was no contravening expert report from the Government directly related to this offense.  With no evidence of harm submitted to the jury and no evidence of harm provided to this Court, this adjustment is inappropriate.

Paragraphs 72 and 73 - On September 11, 2019, the U.S. Probation Office was provided a declaration from the Defendant. This declaration stated his income from 2018, along with the W-2 form to substantiate it, that he is a member of three different limited liability company and that he had other assets.  Defendant is the head of a construction company and engages in real estate development projects.  The purpose of the inquiry about financial condition is to provide the Court with information to assist in determining capability of paying a fine and if so, how much.  The Defendant stated he could pay the maximum fine, if imposed.

Respectfully submitted, this 21st day of January, 2020.

s/ Thomas G. Lemon (#16120)
Cavanaugh, Biggs & Lemon, PA
2942A SW Wanamaker Drive, Suite 100
Topeka, KS 66614-4135
785-440-4000
Fax: 785-440-3900
Email: tlemon@cavlem.com

Edward F. Novak (admitted Pro Hac Vice)
Meslissa S. Ho (admitted Pro Hac Vice)
Polsinelli PC - Phoenix
CityScape
One East Washington Street, Suite 1200
Phoenix, AZ 85004
602-650-2020
Fax: 602-264-7033
Email: enovak@polsinelli.com

*Attorneys for Defendant Thomas Fritzel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 21st day of January, 2020, the foregoing motion was electronically filed with the Clerk of the Court using the CM/ECF electronic filing system, which sent notification of such filing to all counsel of records.

s/ Thomas G. Lemon (#16120)
Cavanaugh, Biggs & Lemon, PA
2942A SW Wanamaker Drive, Suite 100
Topeka, KS 66614-4135
785-440-4000
Fax: 785-440-3900
Email: tlemon@cavlem.com

# Attachments to

# Thomas Fritzel's Objections to Presentence Report

# Paragraph 13



**A C T**

14953 W. 101st Terrace
Lenexa, Kansas  66215
913-492-1337

December 8, 2017

Richard L. Hathaway, Assistant U.S. Attorney
United States Attorney's Office
Frank Carlson Federal Building
444 SE Quincy- Room 290
Topeka, Kansas  66683

Mr. Hathaway,

Please find enclosed documents requested via subpoena.

If you have any questions I can be reached at 913-492-1337.

Regards,

Tami Van
Laboratory Director

DEFENDANT'S
EXHIBIT
1060

RD 1_Fritzel_EPA_000625



**ACT**

14953 W. 101st Terrace
Lenexa, Kansas  66215
(913) 492-1337

October 28, 2016

Mr. Casey Stewart
Gene Fritzel Construction Company, Inc.
643 Massachusetts Street
Lawrence, Kansas 66044

Re:    Asbestos Pre-Demolition Survey Report – Alvamar Country Club – Golf Cart Barn

Dear Mr. Stewart:

Asbestos Consulting and Testing, Inc. (ACT) has completed the asbestos pre-demolition survey for the golf cart barn referenced above.

The asbestos survey and asbestos bulk sampling was performed on October 21, 2016, by ACT representative, EPA accredited asbestos inspector Mr. Adrian Turner (Exp. 11/19/2016). The asbestos inspection and asbestos bulk sampling was conducted within compliance with EPA, NESHAP and State of Kansas asbestos regulations.

Following the completion of the asbestos survey and asbestos bulk sampling activities, the collected samples were submitted to the NVLAP accredited, ACT testing laboratory for analysis utilizing polarized light microscopy with dispersion staining and the EPA/600/R-93/116 test method.

The following is a description of the material sampled, the location and the analysis result.

| Sample # | Sample Location | Description | Asbestos | Friable |
|----------|-----------------|-------------|----------|---------|
| 01 | West Side of Roof | Tar Paper | No | NA |
| 02 | East Side of Roof | Tar Paper | No | NA |
| 03 | Center of Roof | Tar Paper | No | NA |

Please feel free to contact me with any questions you may have regarding this report.

Sincerely,
ACT

*Adrian Turner*

Adrian Turner

Attachments:        Bulk Sample Analysis Report

# **A CT**

14953 W. 101st Terrace
Lenexa, Kansas  66215
913-492-1337

October 24, 2016

Gene Fritzel Construction Company, Inc.
643 Massachusetts Street
Lawrence, Kansas 66044

PROJECT:      Alvamar Cart Shed
REPORT NO.    B-64531

Enclosed please find results for bulk samples submitted to our laboratory for asbestos analysis
from the above referenced project.

The asbestos analysis was performed using Polarized Light Microscopy (PLM) with dispersion
staining in accordance with the EPA test method for the determination of asbestos in bulk
samples, EPA/600/R-93/116.  If the sample(s) submitted was inhomogeneous (layered), the
components of sub-samples were analyzed and reported separately.   The asbestos fiber type and
percentage are reported. The method of measurement is based on calibrated visual estimation.
The data provided herein is related only to those samples submitted for analysis.  Samples
comprised of **greater than one percent (1%) asbestos** are to be considered an asbestos containing
material.

Verification by PLM point counting is available upon request.  Due to limitations of the PLM
microscope and the matrix of floor tile, any floor tile sample found to contain NO asbestos may be
verified by TEM analysis upon the client's request.  An additional fee will apply.

This report may not be used by the client to claim product endorsement by NVLAP or any agency
of the U.S. Government.  This report shall not be reproduced, except in full, without the written approval
of ACT.

If you have any questions, please contact me at 913-492-1337.

Respectfully submitted,

Tami L. Van
Laboratory Director

NVLAP Lab Code: 101649

RD 1_Fritzel_EPA_000627

# Asbestos Bulk Analysis Laboratory Report

Client Name: Gene Fritzel Construction Co. Inc.    **REPORT NO.:**  **B-64531**
Project Name: Alvamar Cart Shed    RUSH TAT
Project No.:

Date collected:    Submitted by: Adrian Turner
Collected by: Adrian Turner    Date sample submitted: 10/24/2016
ANALYST: Tami Van    Analysis date: 10/24/2016

---

Sample No.: 1
Layer No.:
Location of Material: Tar paper
Description of Material: Black tarry fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| NONE DETECTED | | Cellulose | 85 | Bulk/Binder | 15 |

---

Sample No.: 2
Layer No.:
Location of Material: Tar paper
Description of Material: Black tarry fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| NONE DETECTED | | Cellulose | 85 | Bulk/Binder | 15 |

---

Sample No.: 3
Layer No.:
Location of Material: Tar paper
Description of Material: Black tarry fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| NONE DETECTED | | Cellulose | 85 | Bulk/Binder | 15 |

---

Sample No.:
Layer No.:
Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

Sample No.:
Layer No.:
Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

RD 1_Fritzel_EPA_000628



# ACT

14953 W. 101st Terrace
Lenexa, Kansas 66215
(913) 492-1337

October 28, 2016

Mr. Casey Stewart
Gene Fritzel Construction Company, Inc.
643 Massachusetts Street
Lawrence, Kansas 66044

Re:    Limited Asbestos Bulk Sampling Report – Alvamar Country Club –
       Private Club House

Dear Mr. Stewart:

Asbestos Consulting and Testing, Inc. (ACT) has completed the limited asbestos bulk sampling for the area referenced above.

The limited asbestos bulk sampling was performed on October 21, 2016, by ACT representative, EPA accredited asbestos inspector Mr. Adrian Turner (Exp. 11/19/2016). The area and materials sampled were selected by B&R Insulation, Inc. representative Mr. Dick Hall. The limited asbestos bulk sampling was conducted within compliance with EPA, NESHAP and State of Kansas asbestos regulations.

Following the completion of the limited asbestos bulk sampling activities, the collected samples were submitted to the NVLAP accredited, ACT testing laboratory for analysis utilizing polarized light microscopy with dispersion staining and the EPA/600/R-93/116 test method.

The following is a description of the material sampled, the location and the analysis result.

| Sample # | Sample Location | Description | Asbestos | Friable |
|---|---|---|---|---|
| 01 | Exterior East side of Building | Shingle Paper Debris | YES | Yes |
| 02 | Inside South Dumpster | Shingle Paper Debris | YES | Yes |
| 03 | Inside North Dumpster | Shingle Paper Debris | YES | Yes |
| 04 | Exterior North Side of Bldg. | 12"x12' Floor Tile/Mastic Debris | No/No | NA |
| 05 | 1st Floor South Side | Shingle Paper Debris | YES | Yes |
| 06 | 1st Floor South Side | Ceiling Texture | No | NA |
| 07 | 1st Floor Center | Ceiling Texture | No | NA |
| 08 | 1st Floor North Side | Ceiling Texture | No | NA |

Gene Fritzel Const. Company, Inc.          Page 1                                          ACT
Alvamar Country Club – Private Club House
Lawrence, Kansas

Approximate Quantities:

**Shingle Paper Debris:**            10 SF inside Clubhouse
                                     25 SF outside structure on ground
                                     50 SF in <u>each</u> Dumpster.


Please feel free to contact me with any questions you may have regarding this report.

Sincerely,
ACT

*Adrian Turner*

Adrian Turner
Attachments:          Bulk Sample Analysis Report

Gene Fritzel Const. Company, Inc.          Page 2                    ACT
Alvamar Country Club – Private Club House
Lawrence, Kansas

14



**ACT**

14953 W. 101st Terrace
Lenexa, Kansas 66215
913-492-1337

October 24, 2016

Gene Fritzel Construction Company, Inc.
643 Massachusetts Street
Lawrence, Kansas 66044

PROJECT:     Alvamar Private CC
REPORT NO.   B-64532

Enclosed please find results for bulk samples submitted to our laboratory for asbestos analysis
from the above referenced project.

The asbestos analysis was performed using Polarized Light Microscopy (PLM) with dispersion
staining in accordance with the EPA test method for the determination of asbestos in bulk
samples, EPA/600/R-93/116.  If the sample(s) submitted was inhomogeneous (layered), the
components of sub-samples were analyzed and reported separately.  The asbestos fiber type and
percentage are reported. The method of measurement is based on calibrated visual estimation.
The data provided herein is related only to those samples submitted for analysis.  Samples
comprised of **greater than one percent (1%) asbestos** are to be considered an asbestos containing
material.

Verification by PLM point counting is available upon request.  Due to limitations of the PLM
microscope and the matrix of floor tile, any floor tile sample found to contain NO asbestos may be
verified by TEM analysis upon the client's request.  An additional fee will apply.

This report may not be used by the client to claim product endorsement by NVLAP or any agency
of the U.S. Government.  This report shall not be reproduced, except in full, without the written approval
of ACT.

If you have any questions, please contact me at 913-492-1337.

Respectfully submitted,

*Tami Van*

Tami L. Van
Laboratory Director

**NVLAP®**

NVLAP Lab Code: 101649

# Asbestos Bulk Analysis Laboratory Report

**Client Name:** Gene Fritzel Construction Company, Inc.  
**Project Name:** Alvamar Private CC  
**Project No.:**

**REPORT NO.:** B-64532  
RUSH TAT

**Date collected:** 10/21/2016  
**Collected by:** Adrian Turner  
**ANALYST:** Tami Van

**Submitted by:** Adrian Turner  
**Date sample submitted:** 10/24/2016  
**Analysis date:** 10/24/2016

---

**Sample No.:** 1  
**Layer No.:**  

**Location of Material:** Shingle paper  
**Description of Material:** Gray compact fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| CHRYSOTILE | 90 | | | Bulk/Binder | 10 |

---

**Sample No.:** 2  
**Layer No.:**  

**Location of Material:** Shingle paper  
**Description of Material:** Tan compact fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| CHRYSOTILE | 90 | | | Bulk/Binder | 10 |

---

**Sample No.:** 3  
**Layer No.:**  

**Location of Material:** Shingle paper  
**Description of Material:** Tan compact fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| CHRYSOTILE | 90 | | | Bulk/Binder | 10 |

---

**Sample No.:** 4  
**Layer No.:** 1  

**Location of Material:** Floor tile  
**Description of Material:** Tan flat smooth hard

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder | 100 |

---

**Sample No.:** 4  
**Layer No.:** 2  

**Location of Material:** Adhesive  
**Description of Material:** Gold sticky

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder | 100 |

---

Analyst: TV

Page 2 of 3

## Asbestos Bulk Analysis Laboratory Report

**Client Name:** Gene Fritzel Construction Company, Inc.    **REPORT NO.:** _____ **B-64532**

**Project Name:** Alvamar Private CC    RUSH TAT _____

**Project No.:**

**Date collected:** 10/21/2016      **Submitted by:** Adrian Turner

**Collected by:** Adrian Turner      **Date sample submitted:** 10/24/2016

**ANALYST:** Tami Van      **Analysis date:** 10/24/2016

---

**Sample No.:** 5    **Location of Material:** Shingle paper debris
**Layer No.:**    **Description of Material:** Tan compact fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| CHRYSOTILE | 90 | | | Bulk/Binder   10 |

---

**Sample No.:** 6    **Location of Material:** Ceiling texture
**Layer No.:**    **Description of Material:** White lumpy chalky

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder   100 |

---

**Sample No.:** 7    **Location of Material:** Ceiling texture
**Layer No.:**    **Description of Material:** White lumpy chalky

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder   100 |

---

**Sample No.:** 8    **Location of Material:** Ceiling texture
**Layer No.:**    **Description of Material:** White lumpy chalky

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder   100 |

---

**Sample No.:**    **Location of Material:**
**Layer No.:**    **Description of Material:**

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

Analyst: TV     Page 3 of 3

RD 1_Fritzel_EPA_000633



# ACT

14953 W. 101st Terrace
Lenexa, Kansas 66215
(913) 492-1337

October 28, 2016

Mr. Casey Stewart
Gene Fritzel Construction Company, Inc.
643 Massachusetts Street
Lawrence, Kansas 66044

Re:   Asbestos Pre-Demolition Survey Report – Alvamar Country Club –
      Public Clubhouse

Dear Mr. Stewart:

Asbestos Consulting and Testing, Inc. (ACT) has completed the asbestos pre-demolition survey for the Alvamar Public Clubhouse.

The asbestos survey was performed on October 21, 2016, by ACT representative, EPA accredited asbestos inspector Mr. Adrian Turner (Exp. 11/19/2016). The asbestos survey and bulk sampling was conducted within compliance with EPA, NESHAP and State of Kansas asbestos regulations.

Following the completion of the asbestos survey, the collected samples were submitted to the NVLAP accredited, ACT testing laboratory for analysis utilizing polarized light microscopy with dispersion staining and the EPA/600/R-93/116 test method.

The following is a description of the material sampled, the location and the analysis result.

| Sample # | Sample Location | Description | Asbestos | Friable |
|---|---|---|---|---|
| [1]01 | Managers Office | Sheetrock/**Joint Compound** | No/**YES** | NA |
| *(Composite Analysis indicates <u>< than greater than 1% asbestos</u>, or Trace amount)* | | | | |
| [1]02 | Center Storage | Sheetrock/**Joint Compound** | No/**YES** | NA |
| *(Composite Analysis indicates <u>< than greater than 1% asbestos</u>, or Trace amount)* | | | | |
| [1]03 | Basement | Sheetrock/**Joint Compound** | No/**YES** | NA |
| *(Composite Analysis indicates <u>< than greater than 1% asbestos</u>, or Trace amount)* | | | | |
| 04 | Managers Office | Ceiling Texture | No | NA |
| 05 | Women's Restroom | Ceiling Texture | No | NA |

| Sample # | Sample Location | Description | Asbestos | Friable |
|---|---|---|---|---|
| 06 | Men's Restroom | Ceiling Texture | No | NA |
| 07 | Snack Bar | Vinyl Floor Sheeting | No | NA |
| 08 | Snack Bar Office | Vinyl Floor Sheeting | No | NA |
| 09 | Snack Bar Office | Vinyl Floor Sheeting | No | NA |
| 10 | Women's Restroom | Covebase/Mastic | No | NA |
| 11 | Women's Restroom | Covebase/Mastic | No | NA |
| 12 | Women's Restroom | Covebase/Mastic | No | NA |
| 13 | Snack Bar Office | Covebase/Mastic | No | NA |
| 14 | Snack Bar Storage | Covebase/Mastic | No | NA |
| 15 | Snack Bar Storage | Covebase/Mastic | No | NA |
| 16 | Snack Bar Storage | 12"x12' Floor Tile/Mastic | No/No | NA |
| 17 | Snack Bar Storage | 12"x12' Floor Tile/Mastic | No/No | NA |
| 18 | Snack Bar Storage | 12"x12' Floor Tile/Mastic | No/No | NA |
| [2]**19** | **Snack Bar Office** | **12"x12' Floor Tile/Mastic** | **YES/YES** | **No/No** |
| [2]**20** | **Snack Bar Office** | **12"x12' Floor Tile/Mastic** | **YES/YES** | **No/No** |
| [2]**21** | **Snack Bar Office** | **12"x12' Floor Tile/Mastic** | **YES/YES** | **No/No** |
| 22 | Roof | Tar Paper | No | NA |
| 23 | Roof | Tar Paper | No | NA |
| 24 | Roof | Tar Paper | No | NA |

*Please Note*

[1]*The sheetrock tested <u>negative</u> for asbestos, the joint compound tested **positive** for asbestos, however, the EPA and State of Kansas (KDHE) allow the laboratory to composite the joint compound and the sheetrock materials together and consider the sample to be one (1) homogenous material. In this case, the composited analysis shows that the combined material has only a "trace" of asbestos, less than <u>greater than 1%</u> <u>asbestos</u>. Therefore, the sheetrock and joint compound composite material is **not** considered regulated according to the EPA and the State of Kansas. OSHA does consider the joint compound to be an asbestos-containing material, and requires the material to be handled as such.*

[2]*Non-friable asbestos-containing materials (ACM), such as the non-friable <u>floor tile</u> and <u>mastic adhesive</u> needs to be abated prior to renovation and/or demolition <u>**if**</u> activities that may disturb the materials <u>and</u> render them friable by means such as <u>sanding, grinding, cutting or abrading are used.</u> If not, the EPA and KDHE allow the non-friable floor tile and mastic adhesive to be included in the demolition of the building and be disposed of in a construction debris landfill.*

Gene Fritzel Construction Company, Inc.   Page 2                    ACT
Alvamar Country Club – Public Club House
Lawrence, Kansas

RD 1_Fritzel_EPA_000635

Please feel free to contact me with any questions you may have regarding this report.

Sincerely,
ACT

*Adrian Turner*

Adrian Turner


Attachments:        Bulk Sample Analysis Report

Gene Fritzel Construction Company, Inc.    Page 3                                ACT
Alvamar Country Club – Public Club House
Lawrence, Kansas
                                        20

# ACT

14953 W. 101st Terrace
Lenexa, Kansas 66215
913-492-1337

October 24, 2016

Gene Fritzel Constrcution Company, Inc.
643 Massachusetts St.
Lawrence, KS 66044

PROJECT:     Alvamar Public CC
REPORT NO.   B-64530

Enclosed please find results for bulk samples submitted to our laboratory for asbestos analysis
from the above referenced project.

The asbestos analysis was performed using Polarized Light Microscopy (PLM) with dispersion
staining in accordance with the EPA test method for the determination of asbestos in bulk
samples, EPA/600/R-93/116.  If the sample(s) submitted was inhomogeneous (layered), the
components of sub-samples were analyzed and reported separately.  The asbestos fiber type and
percentage are reported. The method of measurement is based on calibrated visual estimation.
The data provided herein is related only to those samples submitted for analysis.  Samples
comprised of **greater than one percent (1%) asbestos** are to be considered an asbestos containing
material.

Verification by PLM point counting is available upon request.  Due to limitations of the PLM
microscope and the matrix of floor tile, any floor tile sample found to contain NO asbestos may be
verified by TEM analysis upon the client's request.  An additional fee will apply.

This report may not be used by the client to claim product endorsement by NVLAP or any agency
of the U.S. Government.  This report shall not be reproduced, except in full, without the written approval
of ACT.

If you have any questions, please contact me at 913-492-1337.

Respectfully submitted,

Tami L. Van
Laboratory Director

NVLAP®

NVLAP Lab Code: 101649

# Asbestos Bulk Analysis Laboratory Report

**Client Name:** Gene Fritzel Construction Company, Inc.
**Project Name:** Alvamar Public CC
**Project No.:**

**REPORT NO.:**   **B-64530**
RUSH TAT

**Date collected:** 10/21/2016
**Collected by:** Adrian Turner
**ANALYST:** Tami Van

**Submitted by:** Adrian Turner
**Date sample submitted:** 10/24/2016
**Analysis date:** 10/24/2016

---

**Sample No.:** 1
**Layer No.:**

**Location of Material:** Sheetrock/ Joint compound
**Description of Material:** White chalky/brown fibrous/off-white shiny chalky

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| CHRYSOTILE | <1 | Cellulose | 12 | Bulk/Binder | 87.9 |

** asbestos in joint compound only - 3%

---

**Sample No.:** 2
**Layer No.:**

**Location of Material:** Sheetrock/ Joint compound
**Description of Material:** White chalky/brown fibrous/off-white shiny chalky

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| CHRYSOTILE | <1 | Cellulose | 12 | Bulk/Binder | 87.9 |

** asbestos in joint compound only - 3%

---

**Sample No.:** 3
**Layer No.:**

**Location of Material:** Sheetrock/ Joint compound
**Description of Material:** White chalky/brown fibrous/off-white shiny chalky

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| CHRYSOTILE | <1 | Cellulose | 12 | Bulk/Binder | 87.9 |

** asbestos in joint compound only - 3%

---

**Sample No.:** 4
**Layer No.:**

**Location of Material:** Ceiling texture
**Description of Material:** White lumpy chalky

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| NONE DETECTED | | Poly | 2 | Bulk/Binder | 98 |

---

**Sample No.:** 5
**Layer No.:**

**Location of Material:** Ceiling texture
**Description of Material:** White lumpy chalky

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| NONE DETECTED | | Poly | 2 | Bulk/Binder | 98 |

---

Analyst: TV

Page 2 of 9

RD 1_Fritzel_EPA_000638

# Asbestos Bulk Analysis Laboratory Report

**Client Name:** Gene Fritzel Construction Company, Inc.          **REPORT NO.:**   **B-64530**
**Project Name:** Alvamar Public CC                                       RUSH TAT _____
**Project No.:**

**Date collected:** 10/21/2016                        **Submitted by:** Adrian Turner
**Collected by:** Adrian Turner              **Date sample submitted:** 10/24/2016
**ANALYST:** Tami Van                          **Analysis date:** 10/24/2016

---

| Sample No.: | 6 | Location of Material: Ceiling texture |
| Layer No.: | | Description of Material: White lumpy chalky |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | Poly | 2 | Bulk/Binder | 98 |

---

| Sample No.: | 7 | Location of Material: Vinyl floor sheeting |
| Layer No.: | 1 | Description of Material: Gray smooth pliable |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | | | Bulk/Binder | 100 |

---

| Sample No.: | 7 | Location of Material: Backing |
| Layer No.: | 2 | Description of Material: Gray compact fibrous |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | Cellulose | 55 | Bulk/Binder | 35 |
| | | Fibrous glass | 10 | | |

---

| Sample No.: | 8 | Location of Material: Vinyl floor sheeting |
| Layer No.: | 1 | Description of Material: Gray smooth pliable |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | | | Bulk/Binder | 100 |

---

| Sample No.: | 8 | Location of Material: Backing |
| Layer No.: | 2 | Description of Material: Gray compact fibrous |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | Cellulose | 55 | Bulk/Binder | 35 |
| | | Fibrous glass | 10 | | |

---

Analyst: TV                                        23                                        Page 3 of 9

## Asbestos Bulk Analysis Laboratory Report

**Client Name:** Gene Fritzel Construction Company, Inc.    **REPORT NO.:**    B-64530

**Project Name:** Alvamar Public CC    RUSH TAT

**Project No.:**

**Date collected:** 10/21/2016    **Submitted by:** Adrian Turner

**Collected by:** Adrian Turner    **Date sample submitted:** 10/24/2016

**ANALYST:** Tami Van    **Analysis date:** 10/24/2016

---

| Sample No.: 9 | Location of Material: Vinyl floor sheeting |
| Layer No.: 1 | Description of Material: Gray smooth pliable |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder    100 |

---

| Sample No.: 9 | Location of Material: Backing |
| Layer No.: 2 | Description of Material: Gray compact fibrous |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| NONE DETECTED | | Cellulose | 55 | Bulk/Binder    35 |
| | | Fibrous glass | 10 | |

---

| Sample No.: 10 | Location of Material: Covebase |
| Layer No.: 1 | Description of Material: Black smooth rubbery |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder    100 |

---

| Sample No.: 10 | Location of Material: Adhesive |
| Layer No.: 2 | Description of Material: Yellow putty |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder    100 |

---

| Sample No.: 11 | Location of Material: Covebase |
| Layer No.: 1 | Description of Material: Black smooth rubbery |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder    100 |

---

Analyst: TV    24    Page 4 of 9

## Asbestos Bulk Analysis Laboratory Report

**Client Name:** Gene Fritzel Construction Company, Inc.

**REPORT NO.:** B-64530

**Project Name:** Alvamar Public CC

RUSH TAT _____

**Project No.:**

**Date collected:** 10/21/2016

**Submitted by:** Adrian Turner

**Collected by:** Adrian Turner

**Date sample submitted:** 10/24/2016

**ANALYST:** Tami Van

**Analysis date:** 10/24/2016

---

**Sample No.:** 11     **Location of Material:** Adhesive

**Layer No.:** 2     **Description of Material:** Yellow putty

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder | 100 |

---

**Sample No.:** 12     **Location of Material:** Covebase

**Layer No.:** 1     **Description of Material:** Black smooth rubbery

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder | 100 |

---

**Sample No.:** 12     **Location of Material:** Adhesive

**Layer No.:** 2     **Description of Material:** Yellow putty

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder | 100 |

---

**Sample No.:** 13     **Location of Material:** Covebase

**Layer No.:** 1     **Description of Material:** Gray smooth rubbery

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder | 100 |

---

**Sample No.:** 13     **Location of Material:** Adhesive

**Layer No.:** 2     **Description of Material:** Yellow putty

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| NONE DETECTED | | | | Bulk/Binder | 100 |

---

Analyst: TV

## Asbestos Bulk Analysis Laboratory Report

**Client Name:** Gene Fritzel Construction Company, Inc.    **REPORT NO.:**    **B-64530**

**Project Name:** Alvamar Public CC    RUSH TAT

**Project No.:**

**Date collected:** 10/21/2016    **Submitted by:** Adrian Turner

**Collected by:** Adrian Turner    **Date sample submitted:** 10/24/2016

**ANALYST:** Tami Van    **Analysis date:** 10/24/2016

---

| Sample No.: | 14 | Location of Material: | Covebase |
| Layer No.: | 1 | Description of Material: | Gray smooth rubbery |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | | | Bulk/Binder | 100 |

---

| Sample No.: | 14 | Location of Material: | Adhesive |
| Layer No.: | 2 | Description of Material: | Yellow putty |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | | | Bulk/Binder | 100 |

---

| Sample No.: | 15 | Location of Material: | Covebase |
| Layer No.: | 1 | Description of Material: | Gray smooth rubbery |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | | | Bulk/Binder | 100 |

---

| Sample No.: | 15 | Location of Material: | Adhesive |
| Layer No.: | 2 | Description of Material: | Yellow putty |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | | | Bulk/Binder | 100 |

---

| Sample No.: | 16 | Location of Material: | Floor tile |
| Layer No.: | 1 | Description of Material: | White flat smooth hard |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | | | Bulk/Binder | 100 |

---

Analyst: TV

## Asbestos Bulk Analysis Laboratory Report

**Client Name:** Gene Fritzel Construction Company, Inc.  **REPORT NO.:**  **B-64530**
**Project Name:** Alvamar Public CC  RUSH TAT _____
**Project No.:**

**Date collected:** 10/21/2016  **Submitted by:** Adrian Turner
**Collected by:** Adrian Turner  **Date sample submitted:** 10/24/2016
**ANALYST:** Tami Van  **Analysis date:** 10/24/2016

---

**Sample No.:** 16   **Location of Material:** Adhesive
**Layer No.:** 2   **Description of Material:** Gold brittle

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | | | Bulk/Binder | 100 |

---

**Sample No.:** 17   **Location of Material:** Floor tile
**Layer No.:** 1   **Description of Material:** White flat smooth hard

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | | | Bulk/Binder | 100 |

---

**Sample No.:** 17   **Location of Material:** Adhesive
**Layer No.:** 2   **Description of Material:** Gold brittle

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | | | Bulk/Binder | 100 |

---

**Sample No.:** 18   **Location of Material:** Floor tile
**Layer No.:** 1   **Description of Material:** White flat smooth hard

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | | | Bulk/Binder | 100 |

---

**Sample No.:** 18   **Location of Material:** Adhesive
**Layer No.:** 2   **Description of Material:** Gold brittle

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | | | Bulk/Binder | 100 |

---

Analyst: TV

Page 7 of 9

RD 1_Fritzel_EPA_000643

## Asbestos Bulk Analysis Laboratory Report

Client Name: Gene Fritzel Construction Company, Inc.    REPORT NO.:    **B-64530**
Project Name: Alvamar Public CC    RUSH TAT _____
Project No.:

Date collected: 10/21/2016
Collected by: Adrian Turner    Submitted by: Adrian Turner
    Date sample submitted: 10/24/2016
ANALYST: Tami Van    Analysis date: 10/24/2016

---

Sample No.: 19    Location of Material: Floor tile
Layer No.: 1    Description of Material: Brownl lat smooth hard

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| CHRYSOTILE | 5 | | | Bulk/Binder | 95 |

---

Sample No.: 19    Location of Material: Mastic
Layer No.: 2    Description of Material: Black tar

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| CHRYSOTILE | 5 | | | Bulk/Binder | 95 |

---

Sample No.: 20    Location of Material: Floor tile
Layer No.: 1    Description of Material: Brown flat smooth hard

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| CHRYSOTILE | 5 | | | Bulk/Binder | 95 |

---

Sample No.: 20    Location of Material: Mastic
Layer No.: 2    Description of Material: Black tar

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| CHRYSOTILE | 5 | | | Bulk/Binder | 95 |

---

Sample No.: 21    Location of Material: Floor tile
Layer No.: 1    Description of Material: Brown flat smooth hard

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| CHRYSOTILE | 5 | | | Bulk/Binder | 95 |

---

Analyst: TV

Page 8 of 9

RD 1_Fritzel_EPA_000644

## Asbestos Bulk Analysis Laboratory Report

**Client Name:** Gene Fritzel Construction Company, Inc.    **REPORT NO.:**    **B-64530**
**Project Name:** Alvamar Public CC                                              RUSH TAT
**Project No.:**

**Date collected:** 10/21/2016                                        **Submitted by:** Adrian Turner
**Collected by:** Adrian Turner                              **Date sample submitted:** 10/24/2016
**ANALYST:** Tami Van                                          **Analysis date:** 10/24/2016

---

| Sample No.: | 21 | | Location of Material: | Mastic |
| Layer No.: | 2 | | Description of Material: | Black tar |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **CHRYSOTILE** | **5** | | | Bulk/Binder | 95 |

---

| Sample No.: | 22 | | Location of Material: | Tar paper |
| Layer No.: | | | Description of Material: | Black tarry fibrous |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | Cellulose | 85 | Bulk/Binder | 15 |

---

| Sample No.: | 23 | | Location of Material: | Tar paper |
| Layer No.: | | | Description of Material: | Black tarry fibrous |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | Cellulose | 85 | Bulk/Binder | 15 |

---

| Sample No.: | 24 | | Location of Material: | Tar paper |
| Layer No.: | | | Description of Material: | Black tarry fibrous |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | Cellulose | 85 | Bulk/Binder | 15 |

---

| Sample No.: | | | Location of Material: | |
| Layer No.: | | | Description of Material: | |

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

Analyst: TV

29

Page 9 of 9

# A C T

14953 W. 101st Terrace
Lenexa, Kansas  66215
913-492-1337

October 18, 2016

KDHE
1000 SW Jackson, Suite 330
Topeka, KS  66612

PROJECT:      Alvamar Golf Course- 1809 Crossgate Dr., Lawrence, KS
REPORT NO.   B-64492

Enclosed please find results for bulk samples submitted to our laboratory for asbestos analysis from the above referenced project.

The asbestos analysis was performed using Polarized Light Microscopy (PLM) with dispersion staining in accordance with the EPA test method for the determination of asbestos in bulk samples, EPA/600/R-93/116.  If the sample(s) submitted was inhomogeneous (layered), the components of sub-samples were analyzed and reported separately.  The asbestos fiber type and percentage are reported. The method of measurement is based on calibrated visual estimation. The data provided herein is related only to those samples submitted for analysis.  Samples comprised of **greater than one percent (1%) asbestos** are to be considered an asbestos containing material.

Verification by PLM point counting is available upon request.  Due to limitations of the PLM microscope and the matrix of floor tile, any floor tile sample found to contain NO asbestos may be verified by TEM analysis upon the client's request.  An additional fee will apply.

This report may not be used by the client to claim product endorsement by NVLAP or any agency of the U.S. Government.  This report shall not be reproduced, except in full, without the written approval of ACT.

If you have any questions, please contact me at 913-492-1337.

Respectfully submitted,

Tami L. Van
Laboratory Director

NVLAP

NVLAP Lab Code: 101649

## Asbestos Bulk Analysis Laboratory Report

**Client Name:** KDHE
**Project Name:** Alvamar Golf Course
1809 Crossgate Dr., Lawrence, KS
**Project No.:**
**Date collected:** 10/17/2016
**Collected by:** Phil Schlaman
**ANALYST:** Tami Van

**REPORT NO.:** B-64492
RUSH TAT   X

**Submitted by:** Phil Schlaman
**Date sample submitted:** 10/18/2016

**Analysis date:** 10/18/2016

---

Sample No.: 1
Layer No.:

Location of Material: Roofing #1- debris pile
Description of Material: Gray thin compact fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **CHRYSOTILE** | **75** | Fibrous glass | 3 | Bulk/Binder | 22 |

---

Sample No.:
Layer No.:

Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

---

Sample No.:
Layer No.:

Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

---

Sample No.:
Layer No.:

Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

---

Sample No.:
Layer No.:

Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

---

Analyst: TV

Page 2 of 2

RD 1_Fritzel_EPA_000647

B 64492

Kansas Department of Health and Environment

Sample Receiving /Transmittal   **Chain of Custody**

Client: KDHE
Send report to: Phil Schlaman
Address: 1000 SW Jackson Suite330
City/State/Zip:Topeka, KS 66612
Phone #: 785-296-1549
Fax #   785-296-1545

Project Name: _Alvamar Golf Course_
Address: _1809 Crossgate, Dr_
_Lawrence, KS 66047_
Notification # _785-296-1549_
Date Required: _ASAP_
Verbal _X_ Fax___ Mail___

Sampler Name: Phil Schlaman

Relinquished by: _Phil Schlam_
Accepted by: _____
Relinquished by: _____
Accepted by: _Jamilan_

Date: _10-14-16_

Date/Time: _10-17-16_ / _13:02_
Date/Time: _10-17-16_  _13:09_
Date/Time: _10-18-16_  _9:23_
Date/Time: _10/18/16_  _9:23AM_

Number of Samples: _1_   Condition of Package:_____   Carrier:_____

| Sample # | Date | Sample Location | Type of Sample |
|---|---|---|---|
| Roofing #1 | 10-14-16 | Debris Pile | Bulk |

# Asbestos Bulk Analysis Laboratory Report

Asbestos Consulting Testing (ACT)  14953 W. 101st Terrace, Lenexa, KS  66215   (913) 492-1337      NVLAP Lab Code: 101649-0

| | |
|---|---|
| **Client Name:** Patterson Construction | **REPORT NO.:** **B-48198** |
| **Address:** 1909 Quail Run | RUSH TAT ___ |
| Lawrence, KS  66047 | **Project Name:** Alvamar Country Club |
| | **Address:** 1800 Crossgate Drive |
| | Lawrence, KS  66047 |
| **Date sample collected:** | |
| **Collected by:** | **Project No.:** |
| **Submitted by:** Jay Patterson | **Analyst:** Tami Van |
| **Date sample submitted:** 12/3/2008 | **Analysis Date:** 12/4/2008 |

---

**Sample No.:** 1
**Layer No.:**

**Location of Material:** Roof felt
**Description of Material:** Brown compact fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **CHRYSOTILE** | **75** | Cellulose | 10 | Bulk/Binder | 15 |

---

**Sample No.:**
**Layer No.:**

**Location of Material:**
**Description of Material:**

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

*[handwritten note: NO COVER LETTER OR COC AVAILABLE Pre-dates PDF TV]*

---

**Sample No.:**
**Layer No.:**

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

**Sample No.:**
**Layer No.:**

**Location of Material:**
**Description of Material:**

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

**Sample No.:**
**Layer No.:**

**Location of Material:**
**Description of Material:**

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

Analyst:_____TV__          Laboratory Director: *Tami Van*          Page 1

1    A.    Yes, we did.

2    Q.    And would you tell the jury what you took a

3          sample of?

4    A.    A pretty good-sized debris pile that included

5          suspect material that obviously came off of a

6          roof very close to the structure where the

7          pile was located.  I was able to ascertain

8          that it indeed came from the roof because

9          there were shingles on top of it and roofing

10         material underneath it.

11              There was these chunks of paper--

12         this particular material looks like white

13         paper.  It's kind of pliable.  It's not very

14         stiff or anything.  And there was quite a bit

15         of it in the pile that we looked at.  And I

16         was able to pretty well tie the material from

17         the roofing to this-- this stuff here.  With

18         no doubt in my mind that it was the same

19         material.

20   Q.    Okay.  Tell the jury how you attired yourself

21         that day.

22   A.    Once we discovered that we have this big pile

23         of debris, I put on my PPE, our protective

24         equipment, and gloves and we-- I slated a

25         sample and put it in a plastic bag and

# Paragraphs 14-17

1           swimming pool, that off-site swimming pool,

2           and that's why that is referenced here?

3     A.    Correct.

4     Q.    All right.  Thank you.  Let's go to paragraph

5           "q," please.  Thank you.  And the-- it says

6           "Environmental Representations:  To the best

7           of seller's knowledge:"  And would you look

8           at subparagraph 2.  And it's a-- it's a long

9           one.  I don't-- I don't want you to read it

10          out loud, but I would ask you to -- excuse me

11          -- to summarize it, please.

12    A.    This paragraph is part of the promises that

13          Alvamar made to the buyer.  Alvamar promised,

14          to its knowledge, that there are no hazardous

15          substances, including asbestos, anywhere on

16          the property or the improvements.

17    Q.    And it specifically says that asbestos is

18          included in the term "hazardous substances";

19          is that right?

20    A.    That's correct.

21    Q.    Okay.  Thank you.  Let's-- let's go back to

22          7k for a moment.  "Neighboring Lot Ownership

23          Rights."  Would you tell us what this

24          paragraph is all about.

25    A.    In this paragraph, the seller is promising

1            that no other owner or neighbor of the golf

2            course has the right, just by being a

3            neighbor, to be a member of Alvamar Golf and

4            Country Club.

5  Q.    So let me see if I have this straight.  So

6            Alvamar is telling Eagle 1968 in this

7            contract that no-- no nearby landowner has a

8            right to claim membership?

9  A.    Correct.

10  Q.    And in 7q, Alvamar is promising that there is

11            no asbestos in any building; am I right?

12  A.    Correct.

13  Q.    Not in the building, not on the property, no

14            asbestos anywhere?

15  A.    Correct.

16  Q.    Okay.  Was-- did you come to learn that one

17            of those neighboring landowners was an

18            individual named John J. Patterson?

19  A.    I was aware of that, yes.

20  Q.    Okay.  Did that awareness come much later on?

21  A.    Could you repeat the question?

22  Q.    Did the-- did your awareness of Mr. Patterson

23            owning a piece of property adjacent to the

24            golf course come later on?  Not at the time

25            you--

682

1    Q.   All right.  And if it turned out that there

2         was asbestos in one of the buildings,

3         pursuant to the indemnification paragraph,

4         would Alvamar, Inc. be liable for the costs

5         associated with remedying the asbestos

6         problem?

7    A.   Yeah.  If it was in their knowledge, then,

8         yes, it would have been.

9    Q.   You told us earlier that the-- the contract

10        was effective on November 1, 2014, and it

11        took 14 months to close.  Did you-- did you

12        receive any information from Alvamar during

13        that 14-month period about the operation of

14        the club?

15   A.   Yes.

16   Q.   Okay.  And in the information that you

17        received, was there any mention that there

18        might be asbestos in any of the buildings?

19   A.   No.

20   Q.   Did anyone at Alvamar relate-- outside of the

21        written documentation that you reviewed, did

22        anyone relate any information to you about

23        asbestos in any of the buildings prior to the

24        closing on December 29, 2015?

25   A.   No.

683

```
 1    Q.   So during that entire 14-month period, you
 2         didn't see or hear anything about asbestos in
 3         the roof?
 4    A.   No.
 5    Q.   Of the private clubhouse or any other
 6         building?
 7    A.   No, sir.
 8    Q.   Okay.  Do you know if anyone at Eagle 1968
 9         received any information about asbestos
10         during that 14-month period?
11    A.   Not to my knowledge.
12    Q.   You-- did you receive a copy at some point in
13         time of a 2008 test of one of the roofs at
14         Alvamar?
15    A.   Yes, sir.
16    Q.   And did you receive that-- well, tell us how
17         you received it and who you received it from.
18    A.   I sent an e-mail to Grant Glenn, who is the
19         attorney for Alvamar, on May 4th, I believe,
20         2016.
21    Q.   So now we're five months after closing?
22    A.   Correct.
23    Q.   Okay.  Go ahead.
24    A.   And then towards the end of that same month,
25         in May of '16, he wrote back and enclosed
```

```
 1          that no other owner or neighbor of the golf

 2          course has the right, just by being a

 3          neighbor, to be a member of Alvamar Golf and

 4          Country Club.

 5    Q.    So let me see if I have this straight.  So

 6          Alvamar is telling Eagle 1968 in this

 7          contract that no-- no nearby landowner has a

 8          right to claim membership?

 9    A.    Correct.

10    Q.    And in 7q, Alvamar is promising that there is

11          no asbestos in any building; am I right?

12    A.    Correct.

13    Q.    Not in the building, not on the property, no

14          asbestos anywhere?

15    A.    Correct.

16    Q.    Okay.  Was-- did you come to learn that one

17          of those neighboring landowners was an

18          individual named John J. Patterson?

19    A.    I was aware of that, yes.

20    Q.    Okay.  Did that awareness come much later on?

21    A.    Could you repeat the question?

22    Q.    Did the-- did your awareness of Mr. Patterson

23          owning a piece of property adjacent to the

24          golf course come later on?  Not at the time

25          you--
```

```
1              terminate this Agreement by giving written

2              notice to Seller."

3    Q.        And then-- you can skip the next sentence.

4              And then it goes on to say, "and this

5              Agreement shall become null and void and

6              Purchaser is entitled to prompt return of any

7              earnest money." (As read). Is that right?

8    A.        That's correct.

9    Q.        How much-- well, what was the purchase price

10             for Alvamar?

11   A.        It was $4,300,000.

12   Q.        And what was the amount of earnest money that

13             was put down at the time the contract was

14             signed?

15   A.        I know ultimately it was $50,000. I'd-- I'd

16             have to go back and look again to see if it

17             was all 50 up front or whether it was over

18             time. I think it was over time.

19   Q.        Okay. So $50,000, that's the earnest money.

20             So just going back to the home purchase, if

21             you're purchasing a home for $100,000, you

22             might be required to put $10,000 down, and

23             then that's credited toward the ultimate

24             purchase price. Is that-- would that be the

25             same here?
```

1            that was made on December 29, 2015, is clear.

2            How much was that payment?

3    A.      It was a million 500 with some change.  It

4            wasn't exactly on the-- on the button.

5    Q.      So there was still a considerable amount of

6            money to be paid out over the-- the next

7            three years?

8    A.      Yes.

9    Q.      And-- and if Eagle learned something about

10           the representations that were unsatisfactory

11           to Eagle, it could back out and any money it

12           had paid would be paid-- would be repaid to

13           Eagle?

14   A.      You know, I don't agree with that.  I think

15           once the closing has occurred, title's

16           changed.  Is that what your question was?

17   Q.      And-- and what changes after the closing?

18   A.      So upon the closing, Alvamar gave a deed to

19           transfer title of the Alvamar golf course.

20           And so after that point in time, you know,

21           they had certainly a note, promissory note,

22           from Eagle 1968 saying you owe us 2.7 million

23           and change.  There was also a mortgage of

24           record.  So they-- they are no longer an

25           owner of a golf course.  They were more like

682

1    Q.   All right.  And if it turned out that there

2         was asbestos in one of the buildings,

3         pursuant to the indemnification paragraph,

4         would Alvamar, Inc. be liable for the costs

5         associated with remedying the asbestos

6         problem?

7    A.   Yeah.  If it was in their knowledge, then,

8         yes, it would have been.

9    Q.   You told us earlier that the-- the contract

10        was effective on November 1, 2014, and it

11        took 14 months to close.  Did you-- did you

12        receive any information from Alvamar during

13        that 14-month period about the operation of

14        the club?

15   A.   Yes.

16   Q.   Okay.  And in the information that you

17        received, was there any mention that there

18        might be asbestos in any of the buildings?

19   A.   No.

20   Q.   Did anyone at Alvamar relate-- outside of the

21        written documentation that you reviewed, did

22        anyone relate any information to you about

23        asbestos in any of the buildings prior to the

24        closing on December 29, 2015?

25   A.   No.

# Paragraph 21

617

```
 1            without objection.
 2                      MR. NOVAK:  Thank you.
 3                      Ms. Hamilton, would you please bring
 4            up the-- the first photo, August 25, 2016.
 5    Q.    (By Mr. Novak)  You recognize this as being
 6            the-- the private clubhouse at Alvamar on
 7            August 25th, 2016?
 8    A.    Yes.
 9    Q.    Thank you.  Let's go to the next photograph.
10            This is a-- and that date sheet went by a
11            little quickly, but we're now looking at a
12            photograph--
13                      MR. NOVAK:  Thank you, Ms. Hamilton.
14    Q.    (By Mr. Novak)  We're now looking at a
15            photograph taken on September 23, 2016; is
16            that correct?
17    A.    Yes.
18    Q.    Let's look at the next one.  Now, this is
19            September 28.  So it appears as though
20            there's been some change to that building in
21            those five days, but this is still the
22            private country club on September 28; is that
23            correct?
24    A.    Yes.
25                      MR. NOVAK:  Next, please.
```

618

1    Q.    (By Mr. Novak)  So now we're going to look at

2          October 7.  And again a view from a different

3          angle of-- of the private clubhouse on

4          October 7; am I right?

5    A.    Yes.

6    Q.    Thank you.

7                  MR. NOVAK:  And the next one.

8    Q.    (By Mr. Novak)  Same date, October 7?

9    A.    Yes.

10   Q.    Thank you.

11                  Now let's go to the next date.  This

12         is October 13, 2016.

13   A.    Yes.

14   Q.    Do you-- do you know-- as you sit there, can

15         you tell me in which direction the camera is

16         pointing?

17   A.    Like cardinal directions?  Like north, south,

18         east, west?

19   Q.    Yes.

20   A.    Maybe southwest.

21   Q.    Thank you.  And the next photograph will be

22         on October 19.  Would you take a look at

23         that, please.  Now, this is taken from a

24         different direction, more toward the

25         southeast?

# Paragraph 22



# A C T

14953 W. 101st Terrace
Lenexa, Kansas  66215
913-492-1337  *  fax 913-492-1392

June 7, 2016

Eagle 1948

PROJECT:      Alvamar
REPORT NO.    B-63669

Enclosed please find results for bulk samples submitted to our laboratory for asbestos analysis
from the above referenced project.

The asbestos analysis was performed using Polarized Light Microscopy (PLM) with dispersion
staining in accordance with the EPA test method for the determination of asbestos in bulk
samples, EPA/600/R-93/116.  If the sample(s) submitted was inhomogeneous (layered), the
components of sub-samples were analyzed and reported separately.  The asbestos fiber type and
percentage are reported. The method of measurement is based on calibrated visual estimation.
The data provided herein is related only to those samples submitted for analysis.  Samples
comprised of **greater than one percent (1%) asbestos** are to be considered an asbestos containing
material.

Verification by PLM point counting is available upon request.  Due to limitations of the PLM
microscope and the matrix of floor tile, any floor tile sample found to contain NO asbestos may be
verified by TEM analysis upon the client's request.  An additional fee will apply.

This report may not be used by the client to claim product endorsement by NVLAP or any agency
of the U.S. Government.  This report shall not be reproduced, except in full, without the written approval
of ACT.

If you have any questions, please contact me at 913-492-1337.

Respectfully submitted,

Tami L. Van
Laboratory Director

NVLAP

NVLAP Lab Code: 101649

**Exhibit 12**

## Asbestos Bulk Analysis Laboratory Report

**Client Name:** Eagle 1948

**Project Name:** Alvamar

**Project No.:**

**REPORT NO.:** ___B-63669___

RUSH TAT _____

**Date collected:**

**Collected by:**

**ANALYST:** Tami Van

**Submitted by:**

**Date sample submitted:** 6/7/2016

**Analysis date:** 6/7/2016

---

**Sample No.:** __1__

**Layer No.:** _____

**Location of Material:** Tar paper

**Description of Material:** Black tarry fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **NONE DETECTED** | | Cellulose | 90 | Bulk/Binder | 10 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Sample No.:** _____

**Layer No.:** _____

**Location of Material:** _____

**Description of Material:** _____

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Sample No.:** _____

**Layer No.:** _____

**Location of Material:** _____

**Description of Material:** _____

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Sample No.:** _____

**Layer No.:** _____

**Location of Material:** _____

**Description of Material:** _____

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Sample No.:** _____

**Layer No.:** _____

**Location of Material:** _____

**Description of Material:** _____

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

Analyst: TV

508

1          and my initials.

2     Q.    What does predating PDF mean?

3     A.    There was a time, I can't recall when, maybe

4           2010, where we made this form cover letter

5           and the Excel all one sheet.  Previously,

6           this would have been generated separately

7           from the Excel form report.  And we felt that

8           that was kind of cumbersome, so we combined

9           it all into one form so I could PDF it all

10          together and send it together.

11    Q.    Okay.  And for the record, this is the last

12          page of Exhibit 1060.  Do you see that?

13    A.    Okay.

14               MR. NOVAK:  We'll stipulate to that,

15          Judge.  I apologize.

16               THE COURT:  That's okay.

17               MR. NOVAK:  I said we'll stipulate

18          that it's the last page of 1060.

19    Q.    (By Mr. Hathaway)  I'm going to show you, and

20          you should have it in front of you,

21          Government Exhibit 12.  Do you see that?

22          Should be a letter of June the 7th of 2016

23          concerning Eagle 1948.

24    A.    Yes.

25    Q.    Yes?

509

1    A.    Yes.

2    Q.    Okay.  Keep your voice up, Dear.

3    A.    Sorry.

4    Q.    Or lean into the mic.  Kind of like this

5          (demonstrating).

6    A.    Okay.

7    Q.    And this is a cover letter after you started

8          producing those that was for, if you look at

9          the second page, Eagle 1948 Alvamar.  You're

10         the analyst, correct?

11   A.    Yes.

12   Q.    And it was submitted on-- in June of 2016,

13         correct?

14   A.    Yes.

15   Q.    It's described as black tarry fibrous.  Do

16         you see that?

17   A.    Yes.

18   Q.    Did you expect that-- well, maybe you can't

19         recall, but did you expect it to contain

20         asbestos?

21   A.    No.

22   Q.    Why?

23   A.    Tarpaper typically doesn't.

24   Q.    And so you recognized when you saw that it

25         was tarpaper, that it probably would have no

510

1        asbestos detected?

2    A.   I really don't make that prejudgment.  I

3         still make a slide no matter what and look at

4         it.

5    Q.   Right.  And you looked at it and you found

6         that there was no asbestos detected--

7    A.   Correct.

8    Q.   --in black tarry fibrous--

9    A.   Correct.

10   Q.   --material?  How is-- how are samples sent to

11        Asbestos Consulting and Testing?

12   A.   Samples can be either dropped off by an

13        individual or a company at our office and/or

14        they can be mailed in.  Our chain of custody

15        is available online now, and we do have some

16        people that mail samples as well.

17   Q.   Had you ever heard of Eagle 1948 before?

18   A.   No.

19   Q.   Have you ever heard of Alvamar before?

20   A.   No.

21   Q.   You should have before you what has been

22        marked for identification as Government

23        Exhibit 14.

24   A.   14?

25   Q.   Yes.

```
 1    A.    I have 12.  Oh, here.  Okay.

 2    Q.    It's admitted so I'll display it for the

 3          jury.  Now, this is a chain of custody; is it

 4          not?

 5    A.    Yes.

 6    Q.    And it was for Eagle 1948.  And it asked that

 7          you e-mail the results to

 8          Tucker@oliviacollection?

 9    A.    Yes.

10    Q.    Did you know who Tucker was?

11    A.    No.

12    Q.    Have you ever met Tucker Fritzel?

13    A.    No.

14    Q.    Now, it looks like this was paid for in

15          advance?

16    A.    Yes.

17    Q.    Yes.  If it was left, how would you know it

18          was paid for in advance?

19    A.    Somebody could have told me, if I wasn't

20          there, that it was paid for at the time of

21          drop-off.  So it could have come in the mail

22          with money as well.

23    Q.    And this shows it was requested by initials I

24          cannot make out, on June the 7th of 2016.  So

25          did you, as requested, send the results to
```

```
1              Tucker@oliviacollection?

2    A.    Did I question it?

3    Q.    Did you send it?

4    A.    Oh, yes.

5    Q.    Via e-mail?

6    A.    Yes.

7    Q.    Okay.  You should have before you Government

8          Exhibit 21.  Do you see that?

9    A.    Yes.

10   Q.    This has been admitted into evidence so I'm

11         going to display this for the jury.  This is

12         a sample collected by someone from KDHE.  Do

13         you recognize that as being an acronym for

14         Kansas Department of Health and Environment?

15   A.    Yes.

16   Q.    Do you often get samples from Phil Schlaman?

17   A.    Not as much as we used to, but, yes, they do

18         send us some occasionally.

19   Q.    And if you look at the second page, it shows

20         it was collected by Phil Schlaman, correct?

21   A.    Yes.

22   Q.    From Alvamar Golf Course?

23   A.    Yes.

24   Q.    And you were the analyst?

25   A.    Yes.
```

513

```
1    Q.   And the date it was collected was October the

2         17th of 2016?

3    A.   That's what he put on the form, yes.

4    Q.   Yes.  And it tested positive for 75 percent

5         chrysotile?

6    A.   Yes.

7    Q.   And if we go to the third page, KDHE also

8         used a chain of custody form, all right?

9    A.   Yes.

10   Q.   And it has on there the names and dates of

11        everybody who handled it, correct?

12   A.   Yes.

13   Q.   And it was accepted by Tami Van?

14   A.   Yes.

15   Q.   The sample that proved to be 75 percent

16        positive for chrysotile?

17   A.   Yes.

18   Q.   Is that your handwriting?

19   A.   Yes.

20   Q.   And it shows that it was from roofing debris

21        pile in bulk.  And that's how this was

22        submitted to you for--

23   A.   Yes.

24   Q.   --you to show acceptance?

25   A.   Yes.
```

514

1    Q.   Would you tell the jury, when you do the

2         sampling of what was shown to you as

3         exhibits, how is that done?

4    A.   Sure.  When I receive a sample, it's usually,

5         hopefully, in a ziplock baggie.  I have a

6         station that has a hood that has what's

7         called a stereoscope in it.  And it's

8         basically a large magnifying glass, and it's

9         hooked to a negative pressure unit so I don't

10        breathe in any asbestos.  The microscope that

11        I use there is probably just about a 20 X

12        magnification.  So I use that to determine

13        layers.  If-- what color, if it's wet, if I

14        see-- you know, what do I have.

15                  And then from there I determine,

16        well, it looks like there's possibly

17        chrysotile.  So then I would make slides

18        accordingly depending on the type of asbestos

19        I think is in there.  Different types of

20        asbestos have different colorations and

21        different refractive index oils.  So-- most

22        common is chrysotile.  So for these-- in

23        these cases, you know, kind of tease the

24        sample a little bit and pull out some fibers,

25        make a slide with that refractive index oil,

1          put a little cover slip on it, take it to the

2          polarized light microscope.

3                    That's where I determine all the

4          refractive indices, its-- all of its optical

5          properties.  It has morphology, which is

6          shape.  Refractive indices.  Whether or not

7          it's isotropic or not.  The birefringence and

8          if it's got positive or negative elongation.

9          There's just about seven factors I-- I

10         measure or determine.  I use the polariscope

11         to determine my refractive indices of the

12         material and report it out as such.

13    Q.   So it's through a visual inspection under a

14         microscope?

15    A.   Correct.  With measurement of refractive

16         indices to knowns.

17    Q.   Are asbestos fibers something you can detect

18         with the naked eye?

19    A.   You can guess, but you can't know for sure

20         without using a microscope and measuring

21         those optical properties.

22    Q.   Thank you.

23                    MR. HATHAWAY:  That's all I have,

24         Your Honor.

25                    THE COURT:  Thank you, Mr. Hathaway.

516

```
1              Mr. Novak.
2                    CROSS-EXAMINATION
3       BY MR. NOVAK:
4    Q.   Good morning, Ms. Van.
5    A.   Hello.
6    Q.   My name is Ed Novak.  I represent
7         Mr. Fritzel.  The--
8              MR. NOVAK:  If we could put Exhibit
9         3 on the screen, please.
10   A.   I'm sorry, I can't hear you.
11   Q.   (By Mr. Novak)  I said could we put Exhibit 3
12        on the screen.  It's on the-- you have a hard
13        copy--
14   A.   Okay.
15   Q.   --and, Ms. Van, it's on the electronic
16        monitor in front of you as well.
17   A.   Right.
18   Q.   So just a couple of quick questions about
19        this.  My question is going to be:  Do you
20        have an independent recollection of doing
21        this testing?  In other words, without
22        looking at this document, do you remember
23        doing a test on-- on or about December 4,
24        2008, of this particular sample?
25   A.   No, I do not.
```

517

1    Q.    Okay.  And how many samples a day do you get

2          in now, 2019?

3    A.    On average, I analyze anywhere from 30 to 50

4          samples a day.

5    Q.    So just to be sure I've-- I've kind of closed

6          the loop on this, do you have any independent

7          recollection of the 2008 sample that

8          Mr. Patterson brought to you?

9    A.    No, I do not.

10   Q.    Only what's on the documents?

11   A.    Correct.

12   Q.    Okay.  With respect to Exhibit 12--

13              MR. NOVAK:  May we have Exhibit 12

14         on the screen?  Thank you.

15   Q.    (By Mr. Novak)  --so this is the June of 2016

16         report that Mr. Hathaway showed you, and I

17         want to ask you the same question.  Do you

18         have any independent recollection of this

19         sample?

20   A.    No, I do not.

21   Q.    Okay.  Only what's on the reported--

22   A.    Yes.

23   Q.    --reported on the documents?  Thank you.

24              MR. NOVAK:  And Exhibit 21, please.

25   Q.    (By Mr. Novak)  This is the KDHE sample from

1           October of 2016, which Mr. Hathaway showed

2           you.  Do you have any independent

3           recollection of this sample?

4    A.     No, I do not.

5    Q.     Only what's on the reported--

6    A.     Yes.

7    Q.     Reported on the document?

8    A.     Yes.

9    Q.     Thank you.  You described for Mr. Hathaway

10          and the jury the test that you performed on

11          this sample that's Exhibit 21.  Is that the

12          same test you would have performed on the

13          June of 2016 sample and the December of 2008

14          sample?

15   A.     Yes.  All samples are processed the same.

16   Q.     And any other testing that you would have

17          done on any of those samples?

18   A.     No.

19   Q.     Okay.

20               MR. NOVAK:  May I have one second?

21   Q.     (By Mr. Novak)  Thank you, Ms. Van.

22               THE COURT:  Thank you, Mr. Novak.

23               Mr. Hathaway, any redirect?

24               MR. HATHAWAY:  No, Your Honor.

25               THE COURT:  All right.  Are you



**ACT**

14953 West 101st Terrace
Lenexa, Kansas 66215
(913) 492-1337 • Fax (913) 492-1392

December 4, 2008

Patterson Construction
1909 Quail Run
Lawrence, KS  66047

Project:  Alvamar Country Club- Lawrence, KS

Enclosed please find results for the bulk sample submitted to our laboratory for asbestos analysis
from the above referenced project.

The asbestos analysis was performed using Polarized Light Microscopy (PLM) with dispersion
staining in accordance with the EPA test method for the determination of asbestos in bulk
samples, EPA/600/R-93/116.  If the sample was inhomogeneous (layered), the components or sub-
samples were analyzed and reported separately.  The percentage of fibers is listed.  The method of
measurement is based on calibrated visual estimation.  The data provided herein is related only to
those samples submitted for analysis.  Samples comprised of greater than one percent (1%)
asbestos are to be considered an asbestos containing material.

Verification by PLM point counting is available upon request. Due to the limitations of the PLM
microscope and the matrix of floor tile, any floor tile samples found to contain NO asbestos may
be verified by TEM analysis upon the client's request.

This report may not be used by the client to claim product endorsement by NVLAP or any agency
of the U.S. Government. This report shall not be reproduced, except in full, without the written
approval of ACT.

If you have any questions, please contact me at 913-492-1337.

Respectfully submitted,

Tami L. Van
Laboratory Director
NVLAP Lab Code: 101649-0

**Exhibit 3**

RD 1_Fritzel_EPA_003784

# Asbestos Bulk Analysis Laboratory Report

Asbestos Consulting Testing (ACT)  14953 W. 101st Terrace, Lenexa, KS  66215  (913) 492-1337       NVLAP Lab Code: 101648-0

| | | |
|---|---|---|
| **Client Name:** Patterson Construction | **REPORT NO.:** | **B-48198** |
| **Address:** 1909 Quail Run | **RUSH TAT** | |
| Lawrence, KS  66047 | **Project Name:** | Alvamar Country Club |
| | **Address:** | 1800 Crossgate Drive |
| **Date sample collected:** | | Lawrence, KS  66047 |
| **Collected by:** | **Project No.:** | |
| **Submitted by:** Jay Patterson | **Analyst:** | Tami Van |
| **Date sample submitted:** 12/3/2008 | **Analysis Date:** | 12/4/2008 |

---

**Sample No.:** 1
**Layer No.:**

**Location of Material:** Roof felt
**Description of Material:** Brown compact fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **CHRYSOTILE** | **75** | Cellulose | 10 | Bulk/Binder | 15 |

---

**Sample No.:**
**Layer No.:**

**Location of Material:**
**Description of Material:**

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

**Sample No.:**
**Layer No.:**

**Location of Material:**
**Description of Material:**

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

**Sample No.:**
**Layer No.:**

**Location of Material:**
**Description of Material:**

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

**Sample No.:**
**Layer No.:**

**Location of Material:**
**Description of Material:**

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

**Analyst:** _____TV__

**Laboratory Director:** *Tami Van*

Page 1

RD 1_Fritzel_EPA_003785

# Asbestos Bulk Analysis Laboratory Report

Asbestos Consulting Testing (ACT)  14953 W. 101st Terrace, Lenexa, KS  66215  (913) 492-1337            NVLAP Lab Code: 101649-0

Client Name: Patterson Construction
Address: 1909 Quail Run
Lawrence, KS  66047

REPORT NO.: **B-48198**
RUSH TAT ___

Date sample collected:
Collected by:
Submitted by: Jay Patterson
Date sample submitted: 12/3/2008

Project Name: Alvamar Country Club
Address: 1800 Crossgate Drive
Lawrence, KS  66047

Project No.:
Analyst: Tami Van
Analysis Date: 12/4/2008

---

Sample No.: 1
Layer No.: _____

Location of Material: Roof felt
Description of Material: Brown compact fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **CHRYSOTILE** | **75** | Cellulose | 10 | Bulk/Binder | 15 |

---

Sample No.: _____
Layer No.: _____

Location of Material: _____
Description of Material: _____

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

NO COVER LETTER
OR COC AVAILABLE
Pre-dates PDF
TV

---

Sample No.: _____
Layer No.: _____

Location of Material: _____
Description of Material: _____

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

Sample No.: _____
Layer No.: _____

Location of Material: _____
Description of Material: _____

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

Sample No.: _____
Layer No.: _____

Location of Material: _____
Description of Material: _____

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

Analyst: _____TV__            Laboratory Director: *Tami Van*            Ex. 1060 - last page            Page 1

63



# A C T

14953 W. 101st Terrace
Lenexa, Kansas  66215
913-492-1337

October 18, 2016

KDHE
1000 SW Jackson, Suite 330
Topeka, KS  66612

PROJECT:      Alvamar Golf Course- 1809 Crossgate Dr., Lawrence, KS
REPORT NO.    B-64492

Enclosed please find results for bulk samples submitted to our laboratory for asbestos analysis
from the above referenced project.

The asbestos analysis was performed using Polarized Light Microscopy (PLM) with dispersion
staining in accordance with the EPA test method for the determination of asbestos in bulk
samples, EPA/600/R-93/116.  If the sample(s) submitted was inhomogeneous (layered), the
components of sub-samples were analyzed and reported separately.  The asbestos fiber type and
percentage are reported. The method of measurement is based on calibrated visual estimation.
The data provided herein is related only to those samples submitted for analysis.  Samples
comprised of **greater than one percent (1%) asbestos** are to be considered an asbestos containing
material.

Verification by PLM point counting is available upon request.  Due to limitations of the PLM
microscope and the matrix of floor tile, any floor tile sample found to contain NO asbestos may be
verified by TEM analysis upon the client's request.  An additional fee will apply.

This report may not be used by the client to claim product endorsement by NVLAP or any agency
of the U.S. Government.  This report shall not be reproduced, except in full, without the written approval
of ACT.

If you have any questions, please contact me at 913-492-1337.

Respectfully submitted,

*Tami Van*

Tami L. Van
Laboratory Director

NVLAP

NVLAP Lab Code: 101649

**Exhibit 21**

## Asbestos Bulk Analysis Laboratory Report

Client Name: KDHE
Project Name: Alvamar Golf Course
1809 Crossgate Dr., Lawrence, KS
Project No.:
Date collected: 10/17/2016
Collected by: Phil Schlaman
ANALYST: Tami Van

REPORT NO.: **B-64492**
RUSH TAT   X
Submitted by: Phil Schlaman
Date sample submitted: 10/18/2016
Analysis date: 10/18/2016

---

Sample No.: 1
Layer No.:

Location of Material: Roofing #1- debris pile
Description of Material: Gray thin compact fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **CHRYSOTILE** | **75** | Fibrous glass | 3 | Bulk/Binder | 22 |

---

Sample No.:
Layer No.:

Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

Sample No.:
Layer No.:

Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

Sample No.:
Layer No.:

Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

Sample No.:
Layer No.:

Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| | | | | Bulk/Binder | |

---

Analyst: TV

Page 2 of 2

RD 1_Fritzel_EPA_000647

B 64492

Kansas Department of Health and Environment

Sample Receiving /Transmittal   **Chain of Custody**

Client: KDHE
Send report to: Phil Schlaman
Address: 1000 SW Jackson Suite330
City/State/Zip:Topeka, KS 66612
Phone #: 785-296-1549
Fax #  785-296-1545

Project Name: _Alvamar Golf Course_
Address: _1809 Crossgate, Dr_
_Lawrence, Ks 66047_
Notification # _785-296-1549_
Date Required: _ASAP_
Verbal __X__  Fax_____  Mail_____

Sampler Name: Phil Schlaman

Relinquished by: _Phil Schlam_
Accepted by: _____
Relinquished by: _____
Accepted by: _Camilan_

Date: _10-14-16_
Date/Time: _10-17-16 / 13:02_
Date/Time: _10-17-16   13:09_
Date/Time: _10-18-16   9:23_
Date/Time: _10/18/16   9:23AM_

Number of Samples: _1_   Condition of Package:_____   Carrier:_____

| Sample # | Date | Sample Location | Type of Sample |
|---|---|---|---|
| Roofing #1 | 10-14-16 | Debris Pile | Bulk |

RD 1_Fritzel_EPA_000648

305

```
 1           screen.
 2                    MR. NOVAK:  I assume Mr. Hathaway is
 3           including the other two pages that go along
 4           with this.
 5                    MR. HATHAWAY:  Indeed.
 6                    MR. NOVAK:  No objection then.
 7                    THE COURT:  Exhibit 21 is admitted
 8           without objection.
 9      Q.   (By Mr. Hathaway)  And in the second
10           paragraph there's a sentence that says
11           samples comprised of greater than 1 percent
12           asbestos are to be considered an
13           asbestos-containing material?
14      A.   Correct.
15      Q.   You indicated a second ago that there was a
16           high concentration of asbestos in the sample
17           that you obtained and submitted for sampling?
18      A.   Correct.
19      Q.   And does that indicate that it's chrysotile?
20      A.   Chrysotile?
21      Q.   Yeah.
22      A.   Yeah.  75 percent.
23      Q.   And that is asbestos?
24      A.   That is asbestos.  A type of asbestos.
25      Q.   It's friable?
```

# Paragraph 23

# Asbestos Bulk Analysis Laboratory Report

Client Name: KDHE
Project Name: Alvamar Golf Course
1809 Crossgate Dr., Lawrence, KS
Project No.:
Date collected: 10/17/2016
Collected by: Phil Schlaman
ANALYST: Tami Van

REPORT NO.: **B-64492**
RUSH TAT __X__

Submitted by: Phil Schlaman
Date sample submitted: 10/18/2016

Analysis date: 10/18/2016

---

Sample No.: 1
Layer No.:

Location of Material: Roofing #1- debris pile
Description of Material: Gray thin compact fibrous

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage | |
|---|---|---|---|---|---|
| **CHRYSOTILE** | **75** | Fibrous glass | 3 | Bulk/Binder | 22 |

---

Sample No.:
Layer No.:

Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

---

Sample No.:
Layer No.:

Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

---

Sample No.:
Layer No.:

Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

---

Sample No.:
Layer No.:

Location of Material:
Description of Material:

| Asbestos Fiber Type | Percentage | Non-Asbestos Fiber Type | Percentage | Non-Fibrous Percentage |
|---|---|---|---|---|
| | | | | Bulk/Binder |

---

Analyst: TV

Page 2 of 2

Ex. 1060, p 23

# Paragraphs 25 – 26

411

```
1    Q.   And how are you employed or what is it you

2         do?

3    A.   I'm president of B & R Insulation.  We do

4         asbestos removal.  Also president of ACT,

5         which does consulting having to do with

6         environmental issues.

7    Q.   Sir, I'm going to display some photos for you

8         of the clubhouse side.  Were you asked to

9         come out on or about October the 13th of 2016

10        to look at the clubhouse?

11   A.   I believe it was later than that; but, yes, I

12        was asked to come out to the clubhouse to

13        take a look.

14   Q.   Okay.  And when do you think it was if it was

15        later?

16   A.   I think it was the 20th.

17   Q.   The 20th?

18   A.   (Shakes head up and down).

19   Q.   Did you see any large debris piles when you

20        were there on the 20th?

21   A.   No, there weren't any large debris piles.

22        There was general construction debris at the

23        site, though.

24   Q.   And did you have an employee who came and did

25        some remediation?
```

417

1           MR. NOVAK:  Could you back up a

2      couple of photos for me, please?  There we

3      go.  Whoops.  Go forward one.  That one.

4      Thank you.

5   Q.   (By Mr. Novak)  Is this one of-- do you

6      recall this being one of the photos that KDHE

7      sent you?

8   A.   I believe it was that one, or something very

9      similar to that, yes.

10  Q.   And as you look at that debris pile, do you

11      see material in there other than material

12      which would have come from the roof of that

13      building behind the pile?

14  A.   It looks like there's a lot of different

15      building debris other than the roof.

16  Q.   Okay.  Thank you.  You had a good opportunity

17      to inspect this area when you were there on

18      the 20th of October.  Would you have expected

19      to find asbestos in the roof of that

20      building?

21  A.   Except for that I was told that there was

22      asbestos paper, I would not have necessarily

23      expected to see asbestos on that roof.

24  Q.   And in order to find asbestos in the roof,

25      what would a person who knew what they were

418

```
1              doing about sampling, what kind of sample

2              would he or she have to do?

3    A.    Well, a sampling person would have had to

4              have done some destructive sampling of the

5              roof to be able to find any underlayment

6              paper or something of that nature.

7    Q.    And when you say destructive sampling, you

8              mean they would have had to like take a core

9              of the entire roof?

10   A.    Either a core or peeled up layer by layer to

11             a substrate.

12   Q.    So is it-- if you don't do a core or peel up

13             layer by layer, then it's possible to miss a

14             layer as you are looking--

15   A.    Correct.

16   Q.    --if you're taking a sample?  Okay.  Do you

17             know, does the City of Lawrence, Kansas,

18             require a predemolition survey to obtain a

19             demolition permit?

20   A.    I'm not aware of any requirement by the City

21             of Lawrence.

22   Q.    Your workers who were on-site on October 28

23             and October 31 -- and those were the two

24             dates that the workers were on-site; is that

25             correct --
```

# Paragraph 31

280

```
 1            down, we want to get in contact with them to
 2            make sure that the friable asbestos is
 3            removed prior to demolition.  That happens on
 4            occasion.  And then of course there's some
 5            questions about whether they're going to burn
 6            it and some other questions.  But the next
 7            important one really is the disposal site
 8            where they're going to get rid of the stuff.
 9            And the friable asbestos is supposed to go to
10            an approved landfill.  And usually it's a
11            municipal solid waste landfill.  We don't
12            regulate the landfill but the landfill is
13            supposed to keep track of where the asbestos
14            goes for future exposure problems and that
15            kind of thing.
16    Q.      What is your understanding of how the
17            landfill deals with regulated
18            asbestos-containing material?
19    A.      They bury it in a-- they assign it to what
20            they call a cell.  And the stuff is supposed
21            to be deposited in that cell.  Many times
22            it's in plastic bags, and they're required
23            every day to cover up this material so that
24            it's not windborne and you've got structures
25            breaking and stuff flying in the air.  So
```

```
 1        they're supposed to cover it up every day.
 2   Q.   In what fashion?
 3   A.   Dirt, I believe.  I suppose they could use
 4        other trash as long as it's not
 5        asbestos-containing.  But I'm not involved in
 6        that waste disposal part.
 7   Q.   So this was not prepared by Mr. Fritzel or
 8        anyone as a part of his organization?
 9   A.   Not to my knowledge.
10   Q.   You were talking about a phone call that you
11        had with Scott Mesler.
12   A.   Okay.
13   Q.   And would that have taken place prior to your
14        going on a trip out to the Alvamar Country
15        Club?
16   A.   Yes.
17   Q.   In Lawrence, Kansas?
18   A.   Yes.
19   Q.   So would that have been sometime in October
20        of 2016?
21   A.   Yes.
22   Q.   I want to take you back to October 13 of
23        2016.  And you indicated that you had made a
24        trip to the site?
25   A.   Yeah.
```

# Paragraph 42





Known for excellence.
Built on trust.

GEOTECHNICAL
ENVIRONMENTAL
ECOLOGICAL
WATER
CONSTRUCTION
MANAGEMENT

20900 Swenson Drive
Suite 150
Waukesha, WI 53186
T: 262.754.2560
F: 262.754.9711
www.gza.com

October 28, 2019
File No. 20.0155934.00

Melissa S. Ho, Esq.
Edward F. Novak, Esq.
Polsinelli PC
1 East Washington Street, Suite 1200
Phoenix, Arizona  85004-2568

Re:      United States of America vs. Thomas Fritzel et al.

Dear Ms. Ho and Mr. Novak:

In the case of the United States of America vs. Thomas Fritzel et al., I have reviewed numerous case-specific documents, regulations, and other materials related to the United States Department of Labor, Occupational Safety and Health Administration (OSHA) and the United States Environmental Protection Agency (USEPA), and the relevant scientific literature.  Based on my review of these materials; my over 46 years of work experience; my education, which includes a Ph.D. with a major in toxicology and a minor in engineering, a Master of Science degree with a major in industrial hygiene, and a Bachelor of Science degree with majors in chemistry and biological science and a minor in economics, the following provides a summary of my opinions to a reasonable degree of scientific certainty in this case.  Please note that my work history, education, publications, certifications, and other credentials are detailed in my curriculum vitae, which is provided in Attachment 1.

**EXPERT OPINIONS**

My expert opinions include the six following areas:

1.   The collection of bulk roofing material samples at the former Alvamar Country Club (hereafter, the Country Club) for the analysis of asbestos by representatives of Mr. Thomas Fritzel, the Kansas Department of Health and Environment (KDHE), and Mr. Fritzel's consultant, GZA GeoEnvironmental, Inc. (GZA).

2.   The interpretation of the bulk sample analytical results described in No. 1, above.

3.   The differences between the bulk sample analytical results.

4.   The potential exposure and resulting asbestos dose for workers and bystanders relating to airborne asbestos for roofing work involving asbestos-containing roofing materials (roof paper).



October 28, 2019
File No. 20.0155934.00
United States of America vs. Thomas Fritzel et al.
Page | 2

5. The roofing system present prior to and after partial removal at the Country Club.

6. The definition of friable and non-friable roofing paper when asbestos is encapsulated in the matrix of the materials.

The following provides a summary of the scientific information related to each of the six areas and my opinion.

***1. The collection of bulk roofing material samples at the Country Club for the analysis of asbestos by representatives of Mr. Fritzel, the KDHE, and Mr. Fritzel's consultant, GZA.***

On June 7, 2016, a bulk sample of roofing paper, identified as being black in color, was collected by a representative of Mr. Fritzel from the roof paper at the Country Club and submitted to the laboratory utilized by the KDHE, which was ACT (hereafter, the Laboratory).  Asbestos was not detected in the sample when it was subjected to analysis by Polarized Light Microscopy (PLM).

According to the interview of Mr. Phil Schalaman of the KDHE on October 14, 2016, he collected a single bulk sample of waste roofing material identified as "Roofing #1-Debris Pile," which it described as "Gray thin compact fibrous."  From my review of the video footage taken by the KDHE during collection of the bulk sample of waste roofing material, an underlying layer of black roofing paper is visible on the severed piece of the original pitched roof substrate.  Inconsistent with the standard of care when sampling the roofing system in question, the black roofing paper was not sampled.  The black roofing paper is part of an independent homogeneous area defined by the overlying metal roofing system that encapsulated the pitched shake roof and the KDHE appears to deliberately avoid sampling the black roofing paper, which is part of the original pitched roof system.  Interestingly, the sample was not submitted to the Laboratory for analysis until either October 17, 2016 at 13:09 (1:09 PM) or October 18, 2016, or four days following its collection, with the analysis requested at that time as "Rush TAT" (turnaround time).  The sample analysis found 75% chrysotile asbestos, 3% fibrous glass, and 22% bulk/binder.  The case materials provided information that showed that the materials from which the KDHE collected its single sample had been disposed in and around a dumpster in a debris pile that was located on-site.  There was no other information that identified the chain-of-custody of the sample from the unidentified time that it was collected on October 13, 2016, until the time it was "Relinquished" by Mr. Schalaman to an individual whose name was not discernible (however, I assumed that person was Adrian Turner, a Laboratory employee) on the KDHE's "Sample Receiving/Transmittal **Chain of Custody**" on October 17, 2016 at 13:02 (1:02 p.m.), and then accepted by the Laboratory on October 18, 2016 at 9:23 a.m., other than the undiscernible name.  Further the chain-of-custody actually identified that the Debris Sample was collected on October 17, 2016 and not on October 13, 2016, as Mr. Schalaman had stated in his interview.

On March 15, 2019, GZA collected bulk roofing material samples at various locations on the Country Club roof.  At each sample location, GZA penetrated the existing pitched roof structure, which consisted of a thin layer of painted polyurethane foam insulation applied to the dimensional metal shingle roofing material overlying an approximately ¼-inch plywood layer that was positioned over a thin layer of aluminum-backed expanded

October 28, 2019
File No. 20.0155934.00
United States of America vs. Thomas Fritzel et al.
Page | 3

polyurethane board that had been installed over the original wooden shake shingle roof.  The wooden shake shingles had been installed over a plywood sheeting substrate that was covered by one to three layers of roofing paper (which is often described as roofing felt), from which the bulk samples were collected and submitted for laboratory analysis.  A plan view identifying the bulk sample locations (identified as MMR) is provided as Figure 1.  GZA submitted the samples to Eurofins | CEI (Eurofins), a National Voluntary Laboratory Accreditation Program (NVLAP)-accredited analytical laboratory.  The laboratory analytical report of the PLM analysis of the bulk roofing material samples is provided in Attachment 2.  As can be seen from review of the analytical results, a gray layer of the roofing paper was found at each of the bulk sample locations with the gray layer positioned on top of a black layer in several bulk sample locations; a gray layer, a black layer, followed by a gray layer of paper found in two bulk sample locations; and a single gray layer found in one bulk sample location.  In the most of the bulk samples of the black roofing paper layer, asbestos was not found and was reported by the laboratory as "None Detected."  In the bulk samples of the gray roofing paper, chrysotile asbestos was reported by the laboratory at 50%.  As can also be seen from review of the analytical data provided in Attachment 2, the composition of the roofing paper also included various non-asbestos-containing cellulose, fiberglass, binder, and silicate materials.

Thus, it can be concluded that one to three layers of roofing paper were used on the roof of the Country Club, with the black roofing paper not containing asbestos.  It can also be concluded that there is no information related to the disposition, storage, or retention of the single bulk roofing material sample collected by the KDHE from October 13-16, 2016, until it was received at the laboratory on 1:09 p.m. on October 17, 2016, or at 9:23 a.m. on October 18, 2016.

### *2.  The interpretation of the bulk sample analytical results described in No. 1, above.*

As noted in No. 1, the KDHE collected a single bulk sample from debris that had been disposed at an unidentified time from an unidentified location.  The single bulk sample was generally identified by the KDHE as:

| Sample No. | Date | Sampling Location | Type of Sample |
|---|---|---|---|
| Roofing #1 | 10/14/16 | Debris Pile | Bulk |

No other descriptors or specific identifiers were provided related to this material.  It should be noted that the KDHE had no specific knowledge or information regarding other materials with which the bulk sample material came into contact before or after its disposal, the weather conditions during the time the bulk sample material was located in or around the dumpster and debris pile, any work performed, or the material used in or around the dumpster and debris pile, or for that matter, any information regarding the bulk sample material.  For its single sample, the KDHE determined that the material contained 75% chrysotile asbestos through PLM analysis conducted by the Laboratory.  Alternatively, GZA collected bulk samples from the actual in-place roofing materials and found that only the gray (light) layer of roof paper contained 50% chrysotile with asbestos not detected in any of the bulk sample layers of the black roof paper when PLM analysis was performed.



Thus, it can be concluded that when multiple samples of the existing roof paper that was included in all but one location, at least two layers of two different colored roof paper, that only the gray (light) colored roof paper contained asbestos, with asbestos not detected in the black roof paper.  It can also be concluded that the bulk material from which the KDHE collected was positioned in or around the dumpster and the debris pile for an unknown time period in unidentified conditions.

### 3.   The differences between the bulk sample analytical results.

As previously described, the KDHE collected a single bulk sample of the gray roof paper that was present in or around the dumpster and debris pile while not collecting a sample of the black roofing paper, while GZA collected bulk samples of the various layers of the roof paper materials that were in place on the roof of the Country Club.  The results of the PLM analysis for the samples resulted in KDHE's Laboratory detecting 75% of chrysotile in the disposed roof material, while each and every sample of the gray (light) in-place roofing material, or for the samples collected by GZA and analyzed by Eurofins, found 50% chrysotile asbestos or 33⅓% less than the KDHE sample result.  While the use of PLM analysis by different laboratories may results in some disparity, neither the accuracy nor precision of the KDHE sample result can be further evaluated, much less validated, since only a single sample was collected and subjected to analysis.  On the other hand, GZA's collection and analysis of its samples of the gray (light) roof paper and samples of the black roof paper provided consistent and repeatable results throughout all of the analyses.

Thus, it can be concluded that KDHE, by collecting a single bulk sample of the disposed roofing material, the accuracy and precision of the results cannot be evaluated, much less validated.  However, GZA's collection and analysis of its bulk samples containing gray (light) roof paper and the black roof paper provided consistent, repeatable results of the percentage of asbestos contained in each roof paper.

### 4.   The potential exposure and resulting asbestos dose for workers and bystanders relating to airborne asbestos for roofing work involving asbestos-containing roofing materials (roof paper).

In order to determine the potential exposure to asbestos from removal of roofing materials, which included roof paper, the calculation of the dose is required.  While specific information is not available regarding all of the potential exposure parameters, sufficient information is available to calculate the hypothetical maximal worst-case dose for the removal of the roof paper.  In order to calculate the dose, the exposure duration is required.

A portion of the roof, estimated as 2,250 square feet of the Country Club, was allegedly removed in what has been identified as the fall of 2016.  While I have not been provided an estimation of the time required for this demolition work, it is my understanding that, for the purposes of my analysis, one full, 8-hour-per-day work days, for a total of 8 work hours, was required to perform this work.  Therefore, the duration of this demolition work was calculated as follows:



October 28, 2019
File No. 20.0155934.00
United States of America vs. Thomas Fritzel et al.
Page | 5

| Duration for Roof Removal | = | 1 day x 8 hours/day |
| | = | 8 hours x 1 year/2,080 hours |
| | = | 0.004 year |

In order to calculate the dose, the exposure (concentration) is required.  The scientific literature provided quantitative exposure information for the application of roof coating.  Mowat et al. evaluated airborne asbestos concentrations by phase contrast microscopy (PCM) during application of two roof coatings ranging from 3.04% to 15.5% chrysotile asbestos, which resulted in a maximum airborne asbestos fiber concentration of 0.009 fibers of asbestos per cubic centimeter of air (f/cc).[1]  It is important to note that the authors found no airborne asbestos fibers when evaluating the same samples by transmission electron microscopy (TEM). The authors further noted that during hand-sanding and hand-scraping of these same materials, that the "...8-h[our] time-weighted averages (TWAs) ranged from 0.0003 to 0.002 f cc$^{-1}$ and were comparable to the background TWA concentration of 0.0002 f cc$^{-1}$ measured in this study."[1]  In addition, according to a study by Sheehan et al., "Analysis of measured fiber concentrations for hand scraping of the weathered products showed 8-h time-weighted average concentrations that were well below the current Occupational Safety and Health Administration permissible exposure limit for asbestos."[2]  In fact the authors found that "...a large fraction of chrysotile fibers contained low concentrations of or essentially no magnesium and did not meet the spectral, mineralogical, or morphological definitions of chrysotile asbestos."[2]

The scientific literature provided quantitative exposure information for roofing work.  The National Roofing Contractors Association (NRCA) provided exposure data for roofing materials and roofing operations in response to the personal monitoring requirements of OSHA's 1994 asbestos standard.[3]  The NRCA compiled a database of several thousand personal breathing zone samples and area samples collected during asbestos roofing material work using sampling and analytical methods prescribed by OSHA.  All of the several thousand air samples included in the NRCA database were well below the current permissible exposure limit (PEL) of 0.1 f/cc as an 8-hour TWA.[3]  In fact, the NRCA stated, "...typical exposures during ACRM [asbestos-containing roofing materials] work are well below the applicable limits, generally by one to two orders of magnitude."[3]

The USEPA also explained that roof coatings were unlikely to be a source of asbestos fiber emissions when they excluded them from the National Emissions Standards for Hazardous Air Pollutants (NESHAP) in 1978. USEPA reported:

> ...[I]f asbestos fibers are released during application of the coatings, during their service life, or during demolition or renovation, the fibers will not remain airborne because they are encapsulated by droplets of the binder and are too heavy to remain suspended.[4]

On August 10, 1994, OSHA promulgated regulations for general industry, maritime and construction industries that classified roofing work as a Class II asbestos job classification.  A Class II asbestos job classification was defined as:



*Class II asbestos work* means activities involving the removal of ACM which is not thermal system insulation or surfacing material.  This includes, but is not limited to, the removal of asbestos-containing wallboard, floor tile and sheeting, roofing and siding shingles, and construction mastics.[5]

On June 29, 1995, OSHA clarified its previous rulemaking by excluding the use of asphalt roof cement, coatings, and mastics that contained asbestos from the Class II requirements.[6]  Further, in its June 29, 1998 rulemaking, OSHA affirmatively excluded asbestos-containing asphalt roof cements, coatings and mastics from the scope and application of the asbestos standards for the maritime and construction industries.[7]  These exclusions were based on the encapsulation of asbestos into the matrix of such roofing products and the fact that quantifiable airborne asbestos concentrations were not found during the use of these roofing products.

As discussed previously, the extensive study by the NRCA revealed that airborne asbestos concentrations during roofing operations were generally one to two orders of magnitude lower than the current PEL.  Nonetheless, I considered work by Williams et al., which cited OSHA 1983, and provided an arithmetic mean airborne asbestos fiber concentration of 0.15 f/cc as an eight-hour TWA exposure concentration during the work with asbestos-containing roofing felts.[8]  Therefore, I selected the arithmetic mean concentration of work with roofing felt and calculated the dose as follows:

Dose   =  Duration (time)  x  Exposure (concentration)
        =  0.004 year  x  0.15 f/cc
        =  0.0006 f-yr/cc

It should be noted that the employee that removed the roof was utilizing a tractor-type piece of equipment (excavator) equipped with a reaching claw while operating the equipment from the enclosed cab distal from the actual roof removal operation.  The scientific literature provides many references that show with increasing distances from the source, the exposure concentration is significantly reduced.[9-14]  Thus, the potential exposure and resulting asbestos dose to the tractor operator and other bystanders would be significantly less than the hypothetical maximal worst-case dose that was calculated using maximum exposure parameter values.

Discussion Regarding Exposure to Roofing Materials

For the purposes of my evaluation, I have assumed that this roofing product contained defined percentages by weight of short-fiber (less than 8 microns [μm] in length) Grade 7 chrysotile asbestos, which is the serpentine classification of asbestos.[15]

Several of the scientific studies previously referenced describe the lack of adverse toxicological effects from short-fiber chrysotile due to its chemical composition and morphology.  Specifically, in chrysotile, the magnesium cations present in the octahedral sheets are leached at the pH found in the lung or stomach, thus decomposing the fibers to fibrils or other non-asbestos materials.  However, in the commercially available amphiboles, the iron cations are stable at the same pH, thus the fibers are unaffected.  The leaching of the magnesium cations from chrysotile and other factors generally account for the days to weeks of



October 28, 2019
File No. 20.0155934.00
United States of America vs. Thomas Fritzel et al.
Page | 7

biopersistence time in the respiratory system for chrysotile while the amphiboles' biopersistence is months to years.  The morphology of the asbestos materials also impacts its toxicity.  Chrysotile is a series of curved layers where the octahedral sheets of magnesium overlap the silicon tetrahedral sheets to offset the magnesium to silicon bond.  This structure provides for a curved, flexible fiber.  On the other hand, the amphiboles are rigid chains of iron and magnesium cations bonding more uniformly with the silicon; thus, the amphiboles are inflexible, rigid, and sharp.

The medical, toxicological, and epidemiological literature includes numerous references that show that exposures that resulted in the dose calculated previously in this document are not associated with or related to an increased risk of an asbestos-related disease, including asbestosis, lung cancer, or mesothelioma. Attachment 3 provides references that support the lack of asbestos-disease risk at such a dose.

OSHA enacted an airborne concentration for workers exposed to asbestos in 1994 of 0.1 fibers per cubic centimeters of air.  Thus, for a worker engaged in employment for 45 years, OSHA would allow that worker to be exposed to a dose of 4.5 fiber-years per cubic centimeter (f-yr/cc).  Likewise, if the employee worked at a facility and would be exposed to OSHA's allowable airborne concentration of 0.1 f/cc, the employee's dose would be 0.1 f/cc.  Both of these doses, which are compliant with OSHA regulations, are substantially greater than the dose calculated for workers or bystanders at the country club.

## 5.  The roofing system present prior to and after partial removal at the Country Club.

As discussed in No. 1 in this document, the current pitched portion of the Country Club roof is composed of two roofs, a layer of dimensional metal roofing system that was installed on top of the original wooden shake shingle roof system when Mr. Fritzel initiated the renovation work (original roof).  As previously discussed, the original shake roof included the exterior surface wooden shake shingles installed over one to three layers of roof paper with the gray (light) roofing paper present on top of a black layer of roofing paper in five locations, with three layers of gray, black, gray roofing paper present in two locations, and a single gray layer of roofing paper present in one area.  The bottom layer of the roof paper was then installed over the top of the roof's plywood substrate.  GZA is unable to determine any pattern or rationale based solely on the locations of the specific use of one to three layers of roofing felt, which were installed over the roof deck substrate (sheeting); however, GZA is neither engaged in the roofing practice nor holds expertise in the design and installation of a roofing system, such as was present at the Country Club.  It can be concluded that different types of roofing paper were utilized at the Country Club at various locations on the original pitched roof system.

## 6.  The definition of friable and non-friable roofing paper when asbestos is encapsulated in the matrix of the materials.

Asbestos-containing material (ACM) is material containing greater than 1% asbestos, as determined using the methods specified in Appendix E, Subpart E, 40 CFR Part 763 (ACM in Schools), Section 1, PLM.  Under NESHAP (40 CFR Part 61, Subpart M), an ACM is classified as either "friable" or "non-friable."  Friable ACM is ACM that, when dry, can be crumbled, pulverized, or reduced to powder by hand pressure.  Non-friable ACM is ACM that, when dry, cannot be crumbled, pulverized, or reduced to powder by hand pressure.  Non-friable ACM is



further classified as either Category I ACM (and includes asbestos-containing packings, gaskets, resilient floor covering, and asphalt roofing products containing more than 1% asbestos). Asphalt roofing products that may contain asbestos include built-up roofing; asphalt-containing single ply membrane systems; asphalt shingles; asphalt-containing underlayment felts; asphalt-containing roof coatings and mastics; and asphalt-containing base flashings. ACM roofing products that use other bituminous or resinous binders (such as coal tars or pitches) are also considered to be Category I ACM or Category II ACM (any material, excluding Category I ACM). Category I ACM and Category II ACM are distinguished from each other by the potential to release fibers when damaged. The applicability of the Asbestos NESHAP to Category I and II ACM depends on: 1) the condition of the material at the time of demolition or renovation; 2) the nature of the operation to which the material will be subjected; and 3) the amount of ACM involved.

ACM regulated under the Asbestos NESHAP is referred to as regulated asbestos-containing material (RACM). RACM is defined in 40 CFR Part 61.141 of the Asbestos NESHAP and includes: 1) friable ACM; 2) Category I non-friable ACM that has become friable; 3) Category I non-friable ACM that has been or will be sanded, ground, cut, or abraded; or 4) Category II non-friable ACM that has already been or is likely to become crumbled, pulverized, or reduced to powder.

The gray (light) and black layers of roofing paper underlying the original pitched wood shake roof of the Country Club are characterized as Category I non-friable ACMs in its undisturbed state and would not be considered a RACM if they are not subjected to processes that potentially render them a friable material. In its current physical undisturbed state, the roofing paper materials can remain in place as a Category I non-friable ACM and are effectively covered by the overlying built-up roofing envelope that is comprised of dimensional metal roofing material, thereby limiting disturbance of the roofing paper and potentially rendering it a RACM. Therefore, it can be concluded that the presence of ACM roofing paper in its current undisturbed physical state and condition at the Country Club does not present a health exposure or risk to human health or the environment.

**CONCLUSIONS**

As previously stated in this document, the following conclusions are provided to a reasonable degree of scientific certainty:

1. One to three layers of roofing paper were used on the original pitched wooden shake shingle roof at the Country Club. The black roofing paper did not contain asbestos. The results of bulk roofing material samples collected by the representative of Mr. Fritzel and GZA confirmed this.

2. The KDHE collected a single bulk sample of debris located in or around a dumpster and debris pile on October 14, 2016. While the black layer was present, the KDHE neglected to collect a sample of the layer. The single sample that the KDHE collected was identified as a bulk sample collected from a "debris pile," which was a "Gray thin compact fibrous" material. There is no information regarding the disposition of this sample until it was received at the Laboratory at 9:23 a.m. on October 18, 2016. The KDHE found 75% chrysotile in its single bulk sample.



October 28, 2019
File No. 20.0155934.00
United States of America vs. Thomas Fritzel et al.
Page | 9

3.  GZA collected bulk samples of the original pitched roof's roofing paper at the Country Club, including samples containing layers of black roofing material, which did not contain asbestos, and samples of the gray (light) roofing paper, which contained 50% chrysotile asbestos.

4.  The single bulk sample collected by the KDHE of the disposed debris material did not provide sufficient data to allow for evaluation or validation of the results.  The numerous samples analyzed from the locations from which GZA collected samples provides for consistent and repeated results in both the gray (light) and black roof papers.

5.  The removal of the estimated 2,250 square feet of the original shake shingle roofing material did not create an exposure and resulting dose to the worker removing the roof or any other person in the work area, or any bystander in the general area that would increase the risk of an asbestos-related disease, including asbestosis, lung cancer, or mesothelioma.  In fact, the hypothetical maximal dose experienced by the worker who removed the roof materials was a small percentage of any dose of chrysotile associated with the development of an asbestos-related disease.

6.  It is obvious that the original pitched shake shingle roof utilized one or two different roofing papers, with one to three layers of the two roofing papers used at various locations throughout the roof.

7.  The remaining gray roofing paper in its current undisturbed physical state and condition does not present a health hazard or risk to human health or the environment.

In the event additional information becomes available, I reserve the opportunity to amend or revise this expert report.  Please feel free to contact the undersigned at (262) 754-2560 should you have any questions, or if you require additional information.

Very truly yours,

Kim E. Anderson, Ph.D.
GZA GeoEnvironmental, Inc.
Senior Principal/Director of Toxicology,
Environmental Health and Safety

Attachments:        References Cited
                    Figure 1 – Roof Plan View and Bulk Sample Locations
                    Curriculum Vitae of Dr. Kim E. Anderson
                    Laboratory Analytical Report
                    Medical, Toxicological, and Epidemiological Literature



**REFERENCES CITED**

1.      Mowat F, Weidling R, Sheehan P.  2007 July.  Simulation tests to assess occupational exposure to airborne asbestos from asphalt-based roofing products.  *The Annals of Occupational Hygiene.*  51(5):451-462.

2.      Sheehan P, Mowat F, Weidling R, Floyd M.  2010 November.  Simulation tests to assess occupational exposure to airborne asbestos from artificially weathered asphalt-based roofing products.  *The Annals of Occupational Hygiene*.  54(8):880-892.

3.      National Roofing Contractors Association [NRCA].  1994 December 14.  "Objective data" demonstration for certain roofing materials and operations under OSHA's 1994 asbestos standard.  Rosemont, IL: NRCA.

4.      United States Environmental Protection Agency [USEPA].  1978 June 19.  Pursuant to Section 12 of the Clean Air Act (40 CFR Part 61 National Emission Standards for Hazardous Air Pollutants [NESHAP]).  National emission standard for asbestos – 43:26372-26373.  Federal Register.

5.      United States Department of Labor, Occupational Safety and Health Administration [OSHA].  1994 August 10.  Final rule for occupational exposure to asbestos – 59:41080.  Federal Register.

6.      United States Department of Labor, Occupational Safety and Health Administration [OSHA].  1995 June 29.  Occupational exposure to asbestos, corrections, final rule – 60:339786.  Federal Register.

7.      United States Department of Labor, Occupational Safety and Health Administration [OSHA].  1998 June 29.  Occupational exposure to asbestos – 63:35137.  Federal Register.

8.      Williams PR, Phelka AD, Paustenbach DJ.  2007 September/October.  A review of historical exposures to asbestos among skilled craftsmen (1940-2006).  *Journal of Toxicology and Environmental Health (Part B, Critical Reviews).*  10(5):319-377.

9.      Murray RA.  1943 May 15.  Amosite water repellent insulation as a health hazard.  Camden, NJ:  New York Shipbuilding Corporation.  Unpublished Report.

10.     Levinson F.  1965 June 18.  Report of asbestos dust count during shipboard asbestos work.  Norfolk Naval Shipyard.  Unpublished Report.

11.     Levinson F.  1969 June 23.  Report of asbestos dust finding during ripout aboard ships.  Norfolk Naval Shipyard.  Unpublished Report.

12.     Report 71-13.  1971 December 2.  Survey of pipecovering shop asbestos operations.  Mare Island Naval Shipyard.  Unpublished Report.



**REFERENCES CITED**
**(Continued)**

13.   Ayer H and Gies R.  1973 April 12.  Report on asbestos exposure at Arkla Air Conditioning Company. Kettering Laboratory at the University of Cincinnati.  Unpublished Report.

14.   Donovan EP, Donovan BL, Sahmel J, Scott PK, Paustenbach DJ.  2011 January.  Evaluation of bystander exposures to asbestos in occupational settings:  a review of the literature and application of a simple eddy diffusion model.  *Critical Reviews in Toxicology*.  41(1):52-74.

15.   Rice C and Heineman EF.  2003 July.  An asbestos job exposure matrix to characterize fiber type, length, and relative exposure intensity.  *Applied Occupational and Environmental Hygiene.*  18(7):506-512.



**FIGURES**

LEGEND

● BULK ROOF SAMPLE LOCATION

NOTES

1. BASE MAP DEVELOPED FROM A GOOGLE PROFESSIONAL ELECTRONIC IMAGE FILE.

2. THE USE OF AERIAL PHOTOGRAPHY CAN OFTEN MAKE BUILDINGS AND OTHER SITE FEATURES APPEAR TO BE OVERLAPPING AND DISTORTED WHEN OVERLAID WITH ACTUAL SITE FEATURES.

3. THE LOCATION OF THE EXPLORATIONS WERE APPROXIMATELY DETERMINED BY LINE OF SIGHT AND/OR TAPE MEASUREMENTS FROM EXISTING TOPOGRAPHIC FEATURES. THESE LOCATIONS SHOULD BE CONSIDERED ACCURATE ONLY TO THE DEGREE IMPLIED BY THE METHOD USED.

FORMER ALVAMAR COUNTRY CLUB
1809 BIRDIE WAY
LAWRENCE, KANSAS

GZA GeoEnvironmental, Inc.
Engineers and Scientists
www.gza.com

ROOF PLAN VIEW AND
BULK SAMPLE LOCATIONS

FIG
1

SHEET NO.

PROJECT NO.
20.0155934.00

DATE
3/22/2019

©2016 – GZA GeoEnvironmental, Inc. GZA-J:\15590010\155934 USA V PRITZEL\FIGURES\20.0155934.00.DWG FIG 1 JUNE 4, 2018 PAMELA REHBEIN



**ATTACHMENT 1**

**Curriculum Vitae of Dr. Kim E. Anderson**



**CURRICULUM VITAE**

# Kim E. Anderson, Ph.D.

Senior Principal
Director of Toxicology, Environmental Health and Safety

## Education

B.S., Chemistry/Biology (Environmental Science)/Economics, University of Oklahoma, 1972

M.S., Department of Environmental Health (Industrial Hygiene), University of Oklahoma, 1973

Ph.D., Department of Environmental Health (Toxicology and Civil Engineering), University of Oklahoma, 1986

## Registrations & Certifications

Certified Hazardous Materials Manager (CHMM)

Certified Hazardous Control Manager (CHCM)

Registered Indoor Air Quality Manager (RIAQM)

## Areas of Specialization

- Human Toxicology
- Environmental Auditing and Assessments
- Microbial Matter Assessment, Identification and Abatement
- Expert Witness Testimony and Litigation Support

## Employment History

**GZA GEOENVIRONMENTAL, INC. (AUGUST 2002 TO PRESENT)**

**Senior Principal/Director of Toxicology, Environmental Health and Safety (September 2016 to Present).** Dr. Anderson's practice areas include regulatory compliance management, risk assessment and toxicological services especially for major corporate clients. Dr. Anderson's practice focuses on regulatory compliance consulting and litigation support for occupational disease, microorganism contamination, toxic torts and environmental damages. He provides consultation services to a wide array of industrial clients for permitting, regulatory compliance and on acquisitions and divestitures. Dr. Anderson manages the toxicology and microbial science practices for GZA.

**Senior Principal/Regional Operations Officer and Director of Toxicology, Environmental Health and Safety (March 2005 to September 2016).**

**Principal/Vice President and Director of Toxicology, Environmental Health and Safety (August 2002 to March 2005).**

**MCLAREN/HART, INC./MCLAREN HART-JONES DIVISION/ENSR (FORMERLY MCLAREN HART-JONES)**

**Senior Vice President (September 2001 to August 2002).** Dr. Anderson was Senior Vice President for ENSR International, which purchased McLaren-Hart/Jones. He was responsible for the integration of the offices and staff of the former McLaren-Hart/Jones into ENSR International. He was also responsible for management of the Risk and Toxicology Practice and the Litigation Support Practice. He provided services in toxicology, occupational health and safety, environmental compliance and other areas to clients throughout the United States. He also provided litigation support including expert testimony in toxic torts, environmental damages, cost recovery, toxicology, microorganism contamination, occupational injury and disease and other areas.

**President and Chief Operating Officer (January 1999 to September 2001).** Dr. Anderson was President and Chief Operating Officer of McLaren/Hart, Inc. He was responsible for the overall operations of the company, which included 11 locations in the United States. He was based in Milwaukee, Wisconsin with his practice areas including regulatory compliance management and toxicological services especially for major corporate clients. Dr. Anderson's practice focused on regulatory compliance consulting and expert witnessing for occupational disease, toxic torts and environmental damages. He provided consultation services to a wide array of industrial clients for permitting, regulatory compliance and on acquisitions and divestitures.

**Senior Vice President (December 1997 to January 1999).** Dr. Anderson was responsible for management of four offices in the central region. Duties included client procurement, employee recruitment and retention and financial management. He



**CURRICULUM VITAE**

## Kim E. Anderson, Ph.D.
Senior Principal
Director of Toxicology, Environmental Health and Safety

managed litigation support, expert witness and regulatory compliance projects including toxic torts, environmental damage, worker illness/intoxication and general toxicology.

**Vice President (April 1996 to November 1997).**  Dr. Anderson was responsible for the acquisition and integration of new offices. His duties included employee recruitment, client marketing and management of selected projects.  He was responsible for the financial management of selected offices, identification and marketing of new clients and identification of new office locations.  Dr. Anderson was responsible for the management of the Bioremediation Group and initiation of the Brownfields development program.  He also managed selected projects and served as expert witness in toxicology, employee exposure and related cases.

**GROWTH ENVIRONMENTAL SERVICES, INC. (MILWAUKEE, WISCONSIN)**

**Senior Vice President, Chief Technical Officer (January 1995 to April 1996).**  Dr. Anderson was responsible for the application of technology at all office locations and for all projects.  Duties included recruitment and management of Technical Support Services. He was responsible for financial management of offices and technical services and he participated in the identification and integration of nationwide acquisitions and service line expansions.

**THE EARTH TECHNOLOGY CORPORATION (MILWAUKEE, WISCONSIN)**

**Senior Vice President/Principal (February 1993 to January 1995).**  Dr. Anderson was responsible for the administration, management and performance of the five eastern commercial division offices.  He was responsible for financial management and technical supervision, as well as the overall office direction and staffing of these offices.  He also served on a five-member Corporate Operating Committee.

**Vice President/Principal (June 1991 to January 1993).**  Dr. Anderson was appointed to an eight-member Board of Principals.  He managed daily operations of the Milwaukee office and provided supervision of projects.  He participated in corporate strategic planning activities to define short- and long-term goals and objectives.  He collaborated with corporate executives to design and implement new organizational structure.

**Vice President/Associate Principal (May 1990 to May 1991).**  Dr. Anderson was responsible for the establishment and development of the Milwaukee office.  He directed hiring and training of supervisory, administrative, clerical and technical staff members.

**A.O. SMITH CORPORATION (MILWAUKEE, WISCONSIN)**

**Corporate Director of Safety, Health and Environment (September 1978 to May 1990).**  Dr. Anderson was responsible for the definition and establishment of corporate goals and objectives and the development of policies, programs and procedures for environmental protection, occupational safety, industrial hygiene, workers' compensation, and security for 28 manufacturing facilities employing in excess of 12,000 employees.

Dr. Anderson was responsible for the administration of programs related to occupational safety, industrial hygiene, workers' compensation, air discharges, water quality, solid and hazardous waste disposal, radiation control, security (governmental and physical), product liability, acquisitions and divestitures and special projects.  He served as a consultant to all corporate departments including legal, medical, engineering, research and development and technology.  Dr. Anderson served as expert witness in all areas of defense and negotiations related to environmental, occupational safety and health and workers' compensation.  He was responsible for researching customer, distributor and/or regulatory compliance of manufactured products. He was responsible for completing site assessments, contract negotiations and assessment management relative to environmental and occupational safety and health issues related to facility and real property acquisitions and divestitures.

He administered environmental permitting programs for manufacturing facilities including construction and operating permits for air discharges, water effluents and solid/hazardous waste disposal.  He supervised 12 Superfund projects and two property sales including complete technical management of two remedial investigation/feasibility study projects.



**CURRICULUM VITAE**

## Kim E. Anderson, Ph.D.

Senior Principal
Director of Toxicology, Environmental Health and Safety

**UNITED STATES GOVERNMENT**

**United States Department of Labor, Occupational Safety and Health Administration (OSHA)**

**National Aeronautics and Space Administration (NASA), Johnson Space Center (Kelsey-Seybold Medical Clinic – Contractor)**

**Supervisor/Senior Industrial Hygienist (May 1973 to September 1978).** Dr. Anderson established, coordinated and supervised the Arkansas Department of Labor, OSHA Industrial Hygiene Consultation, Training, Educational Consultation Programs while on assignment from the United States Department of Labor. He established budgeting requirements of these programs and preparation of required technical and departmental reports.

Dr. Anderson implemented an engineering design protocol for health professionals to assure technical accuracy, validity and applicability of field work. He reviewed health compliance plans for modifications to determine feasibility and acceptance. Dr. Anderson represented the Director of Labor, Governor of Arkansas, State of Arkansas and Area Director of OSHA at meetings and conferences, as required. He served as expert witness in informal and formal hearings in health-related litigation. While employed by the United States Department of Labor, OSHA, he conducted a wide array of compliance inspections covering all types of industry, including petro and agri chemicals, foundry, shoe manufacturing, automobile subassembly and parts, wood and furniture industry, grain elevators, tile manufacturing, textile mills, cottonseed oil mills, anodizing, food, poultry, fiberglass layup, boat manufacturing, general manufacturing, maritime and numerous other operations.

Dr. Anderson, while employed by Kelsey-Seybold Medical Clinic, a contractor at the Johnson Space Center of the National Aeronautics and Space Administration, provided industrial hygiene and toxicology services to the industrial operations and related facilities, as well as during space missions (Skylab) to spacecraft and astronauts. This work included the assessment and regulatory compliance for chemical, physical and biological hazards.

**OKLAHOMA ENVIRONMENTAL PROTECTION AGENCY**

**Environmental Engineer, Pontotoc County Health Department (May 1971 to May 1972).** Dr. Anderson was responsible for establishing an environmental health laboratory, including procuring analytical equipment, supplies, instrumentation and chemicals necessary to conduct laboratory analysis, as required by the Oklahoma State Health Department. He was responsible for the collection and analysis of samples and specimens to determine compliance with state and federal standards. Dr. Anderson conducted inspections to evaluate potential hazards and conducted numerous environmental health surveys to determine compliance with the EPA and state requirements.

### Summary of Experience

Dr. Anderson has had in excess of 40 years of experience in his practice areas of regulatory compliance management and risk assessment and toxicological services, especially for major corporate clients. He also has in excess of 40 years of related environmental experience. Dr. Anderson's focus is on regulatory compliance consulting and litigation support for human toxicology, occupational disease, microorganism contamination, toxic torts and environmental damages. Dr. Anderson has been responsible for management of the Risk and Toxicology Practices and the Litigation Support Practices. He provides services in toxicology, occupational health and safety, environmental compliance and other areas to clients throughout the United States. Dr. Anderson also provides consultation services to a wide array of industrial clients for permitting, regulatory compliance and on acquisitions and divestitures.

While employed for private industry, Dr. Anderson was responsible for the definition and establishment of corporate environmental, health and safety (EH&S) goals and objectives and the development of policies, programs and procedures for environmental protection, occupational safety, industrial hygiene, workers' compensation, security and product liability for 28 manufacturing facilities employing in excess of 12,000 employees. He was also responsible for assisting facilities in achieving compliance.



## Kim E. Anderson, Ph.D.

Senior Principal
Director of Toxicology, Environmental Health and Safety

Dr. Anderson also served as a Supervisor/Senior Industrial Hygienist with the United States Government with OSHA and NASA. With the United States Department of Labor, Dr. Anderson established, coordinated and supervised OSHA Industrial Hygiene Consultation, Training and Educational Consultation Programs. Dr. Anderson also established short- and long-term program objectives and goals and assured that the objectives and goals were realized. He established budgeting requirements of these programs and preparation of required technical and departmental reports relative to proper operation. Dr. Anderson supervised a professional staff of nine, including employee recruitment, placement, scheduling, personnel action and technical report review. He also established a training program for the advancement of these professionals.

### Relevant Project Experience

Relevant project experience of selected projects is provided below (a list of representative clients is available upon request).

**Paducah, Kentucky.** Dr. Anderson was retained to assess water intrusion, ensuing microbial growth and respiratory ailments of the occupants of a home. Dr. Anderson coordinated the assessment, abatement and restorative activities at the residence, as well as providing sworn testimony.

**Milwaukee, Wisconsin.** Dr. Anderson was retained to evaluate the use of alcohol and controlled drugs in a fatal vehicular accident.

**Milwaukee, Wisconsin and Chicago, Illinois.** Dr. Anderson was retained to evaluate a mercury release in a power house and industrial facility including regulatory activities.

**Milwaukee (Area), Wisconsin.** Dr. Anderson was retained to evaluate the use and potential product impacts from latex materials in a manufacturing facility.

**Waukesha, Wisconsin.** Dr. Anderson was retained to conduct indoor air quality assessments at an educational facility.

**Milwaukee, Wisconsin.** Dr. Anderson was retained to conduct personal monitoring, prepare compliance plans and evaluate local ventilation exhaust systems at a foundry.

**Throughout the United States.** Dr. Anderson was retained to perform lead sampling and toxicity at various homes and office buildings.

**Throughout the United States.** Dr. Anderson was retained to provide regulatory compliance consulting to various industrial firms.

**Throughout the United States.** Dr. Anderson was retained to evaluate polychlorinated biphenyl sampling results at various locations.

**Wausau, Wisconsin.** Dr. Anderson was retained to evaluate the use of prescription medication in a fatal vehicular accident.

**Milwaukee (Area), Wisconsin.** Dr. Anderson was retained to evaluate worker exposure to livestock feed additives.

**Manchester, New Hampshire.** Dr. Anderson was retained to evaluate human ingestion of contaminated groundwater.

**Milwaukee, Wisconsin.** Dr. Anderson was retained to supervise and coordinate the abatement, worker safety and environmental compliance activities at an industrial facility which had been significantly damaged by an explosion.

**Milwaukee, Wisconsin.** Dr. Anderson was retained to evaluate worker illness related to exposure to cutting fluids.

**Paducah, Kentucky.** Dr. Anderson was retained to evaluate worker illness related to exposure to benzene.

**Green Bay, Wisconsin.** Dr. Anderson was retained to evaluate worker illness related to exposure to sulfuric acid.

**Springfield, Illinois.** Dr. Anderson was retained to evaluate worker illness related to exposure to pesticides.



## Kim E. Anderson, Ph.D.

Senior Principal
Director of Toxicology, Environmental Health and Safety

**Milwaukee (Area), Wisconsin.**  Dr. Anderson was retained to assess water intrusion damages and ensuing mold contamination at three large condominium developments.  Dr. Anderson coordinated the removal of internal and exterior wall systems, collected samples and determined the cause of water intrusion.

**Milwaukee, Wisconsin.**  Dr. Anderson was retained to conduct an indoor air quality survey in a medical clinic.  Dr. Anderson isolated the causation of air quality issues and assisted the clinic in abating these issues.

**Milwaukee, Wisconsin.**  Dr. Anderson was retained to evaluate water intrusion and subsequent structural damage to an apartment complex.  Dr. Anderson then prepared a scope of work for repairs while conducting a health assessment for the occupants.

**Chicago, Illinois.**  Dr. Anderson was retained to evaluate a mercury release at a testing facility.  Dr. Anderson monitored surface and airborne concentrations of mercury, met with employees and evaluated the abatement of the mercury.

**Madison, Wisconsin.**  Dr. Anderson was retained to represent a manufacturing firm regarding allegations of toxicological effects of employees working with polyurethane foam materials.

**Milwaukee, Wisconsin.**  Dr. Anderson represented an industrial worker who developed respiratory and neurological conditions following exposure to workplace chemicals.

**Los Angeles, California.**  Dr. Anderson represented a testing facility that evacuated their facility following installation of a polyurethane floor coating.  Dr. Anderson met with employees, evaluated air monitoring results and medical examination results of employees.

**Waukesha, Wisconsin.**  Dr. Anderson represented an insurer of an apartment building where two occupants experienced fatal injuries following a fire.  Dr. Anderson reviewed medical testing results and provided an expert report.

**Milwaukee, Wisconsin.**  Dr. Anderson represented a client in the assessment and abatement of hazardous materials following an explosion at a facility.  Dr. Anderson collected multimedia samples for various chemical parameters and supervised the site clean-up.

**Chicago, Illinois.**  Dr. Anderson assisted a facility in assessing a mercury release including oversight of the abatement contractor and regulatory communications.

**Throughout the United States.**  Dr. Anderson was retained to provide expert opinions in cases involving alleged exposure to asbestos-containing products.  The case files and scientific literature were reviewed and expert reports were provided.  In select cases, expert testimony was provided.

**New York, New York.**  Dr. Anderson was retained to evaluate an indoor air quality survey, which included the identification of mold conducted by others at LaGuardia Airport.  Following a review of the report, a walk-through of specific locations was completed.  Specific sampling was then conducted by Dr. Anderson which was utilized to prepare a mold abatement plan.  Dr. Anderson provided oversight of the implementation of the mold abatement plan and conducted clearance sampling.

**Claremore, Oklahoma.**  Dr. Anderson was retained to conduct an environmental and occupational safety and health audit at an analytical laboratory.  Based on the results of a mold survey, Dr. Anderson prepared and executed a mold abatement plan.  Selected air diffusers were removed and replaced, the heating, ventilation and air-conditioning (HVAC) ductwork cleaned and the HVAC systems balanced.  Subsequently, Dr. Anderson conducted clearance sampling to confirm the success of the mold abatement.

**Milwaukee, Wisconsin.**  Dr. Anderson was retained to provide consultation services for mold evaluation, abatement and employee training, as required by the OSHA Hazard Communication Standard (HCS) during the renovation of a multi-family housing development.  GZA also completed employee training, as required by OSHA HCS, to assure employee awareness, the identification



**CURRICULUM VITAE**

## Kim E. Anderson, Ph.D.
Senior Principal
Director of Toxicology, Environmental Health and Safety

and potential toxicity of mold, appropriate safety and health procedures and equipment, and the overall safety and health requirements for mold projects.

**Delavan, Wisconsin.**  Dr. Anderson was contacted to evaluate employee concerns of an offensive odor at a medical clinic.  An investigation of the facility was completed to determine if water intrusion had occurred which could have resulted in the infestation of mold in the clinic, including the roof and attic area, examination rooms, records storage, waiting areas, staff and clinical offices, treatment rooms and the basement.

**Milwaukee, Wisconsin.**  Dr. Anderson was retained to evaluate the composition of ceramic frit and resulting employee exposures to materials during application to consumer products.  Specific concerns regarding exposures to crystalline silica were determined.  Additional services were provided in determining potential toxicity, disease manifestation and causation and the resulting management of cases.

**Trenton, New Jersey.**  Dr. Anderson was retained to delineate soil and groundwater contamination at the facility from creosote.  Various subsurface sampling was conducted with Dr. Anderson providing the nature and extent of the creosote and creosote by-product contamination, the toxicity of the contaminants and the resulting relationship between the contamination and previous operations conducted at the facility.  Dr. Anderson provided an expert report and testimony in Federal District Court.

**Bell Gardens, California.**  Dr. Anderson was retained to determine historic air emissions of hexavalent chromium for a chrome plating facility.  Dr. Anderson then determined the nature and extent of contamination, the potential toxicity to soil, groundwater and the residents in the area and regulatory compliance.  A plan of action was then prepared for all items including decommissioning of the plant, soil and groundwater cleanup and regulatory compliance activities.

**New Orleans, Louisiana.**  Dr. Anderson was retained to conduct toxicological testing of polypropylene dip tubes used in water heaters.  Resultant, Dr. Anderson prepared a white paper regarding the potential toxicity of the polypropylene materials based upon ingestion.

**Green Bay, Beloit, Milwaukee, Wisconsin and Rockford, Illinois**.  Dr. Anderson conducted evaluations to determine the presence of Legionella pneumophila.

**Milwaukee, Wisconsin.**  Dr. Anderson provided employee air sampling, interpreted medical records and opined on regulatory compliance and disease causation on several pneumoconiosis cases (silicosis) at a foundry which utilized green (silica) sand.  Dr. Anderson provided expert reports and testimony on selected occupational disease cases.

**Milwaukee, Wisconsin.**  Dr. Anderson was retained to evaluate employee exposure to crystalline silica during the manufacturing operation.  Dr. Anderson collected air samples, evaluated medical records and provided an expert report.  Testimony was also provided in an administrative law hearing.

**Menomonee Falls, Wisconsin.**  Dr. Anderson designed and managed a research study to evaluate human exposure to metallics, including lead in a foundry operation.  This study included the conduct of physical examinations, collection of medical specimens and the analysis of data.  Comprehensive personal and ambient air sampling was also conducted.

**Chicago, Illinois.**  Dr. Anderson designed and managed a research study to correlate airborne lead concentrations to blood lead and urinary zinc protoporphyrin concentrations in workers at a lead-acid battery manufacturing plant.  Dr. Anderson determined the regulatory compliance and developed a program for compliance for the facility.

**Harrisburg, Pennsylvania.**  Dr. Anderson represented the State of Pennsylvania in determining the location, concentration and source of PCBs in a state office building following demolition.  Dr. Anderson determined the source, mass, persistence and regulatory requirements.  Following preparation of an expert report, Dr. Anderson testified on behalf of the client.

**Russellville, Kentucky.**  Dr. Anderson represented a client at a former manufacturing plant in defending a toxic tort lawsuit.  Significant subsurface PCB contamination had been discovered at and around the manufacturing facility, in nearby stream and river



**CURRICULUM VITAE**

## Kim E. Anderson, Ph.D.
Senior Principal
Director of Toxicology, Environmental Health and Safety

sediments and in discharges from springs.  In addition to providing technical support to litigation activities, Dr. Anderson was involved in remediation work, including the design and construction of a water treatment facility to address PCB impacts.

**Sheboygan, Wisconsin.**  Dr. Anderson was retained by a manufacturer of food industry products to complete a California Proposition 65 evaluation of products.  Dr. Anderson obtained the original PVC resin and the finished component and completed leachate analysis and completed a modified human health risk assessment to determine the potential uptake of the food stuff, surface water and groundwater and the subsequent human health risk from the use of the product in California.

**Naperville, Illinois.**  Dr. Anderson was retained by a diversified manufacturing firm to determine potential employee and consumer health concerns from its products which had PVC components.  Finished products were subjected to leachate analyses to determine unreacted VCM that may exist and potential subsequent exposures to consumers of the products.  Dr. Anderson conducted human health and human health risk assessments during these evaluations.

**Oak Creek, Wisconsin.**  Dr. Anderson was retained to evaluate the blood alcohol level of an injured employee to determine if intoxication or impairment was a causation or contributing factor to the injury.  Dr. Anderson conducted pharmacologic uptake and metabolism calculations to determine the condition of the employee and issued an expert report of the findings.

**Milwaukee, Wisconsin.**  Dr. Anderson was retained to determine the potential physical impairment or intoxication of an individual who fell from a second story balcony at a residence.  Dr. Anderson reviewed the medical evidence and conducted pharmacologic uptake and metabolism calculations to determine the potential effects to the individual.  Dr. Anderson issued an expert report of the findings.

**Milwaukee, Wisconsin.**  Dr. Anderson was retained to determine the contribution of drug and alcohol consumption in an industrial injury.  Dr. Anderson reviewed the medical information, conducted pharmacologic uptake and metabolism calculations and issued an expert report.

## Professional Activities (Past and Present)

American Society of Safety Engineers (ASSE), National Membership Committee, Arkansas and Wisconsin Chapter Presidents

American Society of Testing and Materials (ASTM), Mold Task Force; Member E2418 Committee

American Society of Heating, Refrigeration and Air Conditioning, Microbial Contamination Committee

American Welding Society (AWS), Chairman of Research Committee, member of Safety and Health Committee

Indoor Air Quality Association (IAQA), Member

Wisconsin Manufacturers & Commerce, Environmental Policy Committee

Professional Member of American Industrial Hygiene Association (AIHA), Toxicology and Workroom Environmental Exposure Limits Committees, Gulf Coast Chapter Secretary

Milwaukee County Local Emergency Planning Committee, Chairman, 1990 to Present, Chairman of Right-to-Know Subcommittee, 1987-1989

Arkansas Federation of Water and Air Users, Inc., Vice President, Board of Directors, Chairman of Hazardous Waste Subcommittee, Chairman Right-to-Know Subcommittee, Chairman Annual Meeting Subcommittee

Wisconsin Industrial Air Coalition, Chairman Technical Committee, Member of Negotiations Committee

Machinery and Allied Products Institute, Environmental Council Committee

National Association of Manufacturers, Environmental Committee

Associated Industries of Arkansas/Arkansas State Chamber of Commerce.  Workers Compensation and Safety & Health Committee



**CURRICULUM VITAE**

## Kim E. Anderson, Ph.D.

Senior Principal
Director of Toxicology, Environmental Health and Safety

### University Teaching

**Medical College of Wisconsin, Milwaukee**. Adjunct Professor (May 1999 to May 2001). Instruction of human toxicology sections on medical seminars and instruction of graduate students in toxicology and pharmacology.

**University of Arkansas, Fayetteville and Little Rock.** Associate Professor (August 1976 to May 1986). Instruction of one to two courses annually, development of course curriculum and syllabus and student advisor. Courses included Human Factors Engineering (Graduate); Industrial Safety Administration (Graduate); Environmental Health (Graduate/Undergraduate); and Fundamentals of Industrial Hygiene (Undergraduate).

**University of Arkansas, Little Rock.** Associate Professor (August 1976 to May 1986). Instruction of one to two courses annually and development of course curriculum and syllabus. Courses included Occupational Hygiene (Graduate/Undergraduate); and Safety Engineering (Graduate/Undergraduate).

### Awards

Presented Practice Excellence Award, 2003, 2007, 2009, 2012, 2013 and 2014, GZA GeoEnvironmental, Inc.

Presented Distinguished Service Award by the Arkansas Federation of Water & Air Users, Inc., October 1987.

Awarded the 1984-85 Edgar Monsanto Queeny Award as National Safety Professional of the Year by the American Society of Safety Engineers (ASSE). (Sixth individual to receive this award from over 20,000 members of ASSE).

Awarded a Senate Proclamation during 1984-85 Session of Arkansas General Assembly for achievements in safety and environmental health (first proclamation of the type awarded by the Arkansas State Senate).

Elected 1984 Arkansas Safety Professional of the Year.

Elected 1984 Region IV (Arkansas, Oklahoma, Kansas, Missouri, Iowa, and Nebraska) Safety Professional of the Year.

Presented Skylab Achievement Award from the National Aeronautics and Space Administration, April 1974.

Presented an Award of Merit by the Oklahoma Health Department, June 1972.

Presented Oklahoma Frontiers of Science Award as Outstanding Environmental Health Graduate, May 1972.

### Significant Appointments

American Society of Testing and Materials (ASTM), Mold Task Force, E2418 Task Force

American Society of Heating, Refrigeration and Air Conditioning, Microbial Contamination Committee

Wisconsin Manufacturers and Commerce - Air Toxics Regulation Negotiation Committee

Wisconsin Manufacturers and Commerce - Formaldehyde and Chloroform Air Toxic Committee

Wisconsin Manufacturers and Commerce - Wisconsin Friends of the Environment Awards, Judge

United States Congress - Special Committee to Research Space Shuttle Challenger Tragedy

Arkansas Governor Prior - Dibromochloropropane Toxicity at National Hearings

Arkansas Governor Prior - Right-to-Know Task Force

Arkansas Governor Prior - Iowa Governors Safety Conference, Keynote Speaker

Arkansas Governor Clinton - Hazardous Waste Advisory Committee

United States Department of Labor, Occupational Safety and Health Administration (OSHA) - Asbestos Task Force

United States Environmental Protection Agency - Mexican and U.S. Government Alliance for Development of Environmental Regulations

Chemical Manufacturers Association - Regulatory Review of Toxicity of Methylene Dianiline Committee



**CURRICULUM VITAE**

## Kim E. Anderson, Ph.D.

Senior Principal
Director of Toxicology, Environmental Health and Safety

National Aeronautics and Space Administration - Skylab Medical Team

Arkansas Industrial Development Commission, Educators in Industry Curriculum for University of Arkansas

University of Arkansas Little Rock, Chemistry Department Advisory Committee

Medical College of Wisconsin, Toxicology Review Committee

### Publications

McCoy MJ, Hoppe Parr KA, Anderson KE, Matti H, Cornish J, Greivell J. 2017 January. Diacetyl and 2,3-Pentanedione in Breathing Zone and Area Air During Large-Scale Commercial Coffee Roasting, Blending and Grinding Processes. *Toxicology Reports*. 4:113-122.

Anderson, Kim E. and Cynthia A. Boyd. "The Controversy of the Use of 'No Safe Threshold Exposure' for Asbestos." <u>HarrisMartin's COLUMNS – Asbestos</u>. February 2016. p 3-9.

Anderson, Kim E., Hoppe Parr, Kimberly A. and Boyd, Cynthia A. "A Literature Review of the Ambient Air Asbestos Concentrations." <u>Journal of Safety, Health and Environmental Research (JSHER)</u>. 2015. Volume 11, No. 1, p 211-222.

Anderson, Kim E. "Building the Case for Dose Reconstruction in Toxic-Tort Litigation." <u>Westlaw Journal Asbestos</u>. May 11, 2012. Volume 34, No. 15, p 3-4.

McCoy, Michael M. and Kim E. Anderson. "Phase Contrast Microscopy-Detected Airborne Fiber Concentration in Milwaukee, Wisconsin During Building Demolition." <u>HarrisMartin's COLUMNS – Asbestos</u>. May 2012. Volume 12, No. 6, p 4-12.

Anderson, Kim E. "Response to Discussion on 'Mesothelioma in Drywall Finishing Workers' by McCoy, M. J., Wolter, M. E., and Anderson, K. E." <u>Journal of ASTM International</u>. Published online August 2011.

Anderson, Kim E., and Kenneth L. Anselment, Jr. "Searching for Asbestos Articles: Now vs. Then." <u>HarrisMartin's COLUMNS - Asbestos</u>. December 2011. Volume 12, No. 1, p 4-9.

Anderson, Kim E. "Response to Discussion on 'Mesothelioma in Drywall Finishing Workers' by McCoy, M. J., Wolter, M. E., and Anderson, K. E." <u>Journal of ASTM International</u>. Published online July 2011.

Anderson, Kim E., McCoy, Michael J. and Wolter, Matthew E. "Mesothelioma in Drywall Finishing Workers." <u>Journal of ASTM International</u>. December 2010. Volume 8, No. 1.

Anderson, Kim E. and Behling, Alison R. "Dose Reconstruction: The Use of Dose Reconstruction in the Determination of Human Exposure." <u>Journal of ASTM International</u>. March 2009. Volume 6, No. 3.

Anderson, Kim E., McCoy, Michael J. and Wolter, Matthew E. "A Safety Professional's Review of Natural Rubber Latex Testing in the Workplace." <u>Journal of Safety, Health and Environmental Research</u>. American Society of Safety Engineers. 2008. Volume 5, No. 3.

Anderson, Kim E. "The Standard of Care for the Technical Assessment and Support of Fungal (Mold) Contamination Cases." <u>Professional Safety</u>. September 2004.

Anderson, Kim E. "Indoor Air Quality and Mold Investigation and Abatement in the Health Care Environment." Submitted For Publication.

Anderson, Kim E. "What is Mold? Causation and Analysis." The Mold Challenge in New Hampshire; The Science of Mold. National Business Institute. 2004.

Anderson, Kim E. and Nelson, R.Y. "The Toxicological Evaluation of Chemical Exposure During Fiberglass Pipe Manufacturing." Submitted For Publication.

Anderson, Kim E. "Overview of the Problem, the Science of Mold, handling a Mold Infestation Scenario." The Mold Challenge in Wisconsin. National Business Institute. August 7 and 8, 2003.

Anderson, Kim E. "Risk Assessment/Toxicology Promotes Health and Welfare of Humans and Ecosystems." <u>ENSR International Insight</u>. 2002. Volume 2.



**CURRICULUM VITAE**

## Kim E. Anderson, Ph.D.
Senior Principal
Director of Toxicology, Environmental Health and Safety

Anderson, Kim E. "Brownfields Opportunity – A Product of Pro Business USEPA." 1997 Annual Meeting Proceedings of the Air & Waste Management Association of the 90th Annual Meeting. 1997-TA45B.01.

Anderson, Kim E. "Update on the Impact of the Clean Air Act Amendments of 1990 on the Leather Finishing Industry." The Journal of the American Leather Chemical Association. Summer 1994.

Carlton, M.P. and Anderson, Kim E. "How EPA's Accidental Release Prevention Program Stacks Up Against OSHA's Process Safety Management." Journal of Environmental Regulation. Summer 1994.

Anderson, R.C. and Anderson, Kim E. "Positive Changes and Work-Site Health Education." Psychological Reports. January 1994.

Anderson, K.E. and Anderson, R.C. "Protecting the Pregnant Employee Personnel's Role." Personal Advisory Bulletin. May 1993.

Anderson, Kim E. "Air Toxic Regulations: Now and in the Future." Journal of Environmental Regulation. Winter 1991-1992.

Anderson, R.C. and Anderson, Kim E. "Work-site Health Promotion: The Benefits of Providing Personal Health Status Feedback and Education Programs to Employees." American Association of Occupational Health Nurses Journal. February 1991. Volume 39, p. 2.

Anderson, R.C. and Anderson, Kim E. "Success and Failure Attributions in Smoking Cessation Among Men and Women." American Association of Occupational Health Nurses Journal. April 1990.

Anderson, Kim E. and Hussey, D.H. "Industrial Air Emissions - Assessing the Risks." Pollution Engineering. April 1989. Volume 21, pp. 88-89.

Anderson, R.C. and Anderson, Kim E. "Organization and Planning of the Corporate Wellness Program." Professional Safety. March 1988.

Anderson, Kim E. "Today's Safety Professional and Tomorrow's." Personal Advisory Bulletin. Bureau of Business Practices Inc. August 10, 1986. Number 1415.

Anderson, R.C. and Anderson, Kim E. "Protecting the Pregnant Employee: Personnel's Role." Personnel Advisory Bulletin. Bureau of Business Practice. March 12, 1986. Number 11106.

Anderson, R.C. and Anderson, Kim E. "Alcohol Consumption During Pregnancy." Journal of the American Association of Occupational Health Nursing. February 1986.

Anderson, Kim E. Styrene Exposure During the Manufacturing of Reinforced Fiberglass Pipe. Doctoral Dissertation. University of Oklahoma. Oklahoma City, Oklahoma. January 1986.

Anderson, R.C. and Anderson, Kim E. "Social, Emotional and Intellectual Effect of Day Care." Journal of the American Association of Occupational Health Nursing. June 1984.

Anderson, Kim E. "Development and Administering an Effective Workers Compensation Program." Professional Safety. August 1983. Volume 28, No. 8, pp. 13-16.

### Text
Anderson, Kim E. Fundamentals of Industrial Toxicology. Text #25-40389-1. Butterworth Publishers. November 1980.

### Technical Papers Presented at Meetings, Seminars, and Symposia
Anderson, Kim E. The Collection and Application of Exposure Data in Toxic Tort Cases. Civil Trial Counsel of Wisconsin, Annual Meeting. Wisconsin Dells, Wisconsin. August 14, 2008.

Anderson, Kim E. The Use of Retrograde Analysis in DUI Cases. Wisconsin Academy of Trial Lawyers, 2007 Spring Seminar. March 2, 2007.

Anderson, Kim E. The Success of Consulting Engineering Companies. Design Engineering Professional, 2005 Fall Meeting. August 11, 2005.

Anderson, Kim E. The Standard of Care for the Technical Assessment and Support of Fungal (Mold) Contamination Cases. Wisconsin Federation of Environmental Technologists, Annual Exposition. Milwaukee, Wisconsin. March 2004.

Anderson, Kim E. Indoor Air Quality and Mold Investigation and Abatement in the Healthcare Environment. American Society for Healthcare Engineers. Tampa, Florida. March 15, 2004.



**CURRICULUM VITAE**

## Kim E. Anderson, Ph.D.
Senior Principal
Director of Toxicology, Environmental Health and Safety

Anderson, Kim E.  The Recognition, Assessment and Toxicity of Microbial Contamination.  Port Authority of New York and New Jersey Annual Technical Meeting.  New York City, New York.  July 17, 2003.

Anderson, Kim E.  Hazard Communication Training Video.  Arkansas State Chamber of Commerce.  Little Rock, Arkansas.  October 1988.

Corporate Environmental Manual and Corporate Safety Manual.  A.O. Smith Corporation.  Milwaukee, Wisconsin.  1984.

Anderson, Kim E.  "Does the State Need Regulation on Toxins?"  Arkansas Gazette.  Tuesday, March 15, 1983.

Anderson, Kim E.  Public Health Significance of Environmental Lead.  Master's Thesis, University of Oklahoma.  Oklahoma City, Oklahoma.  May 1973.

### Research

October 2011 - May 2014.  Conducted research on geological formations and location of talc.  Reviewing the literature relating to human exposures and toxicity of talc.

July 2011 - Present.  Conducting research on worker exposure and toxicity of diacetyl in popcorn plants.

February 2011 - Present.  Conducting research of adhesives containing 4,4'-Diphenylmethane diisocyanate (MDI), including airborne concentrations and human toxicity.

February 2011 - Present.  Conducting research on worker exposures to asbestos in occupational settings, including asbestos mining and milling, asbestos-containing materials manufacturing, insulation work, shipyard work, asbestos textiles manufacturing, electrical and power plants, and construction work.

December 2010 - November 2011.  Conducted research on ambient air crystalline silica concentrations.

October 2010 - October 2011.  Conducted research on the toxicity of welding fumes including asbestos materials.

March 2010 - Present.  Conducting research on combustible dust, including physical properties, analysis and regulations.

July 2009 - Present.  Conducting research on Legionnaire's disease and Pontiac Fever.

July 2009 - September 2009.  Conducted research on toxicity and occurrence of Staphylococcus aureus infections.

June 2009 - September 2009.  Conducted research on methyl methacrylates in dental materials.

April 2009 - April 2010.  Conducted research on effects of low frequency noise and vibration.

December 2008 - May 2009.  Conducted research on metabolites and effects of cannabinoids.

February 2008 - January 2011.  Conducted research on therapeutic effects of Zolpidem (Ambien).

February 2008 - Present.  Conducting research on the generation and potential toxicity of trichothecene mycotoxins.

February 2008 - Present.  Conducting research on the toxicity of polychlorinated biphenyls.

January 2008 - March 2008.  Conducted research on the effects or non-ionizing radiofrequency electromagnetic energy.

November 2007 - Present.  Conducting research on the toxicity of bisphenol A.

May 2007 - Present.  Conducting research on latex sensitivity and toxicity in humans.

April 2007 - February 2008.  Evaluated worker exposure to polynuclear aromatics and metallics.

March 2007 - March 2008.  Evaluated worker exposure to mercury.

March 2007 - February 2008.  Conducted research on carbon monoxide toxicity.

February 2007 - January 2008.  Conducted research on the toxicity of sulfuric acid.

December 2006 - Present.  Conducting research on toxicity of the human consumption of contaminated groundwater.



**CURRICULUM VITAE**

## Kim E. Anderson, Ph.D.
Senior Principal
Director of Toxicology, Environmental Health and Safety

August 2006 - Present.  Conducting research on alcohol ingestion, prescribed medications and controlled drug interaction.

June 2006 - March 2007.  Evaluated exposure to bacterial contaminants.

April 2006 - March 2007.  Evaluated worker exposure to benzene.

March 2006 - Present.  Evaluating worker exposure to asbestos.

December 2006 - Present.  Evaluating worker exposure to manganese.

December 2005 - December 2006.  Evaluated worker exposure to lead.

November 2005 - January 2006.  Evaluated worker exposure to polyurethane coatings applications.

March 2005 - May 2005.  Evaluated worker exposure to mercury release.

June 2004 - December 2005.  Conducted research on safety and health of enzymes.

April 2004 - 2005.  Reviewed case materials and the scientific literature to determine the dose response relationship between cutting fluid oils and dermatological sensitization.

April 2004 - 2005.  Reviewed case materials and conducted dose reconstruction related to alleged manifestation of mesothelioma.

April 2004 - 2005.  Reviewed case materials, conducted sampling and performed causation analysis of water intrusion and toxicity for real property and personal damages from mold exposure.

March 2004 - Present.  Conducting literature review of past practices, literature, asbestos composition and regulatory requirements related to the historic use of asbestos-containing products.

March 2004 - 2005.  Reviewed case materials and the scientific literature to determine the dose response relationship between illicit drug use and impairment while operating a motor vehicle.

March 2004 - 2005.  Reviewed case materials and the scientific literature to determine the dose response relationship between organophosphates and chemical sensitization.

March 2004 - 2005.  Reviewed case materials and the scientific literature to determine the dose response relationship between chlorine and hyprochloric acid and respiratory system sensitization.

February 2004 - 2005.  Reviewed case materials and the scientific literature to determine the dose response relationship between paradichlorobenzene and myelogenous leukemia and laryngeal cancer.

January 2004 - November 2004.  Reviewed case materials and the scientific literature to determine the dose response relationship between selected organics and toxic encephalopathy.

December 2003 - Present.  Conducting literature review of roofing materials, insulation products, automotive gaskets and other products including composition, asbestos fiber type and grade, historic exposures and toxicity.

December 2003.  Reviewed case materials and conducted dose reconstruction related to alleged manifestation of mesothelioma.

November 2003.  Reviewed case materials, conducted sampling and performed causative analysis of water intrusion and toxicity for real property and personal damages from mold exposure.

October 2003 - 2004.  Reviewed case materials and conducted a causative analysis regarding mold exposure and various physical anomalies.

September 2003 - 2005.  Reviewed case materials conducted sampling, performed dose construction and completed causation analysis of pulmonary fibrosis from exposure to aluminum and aluminum compounds.

August 2003 - June 2004.  Reviewed case materials, conducted sampling and performed causative analysis of water intrusion and toxicity for real property and personal damages from mold exposure.

August 2003 - January 2004.  Reviewed case materials and conducted risk assessment and causation analysis of systemic disease from exposure to bacterial contaminated potable water.



**CURRICULUM VITAE**

## Kim E. Anderson, Ph.D.
Senior Principal
Director of Toxicology, Environmental Health and Safety

August 2003 - August 2004.  Reviewed case materials and conducted dose reconstruction and pharmacokinetic modeling related to alleged case of myelogenous leukemia from benzene exposure.

July 2003 - 2004.  Reviewed case materials and conducted dose reconstruction related to alleged manifestation of mesothelioma.

June 2003 - 2004.  Evaluated the condition of the stream bed of the Milwaukee River at the North Avenue dam and provided recommended repairs.

June 2003 - 2005.  Reviewed case materials, conducted sampling and performed causation analysis of water intrusion and toxicity for real property and personal damages from mold exposure.

May 2003 - October 2004.  Conducted extensive indoor air quality survey of coal-fired power plant that was flooded. Prepared abatement plan and are following plan.

May 2003 - Present.  Conducting literature review of drywall joint compound including composition, asbestos fiber type and grade, historic exposures and toxicity.

May 2003 - September 2003.  Evaluated roofing materials and infestation of mold.

May 2003 - July 2003.  Conducted indoor air quality survey, prepared abatement plan and conducted abatement.

April 2003 - July 2003.  Evaluated indoor air quality survey at LaGuardia Airport and conducted a study, prepared abatement plan and provided oversight.

March/April 2003.  Conducted indoor air quality survey of a building that was inundated with water and waste water due to extensive rains and a sewer backup.

February 2003 - March 2003.  Conducted compliance evaluation and indoor air quality survey at analytical laboratory.  Prepared and implemented abatement activities.

February 2003 - May 2003.  Evaluated water leak, conducted indoor air quality survey, prepared abatement plan, conducted abatement oversight and performed clearance testing.

February 2003 - Present.  Conducting literature review of the toxicity of all types and grades of asbestos.

November 2002 - May 2003.  Conducted evaluation of fungal contamination to coating of a residence.  Completed pilot study to determine solutions.

August 2002 - January 2003.  Engaged in evaluation for indoor air quality litigation for mine cases.

August 2002 - December 2002.  Evaluated construction and resulting water infiltration and mold at a medical clinic.

August 2002 - November 2002.  Evaluated previous indoor air quality work at a medical clinic that had been temporarily closed.  Conducted extensive indoor air quality surveys, prepared abatement plan, conducted abatement activities and performed clearance indoor air quality survey to re-open the medical clinic.

May 2002 - Present.  Evaluating the subsurface soils, construction of erosion methodologies for the river bottom and shore banks, and resulting failure analyses of a river and river bed.

March 2002 - January 2005.  Evaluated the identification, blasting and recovery of overburden stone over a ledge of decorative stone.

August 2001 - August 2002.  Evaluated construction methods for a residential home.

April 2001 - December 2002.  Evaluated the design, construction and installation of windows in a condominium project.

March 2001 - December 2002.  Evaluated methods of operation of a home integration system.

February 2001 - Present.  Conducting research on the causation of occupational asthma from isocyanates.

August 2000 - May 2001.  Evaluated construction methods to determine mold contamination.

July 2000 - March 2003.  Evaluated soil types and characteristics for construction of a home.



CURRICULUM VITAE

# Kim E. Anderson, Ph.D.
Senior Principal
Director of Toxicology, Environmental Health and Safety

May 2000 - January 2001.  Reviewed the construction and operation of a groundwater extraction and treatment facility at an NPL site.

February 2000 - November 2003.  Measured vibration and noise reading from mechanical power presses utilized at a manufacturing facility.  Developed control devices and evaluated results following installation.

February 2000 - April 2001.  Conducted research to evaluate elevator safety.

## Reviewer / Editor

October 2009 and November 2010.  Journal of Exposure Science and Environmental Epidemiology.

July 1994 - Present.  Medical College of Wisconsin.  Department of Plastic and Reconstructive Surgery.  External review of fellowship proposal for Occupational Health Psychology.

December 1998.  American Society of Safety Engineers.  Technical review of Promoting Employee Health:  A Guide to Worksite Wellness.

1988 - 1999.  American Welding Society.  Chaired Research Committee and served as final editor of Volume 4 of The Welding Environment and provided external evaluation of three research projects.

October 1986 - May 1988.  The Society of Plastics Industry.  "OSHA's Proposed Methylene Dianiline Standard."

June 1974.  United States Department of Labor, Occupational Safety and Health Administration Field Operations Manual.

June - April 1974.  United States Department of Labor, Occupational Safety and Health Administration.  Reviewer.  Several proposed standards.

## Academic Presentations (2006 to Present)

Academy of Certified Hazardous Materials Manager.  Refresher Training Session.  Brookfield, Wisconsin.  June 9, 2010.  SARA Title III and CERCLA.

American Society of Safety Engineers.  Annual Safety Update.  Milwaukee, Wisconsin.  October 11, 2007.  Environmental Update.

Academy of Certified Hazardous Materials Managers.  Refresher Training Sessions.  Brookfield, Wisconsin.  November 16, 2006.  SARA Title III.

American Society of Safety Engineers.  Annual Safety Update.  Milwaukee, Wisconsin.  October 12, 2006.  Environmental Update.

Wisconsin Trade Schools Safety and Health Professionals.  Spring Meeting.  Mauston, Wisconsin.  May 17, 2006.  IAQ in an Academic Setting.

## Corporate Presentations (2006 to Present)

Quarles & Brady.  Milwaukee, Wisconsin.  January 18, 2011.  Update on Mold Assessment and Litigation.

Mid-City Foundry.  Milwaukee, Wisconsin.  July 9, 2008.  Regulatory Compliance for Asbestos.

Astronautics, Inc.  Glendale, Wisconsin.  December 19, 2007.  Asbestos in the Workplace.

GZA GeoEnvironmental, Inc.  Milwaukee, Wisconsin.  May 16, 2007.  The Science and Toxicity of Asbestos.

Falk Industries.  Milwaukee, Wisconsin.  December 12, 2006.  Safety and Health Aspects of Asbestos.

Scott R. Halloin & Associates, S.C.  Milwaukee, Wisconsin.  June 8, 2006.  The Science of Mold.

Updated:  June 2018



**ATTACHMENT 2**

**Laboratory Analytical Report**



March 19, 2019

GZA GeoEnvironmental Inc
20900 Swenson Dr STE 150
Waukesha, WI 53186

**CLIENT PROJECT:**     The Jay Hawk Club, 20.0155934.00
**CEI LAB CODE:**          A195744

Dear Customer:

Enclosed are asbestos analysis results for PLM Bulk samples received at our laboratory on March 15, 2019. The samples were analyzed for asbestos using polarizing light microscopy (PLM) per the EPA 600 Method.

Sample results containing >1% asbestos are considered asbestos-containing materials (ACMs) per EPA regulatory requirements. The detection limit for the EPA 600 Method is <1% asbestos by weight as determined by visual estimation.

Thank you for your business and we look forward to continuing good relations.

Kind Regards,

Tianbao Bai, Ph.D., CIH
Laboratory Director



TESTING
NVLAP LAB CODE 101768-0

730 SE Maynard Road • Cary, NC 27511 • 919.481.1413



# ASBESTOS ANALYTICAL REPORT
# By: Polarized Light Microscopy

**Prepared for**

# GZA GeoEnvironmental Inc

CLIENT PROJECT:   The Jay Hawk Club, 20.0155934.00

LAB CODE:        A195744

TEST METHOD:     EPA 600 / R93 / 116 and EPA 600 / M4-82 / 020

REPORT DATE:     03/18/19

TOTAL SAMPLES ANALYZED:   8

# SAMPLES >1% ASBESTOS:   10



# Asbestos Report Summary
### By: POLARIZING LIGHT MICROSCOPY

**PROJECT:** The Jay Hawk Club, 20.0155934.00          **LAB CODE:** A195744

---

**METHOD: EPA 600 / R93 / 116 and EPA 600 / M4-82 / 020**

| Client ID | Layer | Lab ID | Color | Sample Description | ASBESTOS % |
|-----------|-------|--------|-------|--------------------|------------|
| MMR-1 | | A81688 | Gray | Underlayment / Roof | Chrysotile 50% |
| MMR-2 | Layer 1 | A81689 | Gray | Underlayment / Roof | Chrysotile 50% |
| | Layer 2 | A81689 | Black | Underlayment / Roof | None Detected |
| MMR-3 | Layer 1 | A81690 | Gray | Underlayment / Roof | Chrysotile 50% |
| | Layer 2 | A81690 | Black | Underlayment / Roof | None Detected |
| | Layer 3 | A81690 | Gray | Underlayment / Roof | Chrysotile 50% |
| MMR-4 | Layer 1 | A81691 | Gray | Underlayment / Roof | Chrysotile 50% |
| | Layer 2 | A81691 | Black | Underlayment / Roof | None Detected |
| MMR-5 | Layer 1 | A81692 | Gray | Underlayment / Roof | Chrysotile 50% |
| | Layer 2 | A81692 | Black | Underlayment / Roof | None Detected |
| | Layer 3 | A81692 | Gray | Underlayment / Roof | Chrysotile 50% |
| MMR-6 | Layer 1 | A81693 | Gray | Underlayment / Roof | Chrysotile 50% |
| | Layer 2 | A81693 | Black | Underlayment / Roof | None Detected |
| MMR-7 | Layer 1 | A81694 | Gray | Underlayment / Roof | Chrysotile 50% |
| | Layer 2 | A81694 | Black | Underlayment / Roof | None Detected |
| MMR-8 | Layer 1 | A81695 | Gray | Underlayment / Roof | Chrysotile 50% |
| | Layer 2 | A81695 | Black | Underlayment / Roof | None Detected |

 | CEI

# ASBESTOS BULK ANALYSIS
### By: POLARIZING LIGHT MICROSCOPY

**Client:** GZA GeoEnvironmental Inc
20900 Swenson Dr STE 150
Waukesha, WI 53186

**Lab Code:** A195744
**Date Received:** 03-15-19
**Date Analyzed:** 03-18-19
**Date Reported:** 03-18-19

**Project:** The Jay Hawk Club, 20.0155934.00

## ASBESTOS BULK PLM, EPA 600 METHOD

| Client ID Lab ID | Lab Description | Lab Attributes | NON-ASBESTOS COMPONENTS | | | | ASBESTOS % |
|---|---|---|---|---|---|---|---|
| | | | Fibrous | | Non-Fibrous | | |
| **MMR-1** A81688 | Underlayment / Roof | Heterogeneous Gray Fibrous Bound | 15% 5% | Cellulose Fiberglass | 25% 5% | Binder Silicates | 50% Chrysotile |
| **MMR-2** Layer 1 A81689 | Underlayment / Roof | Heterogeneous Gray Fibrous Bound | 10% 5% | Cellulose Fiberglass | 30% 5% | Binder Silicates | 50% Chrysotile |
| Layer 2 A81689 | Underlayment / Roof | Heterogeneous Black Fibrous Bound | 80% | Cellulose | 20% | Tar | None Detected |

Lab Notes: Analyst opinion: Possible contamination from positive grey underlayment layer; Asbestos is not found in the matrix of the black underlayment layer.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **MMR-3** Layer 1 A81690 | Underlayment / Roof | Heterogeneous Gray Fibrous Bound | 10% 5% | Cellulose Fiberglass | 30% 5% | Binder Silicates | 50% Chrysotile |
| Layer 2 A81690 | Underlayment / Roof | Heterogeneous Black Fibrous Bound | 80% | Cellulose | 20% | Tar | None Detected |

Lab Notes: Analyst opinion: possible contamination from positive underlayment layer. Analyst opinion: Possible contamination from positive grey underlayment layer; Asbestos is not found in the matrix of the black underlayment layer.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Layer 3 A81690 | Underlayment / Roof | Heterogeneous Gray Fibrous Bound | 10% 5% | Cellulose Fiberglass | 30% 5% | Binder Silicates | 50% Chrysotile |

 **eurofins** | CEI

# ASBESTOS BULK ANALYSIS
### By: POLARIZING LIGHT MICROSCOPY

**Client:** GZA GeoEnvironmental Inc
20900 Swenson Dr STE 150
Waukesha, WI 53186

**Lab Code:** A195744
**Date Received:** 03-15-19
**Date Analyzed:** 03-18-19
**Date Reported:** 03-18-19

**Project:** The Jay Hawk Club, 20.0155934.00

## ASBESTOS BULK PLM, EPA 600 METHOD

| Client ID / Lab ID | Lab Description | Lab Attributes | NON-ASBESTOS COMPONENTS Fibrous | | Non-Fibrous | | ASBESTOS % |
|---|---|---|---|---|---|---|---|
| **MMR-4** Layer 1 A81691 | Underlayment / Roof | Heterogeneous Gray Fibrous Bound | 10% 5% | Cellulose Fiberglass | 30% 5% | Binder Silicates | **50% Chrysotile** |
| Layer 2 A81691 | Underlayment / Roof | Heterogeneous Black Fibrous Bound | 80% | Cellulose | 20% | Tar | None Detected |

Lab Notes: Analyst opinion: possible contamination from positive underlayment layer. Analyst opinion: Possible contamination from positive grey underlayment layer; Asbestos is not found in the matrix of the black underlayment layer.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **MMR-5** Layer 1 A81692 | Underlayment / Roof | Heterogeneous Gray Fibrous Bound | 10% 5% | Cellulose Fiberglass | 30% 5% | Binder Silicates | **50% Chrysotile** |
| Layer 2 A81692 | Underlayment / Roof | Heterogeneous Black Fibrous Bound | 80% | Cellulose | 20% | Tar | None Detected |

Lab Notes: Analyst opinion: possible contamination from positive underlayment layer. Analyst opinion: Possible contamination from positive grey underlayment layer; Asbestos is not found in the matrix of the black underlayment layer.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Layer 3 A81692 | Underlayment / Roof | Heterogeneous Gray Fibrous Bound | 10% 5% | Cellulose Fiberglass | 30% 5% | Binder Silicates | **50% Chrysotile** |
| **MMR-6** Layer 1 A81693 | Underlayment / Roof | Heterogeneous Gray Fibrous Bound | 15% 5% | Cellulose Fiberglass | 25% 5% | Binder Silicates | **50% Chrysotile** |

 | CEI

# ASBESTOS BULK ANALYSIS
**By: POLARIZING LIGHT MICROSCOPY**

**Client:** GZA GeoEnvironmental Inc
20900 Swenson Dr STE 150
Waukesha, WI 53186

| | |
|---|---|
| **Lab Code:** | A195744 |
| **Date Received:** | 03-15-19 |
| **Date Analyzed:** | 03-18-19 |
| **Date Reported:** | 03-18-19 |

**Project:** The Jay Hawk Club, 20.0155934.00

## ASBESTOS BULK PLM, EPA 600 METHOD

| Client ID Lab ID | Lab Description | Lab Attributes | NON-ASBESTOS COMPONENTS | | | | ASBESTOS % |
|---|---|---|---|---|---|---|---|
| | | | Fibrous | | Non-Fibrous | | |
| Layer 2 A81693 | Underlayment / Roof | Heterogeneous Black Fibrous Bound | 80% | Cellulose | 20% | Tar | None Detected |

Lab Notes: Analyst opinion: possible contamination from positive underlayment layer. Analyst opinion: Possible contamination from positive grey underlayment layer; Asbestos is not found in the matrix of the black underlayment layer.

| Client ID Lab ID | Lab Description | Lab Attributes | NON-ASBESTOS COMPONENTS | | | | ASBESTOS % |
|---|---|---|---|---|---|---|---|
| **MMR-7** Layer 1 A81694 | Underlayment / Roof | Heterogeneous Gray Fibrous Bound | 10% 5% | Cellulose Fiberglass | 30% 5% | Binder Silicates | **50% Chrysotile** |
| Layer 2 A81694 | Underlayment / Roof | Heterogeneous Black Fibrous Bound | 80% | Cellulose | 20% | Tar | None Detected |

Lab Notes: Analyst opinion: possible contamination from positive underlayment layer. Analyst opinion: Possible contamination from positive grey underlayment layer; Asbestos is not found in the matrix of the black underlayment layer.

| Client ID Lab ID | Lab Description | Lab Attributes | NON-ASBESTOS COMPONENTS | | | | ASBESTOS % |
|---|---|---|---|---|---|---|---|
| **MMR-8** Layer 1 A81695 | Underlayment / Roof | Heterogeneous Gray Fibrous Bound | 10% 5% | Cellulose Fiberglass | 30% 5% | Binder Silicates | **50% Chrysotile** |
| Layer 2 A81695 | Underlayment / Roof | Heterogeneous Black Fibrous Bound | 80% | Cellulose | 20% | Tar | None Detected |

Lab Notes: Analyst opinion: possible contamination from positive underlayment layer. Analyst opinion: Possible contamination from positive grey underlayment layer; Asbestos is not found in the matrix of the black underlayment layer.



**LEGEND:**  Non-Anth    = Non-Asbestiform Anthophyllite
        Non-Trem    = Non-Asbestiform Tremolite
        Calc Carb     = Calcium Carbonate

**METHOD:** EPA 600 / R93 / 116 and EPA 600 / M4-82 / 020

**REPORTING LIMIT:** <1% by visual estimation

**REPORTING LIMIT FOR POINT COUNTS:** 0.25% by 400 Points or 0.1% by 1,000 Points

**REGULATORY LIMIT:** >1% by weight

Due to the limitations of the EPA 600 method, nonfriable organically bound materials (NOBs) such as vinyl floor tiles can be difficult to analyze via polarized light microscopy (PLM). EPA recommends that all NOBs analyzed by PLM, and found not to contain asbestos, be further analyzed by Transmission Electron Microscopy (TEM). Please note that PLM analysis of dust and soil samples for asbestos is not covered under NVLAP accreditation. *Estimated measurement of uncertainty is available on request.*

This report relates only to the samples tested or analyzed and may not be reproduced, except in full, without written approval by Eurofins CEI. Eurofins CEI makes no warranty representation regarding the accuracy of client submitted information in preparing and presenting analytical results. Interpretation of the analytical results is the sole responsibility of the client. Samples were received in acceptable condition unless otherwise noted. This report may not be used by the client to claim product endorsement by NVLAP or any other agency of the U.S. Government.

Information provided by customer includes customer sample ID, location, volume and area as well as date and time of sampling.

**ANALYST:** _____
            Taylor B. Metcalf

**APPROVED BY:** _____
            Tianbao Bai, Ph.D., CIH
            Laboratory Director



TESTING
NVLAP LAB CODE 101768-0



**CEI** LABS

730 SE Maynard Road, Cary, NC 27511
Tel: 866-481-1412; Fax: 919-481-1442

# ASBESTOS
# CHAIN OF CUSTODY

| LAB USE ONLY: | |
|---|---|
| CEI Lab Code: | A195744 |
| CEI Lab I.D. Range: | AD1688 - 198695 |

| COMPANY INFORMATION | PROJECT INFORMATION |
|---|---|
| **CEI CLIENT #:** | Job Contact: David Bauer |
| Company: GZA Geotnvironmental Inc. | Email / Tel: David.Bauer@gza.com |
| Address: 20900 Swenson Dr., Suite 150 | Project Name: The Jay Hawk Club |
| Waukesha, WI 53186 | Project ID#: 20.0155934.00 |
| Email: David.Bauer@gza.com | PO #: |
| Tel: 262-754-2580   Fax: | STATE SAMPLES COLLECTED IN: KS |

### IF TAT IS NOT MARKED STANDARD 3 DAY TAT APPLIES.

| ASBESTOS | METHOD | TURN AROUND TIME | | | | | |
|---|---|---|---|---|---|---|---|
| | | 4 HR | 8 HR | 24 HR | 2 DAY | 3 DAY | 5 DAY |
| PLM BULK | EPA 600 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| PLM POINT COUNT (400) | EPA 600 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PLM POINT COUNT (1000) | EPA 600 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PLM GRAV w POINT COUNT | EPA 600 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PLM BULK | CARB 435 | | ☐ | ☐ | ☐ | ☐ | ☐ |
| PCM AIR | NIOSH 7400 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| TEM AIR | EPA AHERA | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| TEM AIR | NIOSH 7402 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| TEM AIR | ISO 10312 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| TEM AIR | ASTM 6281-09 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| TEM BULK | CHATFIELD | | ☐ | ☐ | ☐ | ☐ | ☐ |
| TEM DUST WIPE | ASTM D6480-05 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| TEM DUST MICROVAC | ASTM D5755-09 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| TEM SOIL | ASTM D7521-13 | | | ☐ | ☐ | ☐ | ☐ |
| TEM VERMICULITE | CINCINNATI METHOD | | | ☐ | ☐ | ☐ | ☐ |
| OTHER: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

| REMARKS / SPECIAL INSTRUCTIONS: | |
|---|---|
| Analyze All layers per sample ID#. | ☐ Accept Samples |
| | ☐ Reject Samples |

| Relinquished By: | Date/Time | Received By: | Date/Time |
|---|---|---|---|
| David Bauer | 3/14/2019  15:00 | SB | 3/15/19  9:30 |
| | | | |

*Samples will be disposed of 30 days after analysis*          *Page 1 of 2*

Version: CCOC.06.16.1/2.LD

*A 95744*

# ASBESTOS
# SAMPLING FORM



| COMPANY CONTACT INFORMATION | | |
|---|---|---|
| Company: GZA GeoEnvironmental Inc. | Job Contact: David Bauer | |
| Project Name: | | |
| Project ID #: 20.0155934.00 | Tel: 262-754-2580 | |

| SAMPLE ID# | DESCRIPTION / LOCATION | VOLUME/ AREA | TEST | | | |
|---|---|---|---|---|---|---|
| MMR-1 | Underlayment / Roof | | PLM | ☒ | TEM | ☐ |
| MMR-2 | | | PLM | ☒ | TEM | ☐ |
| MMR-3 | | | PLM | ☒ | TEM | ☐ |
| MMR-4 | | | PLM | ☒ | TEM | ☐ |
| MMR-5 | | | PLM | ☒ | TEM | ☐ |
| MMR-6 | | | PLM | ☒ | TEM | ☐ |
| MMR-7 | | | PLM | ☒ | TEM | ☐ |
| MMR-8 | | | PLM | ☒ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |
| | | | PLM | ☐ | TEM | ☐ |

Page 2 of 2

Version: CCOC.06.16.2/2.LD



**ATTACHMENT 3**

**Medical, Toxicological, and Epidemiological Literature**



**ATTACHMENT 3**
**Medical, Toxicological, and Epidemiological Literature**

Agency for Toxic Substances and Disease Registry [ATSDR]. 2003 March 17. Appendix E: panelists' comments submitted after the meeting (Lippmann L, McConnell M, Oberdörster W) in Report on the expert panel on health effects of asbestos and synthetic vitreous fibers: the influence of fiber length. p E-1 to E-6; E-17 to E-26; and E-33 to E-56.

Antonescu-Turcu AL and Schapira RM. 2010 March. Parenchymal and airway diseases caused by asbestos. *Current Opinion in Pulmonary Medicine*. 16(2):155-161.

Aust AE, Cook PM, Dodson RF. 2011. Morphological and chemical mechanisms of elongated mineral particle toxicities. *Journal of Toxicology and Environmental Health. Part B, Critical Reviews*. 14(1-4):40-75.

Below JE, Cox NJ, Fukagawa NK, Hirvonen A, Testa JR. 2011. Factors that impact susceptibility to fiber-induced health effects. *Journal of Toxicology and Environmental Health. Part B, Critical Reviews*. 14(1-4):246-266.

Berman DW and Crump KS. 2008. A meta-analysis of asbestos-related cancer risk that addresses fiber size and mineral type. *Critical Reviews in Toxicology*. 38(Suppl. 1):49-73.

Berman DW and Crump KS. 2008. Update of potency factors for asbestos-related lung cancer and mesothelioma. *Critical Reviews in Toxicology*. 38(Suppl. 1):1-47.

Bernstein D, Dunnigan J, Hesterberg T, Brown R, Velasco JA, Barrera R, Hoskins J, Gibbs A. 2013 February. Health risk of chrysotile revisited. *Critical Reviews in Toxicology*. 43(2):154-183.

Bernstein DM. 2005. Understanding chrysotile asbestos: a new perspective based upon current data. IOHA 2005 Pilanesberg. Paper J3:1-10.

Bernstein DM and Hoskins JA. 2006 August. The health effects of chrysotile: current perspective based upon recent data. *Regulatory Toxicology and Pharmacology: RTP*. 45(3):252-264.

Bernstein DM, Chevalier J, Smith P. 2005 August. Comparison of Calidria chrysotile asbestos to pure tremolite: final results of the inhalation biopersistence and histopathology examination following short-term exposure. *Inhalation Toxicology.* 17(9):427-449.

Bernstein DM, Rogers R, Sepulveda R, Kunzendorf P, Bellmann B, Ernst H, Phillips JI. 2014 April 1. Evaluation of the deposition, translocation and pathological response of brake dust with and without added chrysotile in comparison to crocidolite asbestos following short-term inhalation: interim results. *Toxicology and Applied Pharmacology*. 276(1):28-46.

Page 3-1



**Attachment 3**
**Medical, Toxicological, and Epidemiological Literature**
**(Continued)**

Bernstein DM, Rogers R, Smith P.  2004 October/November.  The biopersistence of Brazilian chrysotile asbestos following inhalation.  *Inhalation Toxicology.*  16(11-12):745-761.

Bernstein DM, Rogers RA, Sepulveda R, Donaldson K, Schuler D, Gaering S, Kunzendorf P, Chevalier J, Holm SE.  2010 September.  The pathological response and fate in the lung and pleura of chrysotile in combination with fine particles compared to amosite asbestos following short-term inhalation exposure:  interim results.  *Inhalation Toxicology*.  22(11):937-962.

Bernstein DM, Rogers RA, Sepulveda R, Donaldson K, Schuler D, Gaering S, Kunzendorf P, Chevalier J, Holm SE.  2011 June.  Quantification of the pathological response and fate in the lung and pleura of chrysotile in combination with fine particles compared to amosite-asbestos following short-term inhalation exposure.  *Inhalation Toxicology*.  23(7):372-391.

Boffetta P, Donaldson K, Moolgavkar S, Mandel JS.  2014 May.  A systematic review of occupational exposure to synthetic vitreous fibers and mesothelioma.  *Critical Reviews in Toxicology*.  44(5):436-449.

Broaddus VC, Everitt JI, Black B, Kane AB.  2011.  Non-neoplastic and neoplastic pleural endpoints following fiber exposure.  *Journal of Toxicology and Environmental Health.  Part B, Critical Reviews*.  14(1-4):153-178.

Bunderson-Schelvan M, Pfau JC, Crouch R, Holian A.  2011.  Nonpulmonary outcomes of asbestos exposure.  *Journal of Toxicology and Environmental Health.  Part B, Critical Reviews*.  14(1-4):122-152.

Camus M, Siemiatycki J, Case BW, Désy M, Richardson L, Campbell S.  2002.  Risk of mesothelioma among women living near chrysotile mines versus US EPA asbestos risk model:  preliminary findings.  *The Annals of Occupational Hygiene*.  46(Suppl. 1):95-98.

Churg A, Wright JL, Gilks B, DePaoli L.  1989 April.  Rapid short-term clearance of chrysotile compared with amosite asbestos in the guinea pig.  *The American Review of Respiratory Disease*.  139(4):885-890.

Craighead JE.  1995.  Pathology of environmental and occupational disease.  St. Louis:  Mosby-Year Book, Inc. p 468-469.

Dement JM, Harris RL Jr., Symons MJ, Shy CM.  1983.  Exposures and mortality among chrysotile asbestos workers.  Part II:  mortality.  *American Journal of Industrial Medicine*.  4(3):421-433.

Dodson RF, O'Sullivan M, Corn CJ, McLarty JW, Hammar SP.  1997 July/August.  Analysis of asbestos fiber burden in lung tissue from mesothelioma patients.  *Ultrastructural Pathology*.  21(4):321-336.

Fischbein A, Langer AM, Suzuki Y, Selikoff IJ.  1978.  Carcinoma of the lung in a drywall tape worker:  report of a case.  *Toxicology Letters*.  2:231-236.



**Attachment 3**
**Medical, Toxicological, and Epidemiological Literature**
**(Continued)**

Gardner MJ, Winter PD, Pannett B, Powell CA.  1986 November.  Follow up study of workers manufacturing chrysotile asbestos cement products.  *British Journal of Industrial Medicine*.  43(11):726-732.

Gibbs GW and Berry G.  2008 October.  Mesothelioma and asbestos.  *Regulatory Toxicology and Pharmacology:  RTP*.  52(1 Suppl.):S223-231.

Gross P.  1974 August.  Is short-fibered asbestos dust a biological hazard?  *Archives of Environmental Health*.  29(2):115-117.

Hodgson JT and Darnton A.  2000 December.  The quantitative risks of mesothelioma and lung cancer in relation to asbestos exposure.  *The Annals of Occupational Hygiene*.  44(8):565-601.

Hodgson JT, McElvenny DM, Darnton AJ, Price MJ, Peto J.  2005 February 14.  The expected burden of mesothelioma mortality in Great Britain from 2002 to 2050.  *British Journal of Cancer*.  92(3):587-593.

Huang SX, Jaurand MC, Kamp DW, Whysner J, Hei TK.  2011.  Role of mutagenicity in asbestos fiber-induced carcinogenicity and other diseases.  *Journal of Toxicology and Environmental Health.  Part B, Critical Reviews*.  14(1-4):179-245.

Husain AN.  2010.  Chapter 15 – The lung.  In:  Kumar V, Abbas AK, Fausto N, Aster J.  Robbins & Cotran pathologic basis of disease.  8th edition.  Philadelphia:  Saunders/Elsevier Health Sciences.  p. 700.

Lacquet LM, van der Linden L, Lepoutre J.  1980.  Roentgenographic lung changes, asbestosis and mortality in a Belgian asbestos-cement factory.  *IARC Scientific Publications*.  (30):783-793.

Liddell FDK, McDonald AD, McDonald JC.  1998 January.  Dust exposure and lung cancer in Quebec chrysotile miners and millers.  *The Annals of Occupational Hygiene*.  42(1):7-20.

McDonald AD, Fry JS, Woodley AJ, McDonald JC.  1984 May.  Dust exposure and mortality in an American chrysotile asbestos friction products plant.  *British Journal of Industrial Medicine*.  41(2):151-157.

McDonald JC.  2010 November.  Epidemiology of malignant mesothelioma - an outline.  *The Annals of Occupational Hygiene*.  54(8):851-857.

McDonald JC, Armstrong B, Case B, Doell D, McCaughey WT, McDonald AD, Sébastien P.  1989 April 15.  Mesothelioma and asbestos fiber type.  Evidence from lung tissue analyses.  *Journal of Cancer*.  63(8):1544-1547.

Mossman BT, Lippmann M, Hesterberg TW, Kelsey KT, Barchowsky A, Bonner JC.  2011.  Pulmonary endpoints (lung carcinomas and asbestosis) following inhalation exposure to asbestos.  *Journal of Toxicology and Environmental Health.  Part B, Critical Reviews*.  14(1-4):76-121.



**Attachment 3**
**Medical, Toxicological, and Epidemiological Literature**
**(Continued)**

Newhouse ML and Berry G.  1979.  Patterns of mortality in asbestos factory workers in London.  *Annals of the New York Academy of Sciences.*  330:53-60.

Ohlson CG and Hogstedt C.  1985 June.  Lung cancer among asbestos cement workers.  A Swedish cohort study and a review.  *British Journal of Industrial Medicine*.  42(6):397-402.

Pierce JS, McKinley MA, Paustenbach DJ, Finley BL.  2008.  An evaluation of reported no-effect chrysotile asbestos exposures for lung cancer and mesothelioma.  *Critical Reviews in Toxicology*.  38(3):191-214.

Pierce JS, Ruestow PS, Finley BL.  2016 August.  An updated evaluation of reported no-observed adverse effect levels for chrysotile asbestos for lung cancer and mesothelioma.  *Critical Reviews in Toxicology.*  46(7):561–586.

Piolatto G, Negri E, La Vecchia C, Pira E, Decarli A, Peto J.  1990 December.  An update of cancer mortality among chrysotile asbestos miners in Balangero, northern Italy.  *British Journal of Industrial Medicine*.  47(12):810-814.

Pira E, Pelucchi C, Romano C, Manzari M, Negri E, La Vecchia C.  2012 March.  Mortality from cancer and other causes in an Italian cohort of male rubber tire workers.  *Journal of Occupational and Environmental Medicine*.  54(3):345-349.

Pistolesi M and Rusthoven J.  2004 October.  Malignant pleural mesothelioma:  update, current management, and newer therapeutic strategies.  *Chest*.  126(4):1318-1329.

Platek SF, Groth DH, Ulrich CE, Stettler LE, Finnell MS, Stoll M.  1985 April.  Chronic inhalation of short asbestos fibers.  *Fundamental and Applied Toxicology (Official Journal of the Society of Toxicology)*.  5(2):327-340.

Pott F, Huth F, Friedrichs KH.  1974 December.  Tumorigenic effect of fibrous dusts in experimental animals.  *Environmental Health Perspectives*.  9:313-315.

Roggli VL.  2015 August.  The so-called short-fiber controversy:  literature review and critical analysis.  *Archives of Pathology and Laboratory Medicine*.  139(8):1052-1057.

Roggli VL, Sharma A, Butnor KJ, Sporn T, Vollmer RT.  2002 March-April.  Malignant mesothelioma and occupational exposure to asbestos:  a clinicopathological correlation of 1445 cases.  *Ultrastructural Pathology*.  26(2):55-65.

Rudd RM.  2010.  Malignant mesothelioma.  *British Medical Bulletin*.  93:105-123.



**Attachment 3**
**Medical, Toxicological, and Epidemiological Literature**
**(Continued)**

Sichletidis L, Chloros D, Spyratos D, Haidich AB, Fourkiotou I, Kakoura M, Patakas D.  2009.  Mortality from occupational exposure to relatively pure chrysotile:  a 39-year study.  *Respiration (International Review of Thoracic Diseases)*.  78(1):63-68.

Stettler LE, Sharpnack DD, Krieg EF.  2008 January.  Chronic inhalation of short asbestos:  lung fiber burdens and histopathology for monkeys maintained for 11.5 years after exposure.  *Inhalation Toxicology*.  20(1):63-73.

Szeszenia-Dąbrowska N, Świą Tkowska B, Sobala W, Szubert Z, Wilezyhska U.  2015.  Asbestos related diseases among workers of asbestos processing plants in relation to type of production and asbestos use.  *Medycyna Pracy*.  66(1):1-9.

Thomas HF, Benjamin IT, Elwood PC, Sweetnam PM.  1982 August.  Further follow-up study of workers from an asbestos cement factory.  *British Journal of Industrial Medicine*.  39(3):273-276.

United States Department of Health and Human Services [DHHS], Public Health Service, Agency for Toxic Substances and Disease Registry [ATSDR].  2001 September.  Toxicological profile for asbestos.

United States Environmental Protection Agency [USEPA], Integrated Risk Information System [IRIS].  Revised 1993 July 1.  II C.2 – Dose response data for carcinogenicity, inhalation exposure in asbestos (CASRN 1332-21-4).

Wagner JC, Berry G, Skidmore JW, Pooley FD.  1980.  The comparative effects of three chrysotiles by injection and inhalation in rats.  IARC Scientific Publications.  (30):363-372.

Wang X, Yano E, Lin S, Yu IT, Lan Y, Tse LA, Qiu H, Christiani DC.  2013 August 21.  Cancer mortality in Chinese chrysotile asbestos miners:  exposure-response relationships.  *PLos One*.  8(8):e71899.

Weill H, Hughes JM, Churg AM.  2004 May.  Changing trends in US mesothelioma incidence.  *Occupational and Environmental Medicine*.  61(5):438-441.

World Health Organization [WHO].  1998.  Environmental Health Criteria 203:  Chrysotile asbestos.

World Health Organization [WHO], International Agency for Research on Cancer [IARC].  2012.  Asbestos (chrysotile, amosite, crocidolite, tremolite, actinolite, and anthophyllite).  In:  IARC monographs on the evaluation of carcinogenic risks to humans.  Volume 100C.  Lyon, France:  IARC.  http://monographs.iarc.fr/ENG/Monographs/vol100C/Mono100C.pdf.  Accessed 2017 April.

Yarborough CM.  2006 February.  Chrysotile as a cause of mesothelioma:  an assessment based on epidemiology.  *Critical Reviews in Toxicology*.  36(2):165-187.



**Attachment 3**
**Medical, Toxicological, and Epidemiological Literature**
**(Continued)**

Yarborough CM.  2007 July.  The risk of mesothelioma from exposure to chrysotile asbestos.  *Current Opinion in Pulmonary Medicine*.  13(4):334-338.