UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                Plaintiff,

                               No. 5:18-CR-40058-HLT

-vs-

THOMAS FRITZEL,

                Defendant.

_____/

**SENTENCING MEMORANDUM OF THE UNITED STATES**

      NOW COMES the United States of America, by and through Richard L. Hathaway, Assistant United States Attorney for the District of Kansas, who respectfully submits this Sentencing Memorandum regarding defendant THOMAS FRITZEL, who is scheduled to be sentenced on **February 20, 2020, at 9:30 a.m.**  The United States respectfully requests that the Court sentence the defendant to a term of imprisonment of between thirty-three (33) and forty-one (41) months, which is within the recommended range under the United States Sentencing Guidelines (U.S.S.G.) for a total offense level of 20.  The United States also respectfully requests that the Court require defendant FRITZEL to pay a criminal fine in an amount between $15,000 and $150,000, in accordance with U.S.S.G. § 5E1.2(c)(3).

**INTRODUCTION AND PROCEDURAL BACKGROUND**

      The offense conduct cited in Presentence Investigation Report (PSIR) prepared October 4, 2019, comports with the facts cited in this brief, and, though the United States

1

disagrees with the offense level computed in the PSIR (as described below under

"Sentencing Guidelines Calculation"), it agrees with the Probation Officer's conclusion

that no factors warrant a departure or variance outside of the advisory Guideline range.

*See* Fritzel PSR ¶ 93. Likewise, a sentence within the advisory Guideline range is

supported by the § 3553(a) factors. Of course, a "sentencing court does not enjoy the

benefit of a legal presumption that the Guidelines sentence should apply," *Rita v. United*

*States*, 127 S. Ct. 2456, 2465 (2007), and "may not presume that the Guidelines range is

reasonable," *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 596-97 (2007); *Nelson v.*

*United States*, 129 S. Ct. 890, 892 (2009). Examination of the § 3553(a) factors, however,

shows that a Guideline sentence is warranted here.

For reasons more fully set forth below, the United States respectfully requests that

the Court sentence the defendant to a term of imprisonment within the defendant's

advisory Sentencing Guideline range.

**1. Summary of the Facts**

    **a. History of the Site and Site Purchase**

## FACTS

Defendant THOMAS FRITZEL bought a building with asbestos in the roof.

Although he could have left the asbestos in place or hired a qualified asbestos abatement

contractor to abate the asbestos in accordance with state and federal law, he instead

knowingly chose to disregard the law and dismantle a significant portion of the roof in

violation of applicable safety regulations.

The Alvamar Country Club's private clubhouse in Lawrence, Kansas, had been constructed in the early 1980s by defendant FRITZEL's father. In 2008, the private clubhouse was in need of a new roof due to hail damage. Jay Patterson, a contractor and member of the Alvamar Country Club, was tasked by the Alvamar Board to oversee the replacement of the roof. Having been informed by an acquaintance that the roof was known to contain asbestos, Patterson took a sample of the roof material and submitted it for analysis. The analysis tested at 75% chrysotile asbestos. After Patterson obtained bids for a roof replacement including abatement of the asbestos that ranged from $59,000 to $110,000, the Alvamar Board decided not to replace the roof, opting instead to encapsulate it at much lower cost with a new roof on top of the old one.

In or about December 2015, defendant FRITZEL's company Eagle 1968 finalized its purchase of the Alvamar Country Club and, in conjunction with another of FRITZEL's companies, DFC Company of Lawrence, L.C., began the process of obtaining permits to remodel and renovate the buildings at the site, including the Alvamar private clubhouse.

### b.  Fritzel Alerted of Asbestos Presence

In early March 2016, shortly after the Alvamar purchase was complete, but before substantial renovation activity had begun, Alvamar golf course superintendent Richard Herries sent emails to FRITZEL and several others, including FRITZEL employee Wes Lynch, the General Manager of the property, and Paul Werner, the architect working on the site remodel. Herries' emails stated that he had been informed by Patterson that the

roof of the Alvamar private clubhouse contained asbestos, and that, rather than replace it, the previous owners had opted to cover the old roof with a new roof. Lynch met with Herries, acknowledging FRITZEL's receipt of the emails. FRITZEL also discussed the matter with Werner, and subsequently, through his legal counsel, contacted the former owners of Alvamar regarding the asbestos. In May of 2016, the former Alvamar board members responded to FRITZEL's legal counsel, providing 2008 analysis results, which showed the roof sample Patterson had submitted to contain 75% chrysotile asbestos. This communication was followed by an offer to defendant FRITZEL's legal counsel from the former owners to indemnify defendant's company for costs associated with the asbestos.

Despite being on notice of the asbestos hazard in the clubhouse and seeking indemnification for it, FRITZEL took no steps to abate or contain the material prior to commencing renovation activities that included demolishing significant portions of the asbestos-laden roof.

### c.  Renovation Activities / Roof Demolition

In the fall of 2016, FRITZEL proceeded with the demolition of significant portions of the clubhouse roof, with no notice to state or federal officials that he was engaging in asbestos removal and taking no precautions as required by state and federal law. Witnessing a construction worker cutting into the roof of the clubhouse, neighbor Jay Patterson – the individual who had performed the 2008 asbestos sampling for the previous owners – confronted FRITZEL employee Wes Lynch, the General Manager of the property, now redubbed the "Jayhawk Club." Patterson informed Lynch in person of

his knowledge of the asbestos hazard and provided him a copy of the 2008 analysis – the same analysis that had previously been provided to FRITZEL's attorney by the Alvamar board members.

### d.  KDHE Inspection

On or about October 13, 2016, inspectors from the Kansas Department of Health and the Environment ("KDHE"), having been alerted to the renovation project by an acquaintance of Patterson's, visited the Alvamar site. While there, they documented the site via photographs and collected a sample of the suspected regulated asbestos containing material (RACM), and informed General Manager Wes Lynch of a possible asbestos violation, instructing him that all debris and dumpsters were to remain in place and were not to be disturbed. The KDHE subsequently contacted FRITZEL directly on October 17, 2016, and met in person with FRITZEL and his construction foreman Casey Stewart on October 19, both times informing FRITZEL of possible asbestos and work practice violations at the Site, and advising him that a certified asbestos inspector was required to take samples prior to any sort of renovation or demolition, and that a licensed asbestos contractor would need to be hired to supervise and remove the debris piles and dumpsters they had documented on October 13, 2016. KDHE also provided FRITZEL with a copy of the Kansas asbestos statutes, as well as a copy of penalties that would apply in the unauthorized removal of friable asbestos material.

Despite the warning by KDHE, as the evidence established at trial, defendant not only continued to remove the asbestos-containing debris after the KDHE inspection, but

also actively continued demolition activities on the roof, and even continued offsite shipments of the debris after attending the October 19, 2016 meeting.

### e.  Continuation of Illegal Asbestos Removal and Renovation Activity

Despite the KDHE's notice to Lynch and FRITZEL, multiple loads of waste were removed from the Site to a landfill and ultimately disposed in a landfill cell that was not approved for RACM between on or about October 14 through on or about October 26, 2016. The waste was removed by an entity identified on landfill documents as R&R Supply Company, L.C., an administratively forfeited Kansas limited liability company associated with THOMAS FRITZEL. On October 28, 2016, the KDHE inspectors returned to the site and witnessed that the debris pile they had seen on October 13 had been removed, as had all the dumpsters they had documented on their initial visit.

Furthermore, comparison of an aerial photograph taken on October 13, 2016 with one taken just six days later, on October 19, 2016, clearly establishes that, not only were the debris piles documented by KDHE on October 13 removed by October 19, but also that further renovation activities involving the cutting and removal of another section of the clubhouse roof had take place in the interim (Def. Ex. 1026).

In addition to the sixteen loads of debris documented as having been received by the Hamm Landfill between on or about October 14 through on or about October 26, 2016, it should be noted that at least twelve loads were documented as having been transported to the landfill between August 25 through October 13, 2016. As evidenced by

the aerial photographs taken to document progress on the renovation, the majority of the roof removal activity took place during this time (Def. Ex. 1026).[1]

Even though defendant was alerted to the presence of asbestos in the clubhouse roof as early as March of 2016, and multiple times thereafter, he nevertheless proceeded to have a significant portion of the roof demolished by cutting and heavy machinery, taking no measures to contain the material in accordance with federal and state law, and failing to dispose the material in a landfill designated for asbestos disposal. Furthermore, he failed to notify either the state of Kansas or the United States Environmental Protection Agency prior to the commencement of renovation activities that would disturb the asbestos, and his actions resulted in ongoing and repetitive releases of regulated asbestos-containing material into the environment. These ongoing and repetitive releases exposed not just the workers involved in the improper removal of asbestos and the renovation of the Alvamar/Jayhawk Club facility, but also the public in the surrounding areas, in addition to employees of the landfill who received multiple uncontained and unidentified loads of regulated asbestos containing material from the site.

Additional relevant facts are set forth in the Presentence Investigation Report (PSR), and the government incorporates those facts into this memorandum by reference.

---

1 The photographic evidence in Def. Ex. 1026 provides a clear counter to defendant's contention in its objections to Paragraph 21 of the PSIR (Doc. 147) that the roof demolition activities were confined to one day. While it may be true that the excavator operator Moffett completed the removal of a selected portion of the roof in one day, the site photographs show that the roof removal activities in fact took place over an extended period of time, utilizing saws to cut the roof edge as well as Moffet's excavator, with a portion of the roof edge even being removed *after* the October 13, 2016 KDHE site visit.

The United States also refers this court to the following attachments to this memorandum: *Attachment 1 (Toxicological Profile for Asbestos, Agency for Toxic Substances and Disease Registry, Public Health Service, U.S. Department of Health and Human Services (September 2001))*; *Attachment 2 (Public Health Statement, Asbestos (September 2001))*; *Attachment 3 (Testimony of Dr. Richard A. Lemen, before the Senate Committee on Environment and Public Works (June 12, 2007))*; *Attachment 4 (Testimony of Dr. Kathleen M. Rest, Ph.D., Acting Director, National Institute for Occupational Safety and Health, before the Senate Committee on Health, Education, Labor and Pensions (July 31, 2001)), and Attachment 5 (Compared photographs taken by KDHE October 13 and 19, 2016).*

## 2.  Procedural History

Based on the factual recitation above, defendant THOMAS FRITZEL and several other individuals and corporate entities were charged on June 27, 2018 with conspiracy to violate the federal Clean Air Act ("CAA"), 42 U.S.C. § 7413(c)(1), and with three substantive violations of the CAA (Doc. 1). The government called a number of witnesses in the course of a five-day trial, and, both after the government's case-in-chief and at the close of all evidence, the defendant filed a motion for acquittal pursuant to Fed. R. Crim. P. 29. The Court reserved ruling at that time. On July 30, 2019, the jury returned a verdict of guilty on Counts 2-4 of the four-count Indictment (Count One, the conspiracy charge, having been dismissed prior to the trial, and the other defendants having also been dismissed), which charged FRITZEL with knowing violations of the federal Clean

Air Act, 42 U.S.C. § 7413(c)(1), and the federal asbestos regulations, 40 C.F.R. Part 61,

Subpart M (Doc. 133). On August 2, 2019, the Court denied defendant's motions for

acquittal (Doc. 136). Defendant then filed a motion for new trial which was denied (Doc.

141). On January 21, 2020, Defendant filed his objections to portions of the PSIR (Doc

147).

### 3.   Regulatory Framework – Federal Regulation of Asbestos

Asbestos is a "listed" hazardous substance and hazardous air pollutant. See 40

C.F.R. § 302.4 and 42 U.S.C. § 7412(b)(1). Medical science has not established a level

below which human exposure to asbestos fibers is considered safe. 20 U.S.C. §

3601(a)(3). Because of its inherent danger, activities related to asbestos are highly

regulated, at both the federal and state levels.

The CAA, 42 U.S.C. § 7413(c)(1), provides criminal penalties for any person who

knowingly violates any requirement or prohibition of Section 7412. Section 7412

provides for work practice standards governing asbestos renovation and demolition

projects. 42 U.S.C. §§ 7412(b) and (h). Regulations governing work practice standards

(National Emission Standard for Hazardous Air Pollutants or "NESHAPs," Subpart M),

established for asbestos renovation and demolition projects, are found at 40 C.F.R. §§

61.141 (definitions), 145, and 150. See Indictment ¶¶ 11-20. (Doc. 1) (setting forth work

practice standards and/or citing same); see also *United States v. Shurelds*, 173 F.3d 430

(Table), 1999 WL 137636, at *1, No. 97-6265, slip op. at 3-4 (6th Cir. 1999), *United

States v. Weintraub*, 273 F.3d 139, 144-148 (2d Cir. 2001). For renovation or demolition

activities[2] involving asbestos, 40 C.F.R. § 61.145 contains three basic subsections (a-c). Subsection (a), entitled "Applicability," requires that a thorough inspection, or "survey," occur prior to renovation or demolition activities to determine whether regulated asbestos containing material ("RACM" or "asbestos") in a jurisdictional amount is present, and if so, where and in what specific amounts. RACM is defined by the regulations to include all friable asbestos, as well as any Category I nonfriable asbestos (including floor covering and asphalt roofing materials) that has been or will be subjected to sanding, grinding, cutting or abrading, and any Category II nonfriable asbestos (i.e., all other nonfriable asbestos containing material) that has a high probability of becoming friable as a result of the forces acting on the material in the course of the demolition or renovation. *See* 40 C.F.R. § 61.141 (definitions).

To be covered by the NESHAP regulations, a demolition or renovation project must involve a facility with at least 260 linear feet, 160 square feet, or, if the area could not first be measured, 1 cubic meter (35 cubic feet) of RACM. See 40 C.F.R. §§ 61.145(a)(1)(I) and (ii),(4)(I) and (ii).

Title 40, Code of Federal Regulations, Section 61.145(b), entitled "notification requirements," spells out the obligation of owners and operators to notify the EPA in writing 10 days prior to the commencement of renovation and demolition activities. The

---

[2] "Demolition" means the wrecking or taking out of any load-supporting structural member of a facility together with any related handling operations or the intentional burning of any facility. *See* 40 C.F.R. § 61.141. "Renovation" means altering a facility or one or more facility components in any way, including the stripping or removal of RACM from a facility component. *Id.*

notification must include a description of the facility, its location, the amount of asbestos to be removed, dates of anticipated work, analytical methods used to detect the presence of RACM, and work practices and engineering controls that will be employed to comply with NESHAP.

Title 40, Code of Federal Regulations, Section 61.145(c), entitled "Procedures for Asbestos Emission Control," establishes work practice standards that must be followed during renovation and demolition activities. Among other things, subsection (c) requires that all RACM be removed from a facility being demolished or renovated before any activity begins that would break up, dislodge, or similarly disturb the material or preclude access to the material.[3] *See, e.g., Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277-78 (6th Cir. 1995) ("removal of [asbestos] prior to demolition [is] required . . . by federal regulation, 40 C.F.R. §§ 61.145 and 61.150). RACM must be adequately wetted when being stripped from facility components. *Id.* It must be carefully lowered to the floor and to ground level, not dropped or thrown. Id. RACM must remain adequately wet until packed and sealed in leak-tight containers. *Id.* All of these work practices are intended to prevent the release of asbestos fibers into the air.

Transportation and disposal of RACM is governed by regulations found at 40 C.F.R. §§ 61.145, 61.150. RACM transported off the facility must be marked with labels

---

[3] All friable asbestos, except for material on a component encased in concrete and material not discovered until after demolition began, must be removed before demolition begins. *See* 40 C.F.R. § 61.145(c)(1)(ii), (iii).

stating the name of the asbestos waste generator and the location where it was generated, and the owner or operator must maintain records regarding the shipment. 40 C.F.R. § 61.150(a)(v) and (d)(1). Further, RACM transported from the facility must be deposited as soon as practical at a disposal site authorized to accept asbestos. 40 C.F.R. § 61.150(b)(1).

As a consequence of delegation of regulatory authority, the above-referenced EPA regulations set forth above are enforced by the KDHE. Each state is permitted to develop a program for the implementation and enforcement of CAA emission standards (discharges into the air) and other requirements of 42 U.S.C. § 7412 and submit the program to EPA for approval. A program submitted by a state may provide for partial or complete delegation of EPA's authority to implement and enforce CAA emission standards and prevention requirements, but shall not include authority to set standards less stringent than those promulgated by EPA. 42 U.S.C. § 7412(1). The KDHE is responsible for enforcing these regulations for the State of Kansas. *See* 40 C.F.R. § 61.04; 83 Fed. Reg. 25382-01, 2018 WL 2441922 (June 1, 2018); K.A.R. 28-50-1 to 28-50-14.

## HEALTH EFFECTS OF ASBESTOS EXPOSURE

Asbestos is a heat-resistant mineral fiber that has been widely used in insulation and fire retardant products.   As explained below, exposure to asbestos causes lung diseases such as mesothelioma and asbestosis. The deleterious effects of asbestos have been documented at all dosage levels studied, leading experts to conclude that there is no known safe exposure level to asbestos. In addition, the aerodynamic shape of asbestos

fibers facilitates transport of the fibers far beyond the point of original release. This can result in health risks for people other than those who worked on a particular asbestos removal job.

According to the Agency for Toxic Substances and Disease Registry (ATSDR), U.S. Department of Health and Human Services, a "voluminous body of evidence establishes that inhalation exposure to asbestos increases the risk of lung cancer and mesothelioma" in both humans and animals. *Attachment 1 (Toxicological Profile for Asbestos, Agency for Toxic Substances and Disease Registry, Public Health Service, U.S. Department of Health and Human Services, at 48-49 (September 2001))*. Studies have revealed that short-term exposure to asbestos fibers, including even a single high-inhalation exposure, can result in lung fibrosis and a risk of cancer. *Attachment 1 (Toxicological Profile for Asbestos), at 121*.

Mesothelioma is characterized by tumors on the pleura, the thin membranes lining the chest and abdominal cavities. Many scientific studies have demonstrated a strong link between occupational exposure to asbestos and the development of mesothelioma, as occurrences of mesothelioma are relatively rare in the general population, but significantly more prevalent among asbestos workers. *Attachment 1 (Toxicological Profile for Asbestos), at 51-53*. Lung cancer from asbestos exposure is usually fatal, while mesothelioma almost always proves to be fatal, often within a few months of diagnosis. *Attachment 2 (Public Health Statement, Asbestos, at 4 (September 2001))*. The risk of these diseases is not limited to asbestos workers; lung cancer has been

reported in the family members of asbestos workers, where exposure likely occurred when asbestos was carried home on the workers' clothing. *Attachment 1 (Toxicological Profile for Asbestos, at 49, 53); Attachment 3 (Testimony of Dr. Richard A. Lemen, before the Senate Committee on Environment and Public Works (June 12, 2007)).* Generally, the development of lung diseases from asbestos-exposure will not be apparent for anywhere from 10 to 40 years following exposure. *Attachment 4 (Testimony of Dr. Kathleen M. Rest, Ph.D., Acting Director, National Institute for Occupational Safety and Health, before the Senate Committee on Health, Education, Labor and Pensions (July 31, 2001)); Attachment 1 (Toxicological Profile for Asbestos), at 53.*

In addition to fatal lung diseases, many studies have shown that inhalation exposure to asbestos fibers can lead to "asbestosis," a disease characterized by scarring of the lung tissues. *Attachment 4 (Testimony of Dr. Kathleen M. Rest before the Senate Committee on Health, Education, Labor and Pensions (July 31, 2001)).* Dr. Richard A. Lemen, retired Assistant Surgeon General, has described asbestosis as "a progressive disease which can eventually result in death after much disability and suffering." *Attachment 3 (Testimony of Dr. Richard A. Lemen, before the Senate Committee on Environment and Public Works (June 12, 2007)).* Inhalation of asbestos fibers can also lead to the development of lesions known as pleural plaques. *Attachment 1 (Toxicological Profile for Asbestos), at 44.*

## SENTENCING GUIDELINES CALCULATION

Defendant THOMAS FRITZEL was convicted of three counts of knowingly violating the Clean Air Act and the federal asbestos regulations, 42 U.S.C. § 7413, 40 C.F.R. § 61.145. In imposing a sentence under the Clean Air Act, a court must consult and consider the applicable United States Sentencing Guideline ("USSG" or "Guidelines") § 2Q1.2(a). Based on the conduct in this case, Section 2Q1.2 of the USSG is the controlling guideline section.[4] The United States submits that the appropriate sentencing guideline calculation can be summarized as follows:

- Base Offense Level – § 2Q1.2(a):                                                           8

- Specific Offense Characteristics – § 2Q1.2(b)(1)(B)
  (Continuous/Repetitive Discharge of hazardous substance/pollutants):      +6

- Specific Offense Characteristics – § 2Q1.2(b)(4) (Offense involved transportation, treatment, storage, or disposal without a permit)                         +4

- Role in Offense – § 3B1.1(c):                                                          +2

- Total Offense Level:                                                                   **20**

In its Presentence Investigation Report ("PSIR"), the Probation Office makes a similar guideline calculation, but it included no adjustment for the defendant's role in the

---

[4] The Commentary to U.S.S.G. §2Q1.2, Application Note 3, states that this section applies to "offenses involving … substances designated as toxic or hazardous at the time of the offense by statute or regulation." It is the nature of the pollutants involved, not the offense of conviction, that determines which guideline applies. See, *inter alia, United States v. Van Loben Sels*, 198 F.3d 1161 (9th Cir. 1999). Asbestos is designated as a hazardous air pollutant under the Clean Air Act, 42 U.S.C. 7412(b)(1). In addition, asbestos is a hazardous substance under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). *See* 42 U.S.C. §§ 9601(14) and 9602; and 40 C.F.R. § 302.4, Table 302.4.

offense (*i.e.*, FRITZEL's role as leader, organizer, manager or supervisor in the criminal activity), pursuant to section 3B1.1(c). The PSIR also recommended a four-level upward adjustment for the specific offense characteristic of resulting in a discharge, release, or emission of a hazardous or toxic substance into the environment. As explained below, the Government submits that the facts support a six-level enhancement for this characteristic, as the discharges, releases, or emissions of asbestos resulting from the renovation activities conducted from August through October of 2016 should be considered repetitive or ongoing, rather than a one-time event.

## I.   U.S.S.G. §2Q1.2(b)(1): Ongoing, Continuous or Repetitive Discharge, Release or Emission of a Hazardous or Toxic Substance into the Environment; 6 Level Enhancement.

The evidence in this case demonstrates that there were repetitive or ongoing discharges, releases or emissions of asbestos (a toxic and hazardous substance) into the environment.[5]  According to the ATSDR, asbestos fibers may be released to the air by the disturbance of asbestos-containing building materials, such as insulation, during renovation or demolition activities. *Attachment 1 (Toxicological Profile for Asbestos), at 161.* These asbestos fibers can remain suspended in air and be transported over long

---

[5]  Defendant, in its objection to paragraph 42 of the PSIR (Doc. 147), appears to be arguing that evidence of harm is a prerequisite to assessing an increase in offense level for the specific offense characteristic of release to the environment (whether ongoing or one-time). This is incorrect. While Application Note 5 to U.S.S.G. § 2Q1.2 allows for a departure of up to two levels in either direction depending on the harm shown from an emission or discharge, such a showing is not a prerequisite to establishing the specific offense characteristic – all that is required is that the discharge resulted in actual environmental contamination, which the record amply demonstrates.

distances. *Attachment 1 (Toxicological Profile for Asbestos), at 154, 156*. In the instant matter, the manner in which the Alvamar/Jayhawk private clubhouse's roof was razed inevitably led to releases of asbestos fibers to the environment on each day of the roof renovation job, as did the unauthorized cleanup and transportation of the site following the KDHE visit and prior to the ultimate abatement of the site on or around October 28, 2016 by the licensed abatement contractor, B&R Insulation.

The KDHE inspectors arrived at the site on October 13, 2016, and documented piles of debris containing suspected asbestos-containing material in an open area that was exposed to the outside air. *See Attachment 5 (photograph of pile of debris with asbestos materials).* By that point, most of the roof removal activity had taken place, as evidenced by the aerial photographs of the site from August 25, 2016 onward, and by the testimony of Jay Patterson, who had confronted FRITZEL's employee Wes Lynch when he witnessed a heavy machine operator tearing into the roof, and who testified that he subsequently witnessed workers cutting the edge of the roof with a saw. Indeed, a comparison of the aerial photograph taken October 13, 2016, the date KDHE investigators visited the site, with one taken just six days later, on October 19, 2016, shows that not only were the piles of debris removed, but further roof-cutting activity had taken place in the interim. *See Defendant's Exhibit 1026.* The ongoing and continuous nature of the release is further supported by the testimony of ACT Labs contractor Adrian Turner, who collected samples from the Alvamar/Jayhawk property on October 21, 2016, and who testified to collecting samples from various locations, including roofing felt

paper that was scattered on the ground outside the public clubhouse, which subsequently tested positive for chrysotile asbestos. Similarly, on October 28, 2016, B&R Insulation employee and asbestos abatement contractor Max Cowley testified to collecting multiple bags worth of suspected RACM for disposal that had been scattered about the grounds, in addition to having to HEPA vacuum dust that had resulted from sawing through the roof edge. The ongoing and repetitive nature of the asbestos discharge may be further inferred from the records of at least 28 shipments of construction debris by R&R Supply trucks to the Hamm Landfill between on or about August 25 to October 26, 2016, none of which were identified as

asbestos-containing material for disposal in a cell designated for asbestos waste at the landfill.[6]

The evidence summarized above is more than sufficient to establish that the offenses at issue resulted in ongoing, continuous or repetitive releases and emissions of asbestos fibers into the environment. Federal courts have found repetitive or continuous emissions of asbestos under circumstances even less egregious as those present in the instant matter. In *United States v. Chau*, 293 F.3d 96, at 99-100 (3rd Cir. 2002), the Third Circuit found that illegal asbestos removal work had resulted in the continuous discharge of asbestos, where the evidence showed disturbance of asbestos inside a building, and

---

6  While it may be true, as defendant states in its objections to Paragraph 31 of the PSIR (Doc. 147), that "Whether a cell contains asbestos material or not, it is only covered by dirt," that is besides the point. As Charlie Sedlock, manager at Hamm Landfill testified at trial, landfills use designated cells for disposing asbestos containing material so that the disposed material is not later inadvertently disturbed, thus releasing hazardous asbestos fibers to the environment.

where "some opened garbage bags containing asbestos were left outside the building on

the sidewalk." *Chau*, 293 F.3d at 100. The Fifth Circuit reached a similar conclusion in

*United States v. Ho*, 311 F.3d 589, at 609-10 (5th Cir. 2002). In reversing a district

court's failure to apply the six-level enhancement under U.S.S.G. §2Q1.2(b)(1)(A) in an

asbestos criminal case, the Fifth Circuit noted that, while only one bag of asbestos

material had been removed from the building, there had been open bags of asbestos

debris inside a building which was unsealed, and which had open doors; this evidence,

along with proof of dust residues inside the building, was sufficient to prove that

repetitive emissions of asbestos had occurred. *Ho*, 311 F.3d at 608-09. The Fifth Circuit

explained that "This evidence, when considered as a whole, leaves no doubt that asbestos

escaped the unsealed hospital continuously and repeatedly throughout the removal

project." *Ho*, 311 F.3d at 609.   *See*

*also United States v. Rubenstein*, 403 F.3d 93, at 99-100 (2nd Cir. 2005); *United States v.*

*Liebman*, 40 F.3d 544, at 550-51 (2nd Cir. 1994).

    Therefore, the six-level enhancement for an "ongoing, continuous or repetitive"

release or emission of a hazardous substance into the environment called for under

U.S.S.G. §2Q1.2(b)(1)(A) should be applied in this case.

    **II.**    **U.S.S.G. §2Q1.2(b)(4): Offense involved transportation, treatment, storage, or disposal without a permit**

        **A.**  **Four-level enhancement warranted per §2Q1.2(b)(4), as defendant was required under Kansas law to obtain a license from the state prior to engaging in an asbestos project, and did not do so.**

The Kansas Statutes Annotated (KSA) prescribes that, except as otherwise provided, "no business entity shall engage in an asbestos project unless the entity holds a license" issued by the state Secretary for Health and the Environment. KSA 65-5302(a).

Pursuant to KSA 65-5304:

*In order to qualify for a license, a business entity shall:*

*(a) Ensure that each employee or agent of the business entity who will come into contact with asbestos or who will engage in an asbestos project is certified;*

*(b) demonstrate to the satisfaction of the secretary that the business entity is capable of complying with all applicable requirements, procedures, standards of the United States environmental protection agency and the United States occupational safety and health administration and the secretary;*

*(c) have access to at least one approved asbestos disposal site for deposit of all asbestos waste that the business entity will generate during the term of the license; and*

*(d) comply with all rules and regulations adopted by the secretary under this act.*

Defendant FRITZEL did not obtain or seek to obtain a license from the state of Kansas prior to engaging in the removal and disposal of the asbestos-containing material from the Alvamar/Jayhawk clubhouse roof. Accordingly, a four-level enhancement is warranted per U.S.S.G. § 2Q1.2(b)(4).

### III.   U.S.S.G. §3B1.1:   Role as organizer/leader of a criminal activity

### A. Two-level enhancement warranted per U.S.S.G. § 3B1.1(c), as defendant was an organizer, leader, manager, or supervisor in the criminal activity.

U.S.S.G. § 3B1.1(c) provides for a two-level enhancement "if the defendant was an organizer, leader, manager, or supervisor in any criminal activity… ." In this case, there is no question that defendant THOMAS FRITZEL was the organizer and leader of the activity. Defendant FRITZEL's company, Eagle 1968, L.C. owned the Alvamar/Jayhawk Club site; defendant FRITZEL was the organizing and managing member of Eagle 1968, L.C., and was the individual interested in redeveloping the site. Defendant FRITZEL's company, DFC Company of Lawrence, L.C., was the contractor responsible for developing the Alvamar/Jayhawk Club site; defendant FRITZEL was a member and President of DFC Company of Lawrence, L.C. and was the individual interested in redeveloping the site. R&R Supply Company, L.C., which operated the trucks used in transporting the waste from the site to the landfill, was likewise defendant FRITZEL's company – indeed, it appears to have been administratively dissolved by the time of the Alvamar/Jayhawk Club renovation, and thus was in effect defendant FRITZEL doing business as R&R.

Defendant FRITZEL instructed Alvamar/Jayhawk General Manager Wes Lynch to speak with Alvamar employee Herries regarding the March 2016 emails warning FRITZEL and others of the asbestos in the roof. Defendant FRITZEL instructed his counsel to contact the former owners of Alvamar Country Club regarding the asbestos,

and through his counsel obtained their 2008 sample analysis results. Defendant FRITZEL instructed his son, Tucker, who himself was employed in a managerial position at the Alvamar/Jayhawk Club, to collect a sample of tar paper and submit it for asbestos testing. Defendant FRITZEL discussed the asbestos with his architect, Paul Werner, and assured him he was going to investigate the matter. Finally, Defendant FRITZEL, accompanied by his construction foreman Casey Stewart, communicated with KDHE inspectors following the October 13, 2016 inspection, and represented that he would ensure that a certified asbestos inspector would take samples prior to any further renovation or demolition, and that he understood the need to hire a licensed asbestos contractor to supervise and remove the preexisting debris piles and dumpsters located on site – and after which meeting multiple loads of debris continued to be illegally delivered to the Hamm Landfill.

In light of the above, defendant FRITZEL's role in the offense warrants a two-level enhancement in accordance with U.S.S.G. 3B1.1(c), since he is clearly an organizer, leader, manager, or supervisor in a criminal activity. As discussed above, the evidence shows that FRITZEL was the organizer or leader of a criminal activity that consisted in the illegal removal and disposal of asbestos. At least two corporations and one or more individual persons participated in the activity. FRITZEL knew that the roof of the private clubhouse contained asbestos. By having his workers demolish and remove a substantial portion of the roof in violation of the CAA's regulations, and by failing to notify the state of Kansas or the EPA in advance of the renovation activities that disturbed the RACM,

FRITZEL committed violations of the CAA.

Federal courts have held that, under similar circumstances, the enhancement under U.S.S.G. 3B1.1 should be applied. *See United States v. Chau*, 293 F.3d 96, at 103 (3rd Cir. 2002) (applying 3B1.1(c) because defendant controlled the actions of two other individuals who illegally removed or disposed of asbestos); *United States v. Chernis*, No. 16-Cr.-30033 (C.D. Ill. sent. Feb. 5, 2018) (applying 3B1.1(c) because defendant controlled the actions of another individual who illegally removed or disposed of asbestos); *See also U.S. v. Technic Services, Inc.*, 314 F.3d 1031, 1048 (C.A.9 (Alaska), 2002) (affirming application of four-level enhancement under 3B1.1 where defendant led five or more people in illegally removing or disposing of asbestos); *United States v. Bragg*, 207 F.3d 394, at 400-401 (7th Cir. 2000) (affirming application of four-level enhancement under 3B1.1 in Clean Air Act asbestos prosecution). Since the offenses involved more than two persons, each of whom was aware of the illegality of their conduct, a two-level enhancement should be applied to the defendant's U.S.S.G. sentence calculation.

### IV.    Offense Level

Based on the foregoing, the government believes the final offense level applicable in this case is "20."

### IV.    Criminal History and Sentencing Guideline Range

Based on a total offense level of 20 and a criminal history category of I, the resulting sentencing guideline range between thirty-three (33) and forty-one (41) months.

The government respectfully requests that this Court impose a sentence of imprisonment of between 33 and 41 months.

## ARGUMENT

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary."   Those factors are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution.

### I.      Advisory Guideline Range

In *Rita v. United States*, 127 S. Ct. 2456 (2007), the Supreme Court restated that the goals of the United States Sentencing Commission in formulating the Sentencing Guidelines are to carry out the objectives of 18 U.S.C. § 3553(a).   Despite being advisory, rather than mandatory, the Guidelines remain an important factor in fashioning a just sentence.   As the Supreme Court stated, "[i]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."   *Id*. at 2464-65.   Even after *United States v. Booker*, 543 U.S. 220 (2005), district courts remain obligated to consult and accurately calculate the guideline

24

range in each case.   *See Booker*, 543 U.S. at 264 (noting that the "district courts, while not bound to apply the guidelines, must consult those Guidelines and take them into account when sentencing").

As explained above, the United States submits that the in this case the appropriate offense level is 20, which corresponds to an advisory Guideline range sentence of imprisonment for 33 to 41 months.

**II.      Sentencing Factors Pursuant to 18 U.S.C. § 3553**

Once this Court arrives at the calculated guideline range for the defendant, which encompasses the base offense level as well as the enhancements, the Court must then consider the factors in § 3553, as discussed above, in exercising its post-*Booker* discretion.   The goal of this provision is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a).   The purposes of sentencing as set forth in section 3553(a)(2) are:

> "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

### III.   **Analysis of § 3553 Factors**

An analysis of the sentencing factors pursuant to 18 U.S.C. § 3553 indicates that the defendant merits a sentence of not less than 21 months.

### 1.   *Nature and Circumstances of the Offense*

The defendant's conduct was serious, involving both dangers to public health and efforts to deceive regulatory officials. Knowing that the roof of the private clubhouse contained a layer of asbestos containing material concerning enough to the previous ownership of the Alvamar Country Club that they opted to encapsulate the old roof rather than shoulder the cost of removal and replacement, he nonetheless directed that a significant portion be destroyed by workers using heavy machinery and power tools, in a manner that resulted in the repetitive and ongoing release of asbestos fibers into the environment. The defendant failed to notify the KDHE or the EPA of the renovation activity that disturbed the RACM, and he failed to ensure that the RACM was contained, adequately wetted, and disposed in leak-tight containers in accordance with federal and state law. Even after the KDHE visited the site on October 13, 2016, he allowed renovation work to continue, including further cutting of the roofline that contained RACM, and allowed shipments of construction debris to be removed from the site and disposed in a non-asbestos designated landfill site, in direct contravention to KDHE instructions. Further, he did not caution the site's workers of the dangers of asbestos exposure or give them respirators to protect their lungs from the asbestos fibers inevitably

entrained in the air of the work space (nor did he even suggest that they wear such protection).

FRITZEL placed his desire to renovate the Alvamar/Jayhawk Club as quickly as possible and to save money above any concern for the health of the men he had hired to renovate the structure. As a result of the defendant's criminal conduct, the workers hired for the renovation job in all likelihood were exposed to dangerous asbestos fibers, and these toxic fibers inevitably drifted out of the building into the environment, and likely were carried home on the workers' clothing to contaminate the environment and potentially endanger the workers' families.

2.    *Characteristics of Defendant*

Any consideration of the defendant's characteristics warrants a stiff sentence. FRITZEL exhibited a complete disregard for the legal requirements of the federal asbestos regulations, as well as the health and welfare of the workers he had hired to renovate the Alvamar/Jayhawk Club private clubhouse. He ignored the multiple notices that the building's roof contained asbestos – save to seek indemnification from the former Alvamar ownership – and directed others to demolish a significant portion of the roof without taking even a semblance of precautions when he knew that asbestos materials were present in the structure. When discussing the matter with his architect Paul Werner (who had been copied on the Herries email), FRITZEL told him he would take care of the situation. However, even after being provided the 2008 positive sample analysis results from the former Alvamar owners, the only step he took prior to the dismantling of the

roof was to send his son to collect a piece of black tar paper and submit it for laboratory analysis, in a transparent attempt to cover his actions. Furthermore, the defendant failed to provide respirators to the site workers, and failed to make water available to wet down the asbestos debris and to ensure that it was at all adequately contained. Even after KDHE inspected the site on October 13, 2016, he allowed work to continue, including the illegal removal of inadequately contained debris to the landfill and further cutting of the existing roof. Even after meeting in person with KDHE officials on October 19, 2016 and he understood the need to hire a licensed asbestos contractor to supervise and remove the preexisting debris piles and dumpsters located on site, he allowed multiple loads of debris to be removed to the landfill, where they were disposed in non-asbestos approved cells.

Moreover, the defendant engaged in repeated efforts to deceive regulators and conceal his offenses. Despite having been told multiple times of the asbestos and nonetheless proceeding with the renovation activity, when interviewed by KDHE officials on October 19, 2016, he disingenuously claimed a lack of knowledge of asbestos.

FRITZEL has exhibited both a callous disregard for the health and safety of the renovation crew he hired and for the public, and a cavalier willingness to deceive regulatory inspectors. The evidence summarized above indicates that FRITZEL was motivated by both greed and a desire to cover up his blatant disregard of environmental

legal requirements. Any consideration of the defendant's characteristics militates in favor of a stiff prison sentence.

### 3.     Deterrence to Criminal Conduct

The defendant was particularly cavalier in his commission of the offenses of which he was convicted. Therefore, a sentence of 33 to 41 months imprisonment is necessary to deter him from committing similar violations of the federal asbestos laws in future renovation projects. Moreover, there are many other similarly-situated persons who must be deterred from mimicking the defendants' actions.

### 4.     Protection of the Public from Further Crimes by the Defendant

The instant offenses, while not crimes of violence, potentially endangered others through exposure to carcinogenic asbestos fibers. Any consideration of public protection militates in favor of sentencing the defendant to a term of imprisonment.

### 5.     Types of Sentences Available/Sentencing Guidelines

The United States' recommended sentence of 33 to 41 months is a term of incarceration comparable with or shorter than sentences handed down in other recent cases involving criminal violations of the federal asbestos regulations.   For example, in *United States v. Chernis*, No. 16-Cr.-30033 (C.D. Ill. Feb. 5, 2018), the defendant was sentenced to thirty-seven months in prison after pleading guilty to three criminal violations for illegal removal, demolition, and disposal of asbestos. In *United States v. Duane L. O'Malley*, Dkt. No. 2:10-cr-20042-MPM (July 25, 2012), the defendant was sentenced to ten years in prison following his conviction for similar criminal offenses. In

*United States v. Robert Joe Knapp et al*., No. 4:10-CR-00025 (S.D. Iowa, June 22, 2011),

the defendant received a sentence of forty-one months imprisonment after pleading guilty

to a criminal violation of the federal asbestos regulations and a related conspiracy charge.

And, in *United States v. Charles Yi et al*., Nos. 2:10-CR-00575 and 00793 (C.D. CA,

June 6, 2011), the primary defendant, Charles Yi, was sentenced to forty-eight months

incarceration, after being convicted by a jury on five Clean Air Act criminal charges and

a related conspiracy count,all stemming from his involvement in the renovation of an

apartment building in January and February of 2006.

The United States is not suggesting that the facts in the instant matter are identical

to those present in the *Chernis, O'Malley*, *Knapp* or *Yi* cases. However, the sentences

handed down in those cases illustrate the seriousness of criminal violations of the

asbestos laws which FRITZEL knowingly transgressed in the instant matter. Therefore, a

sentence that includes a meaningful term of imprisonment is necessary in this case.

> 6.     *Need for Restitution*

The United States is not aware of the need for restitution in this case.

> 7.     *Fine*

In addition, the United States respectfully requests that the Court impose a

criminal fine consistent with 18 U.S.C. §§ 3571 and 3572. The counts for which

defendant has been convicted each carry a fine of up to $250,000. However, under

U.S.S.G. § 5E1.2(c)(3), a criminal fine in an amount between $15,000 and $150,000 is

appropriate.   The government respectfully requests that the Court impose a fine of

between $15,000 and $150,000 on the defendant, especially in light of the fact that FRITZEL collected as much as $100,000 from the former Alvamar owners in indemnification despite his choice to flagrantly disregard the federal asbestos laws. Moreover, in the course of engaging in his criminal conduct, FRITZEL avoided expending significant costs associated with the proper abatement and disposal of the bulk of the asbestos debris that he had illegally delivered to the Hamm Landfill. A significant criminal fine is warranted to prevent the defendant from profiting from his crimes.

## CONCLUSION

In conclusion, a sentence of 33 to 41 months imprisonment for defendant FRITZEL would serve the goals articulated by Congress, in that it would represent a sentence "sufficient, but not greater than necessary." Given the seriousness of the defendant's conduct, and the nature of the crime, this sentence is fully supported by the factors under Section 3553. In addition, the United States respectfully requests that this Court order the defendant to pay a fine of between $15,000 and $150,000.

Respectfully submitted,

s/Richard L. Hathaway for
Thomas Beall, Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515
District of Kansas
444 SE Quincy, Suite 290
Topeka, KS 66683
(785) 295-2850
(785) 295-2953 (fax)

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 21st day of January, 2020, the

foregoing motion was electronically filed with the Clerk of the Court using the CM/ECF

electronic filing system, which sent notification of such filing to all counsel of record.

s/Richard L. Hathaway for
Thomas Beall, Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515
District of Kansas
444 SE Quincy, Suite 290
Topeka, KS 66683
(785) 295-2850
(785) 295-2953 (fax)